IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 21-cr-00268-RBJ

UNITED STATES OF AMERICA,

        Plaintiff,

v.

**CLIFFORD LEWIS**,

        **Defendant.**

---

## MOTION TO SUPPRESS EVIDENCE

---

Clifford Lewis, through counsel, Assistant Federal Public Defender Laura H. Suelau, respectfully requests this Court suppress all evidence obtained as the result of his illegal arrest and the illegal search of his vehicle. While standing outside his car, Mr. Lewis was approached by police officers, guns drawn. The officers then handcuffed and involuntarily placed him in the back of a police car while they conducted additional investigation. During that time, police had neither a warrant for his arrest, nor probable cause to arrest him. Knowing that, police officers told him repeatedly he was not under arrest, but his detention far exceeded the permissible scope of a *Terry* stop.

Within minutes (perhaps seconds) of police initiating the encounter, Mr. Lewis's detention became an illegal arrest. After that illegal seizure, police searched Mr. Lewis's car. But for his illegal arrest, his car would not have been searched. Therefore, Mr. Lewis requests this Court suppress all evidence found in that search – the fruit of his illegal arrest.

**FACTUAL BACKGROUND[1]**

At approximately 1:19PM on April 22, 2021, an employee of Circle K gas station at 2500 W. Eisenhower Boulevard called 911 to report that drivers of two cars –a Nissan and a green Dodge Durango with a trailer – had an altercation at the gas station. According to the 911 caller, the driver of the Dodge Durango had a gun, and the driver of the Nissan nearly ran him over. The caller described the driver of the Dodge as "younger" with a beard, hat, and glasses. The Loveland Police Department was dispatched.

In the course of responding to the call, officer Evan Dunlap saw a green Dodge Durango with a trailer pulled over on the shoulder of the 2000 block of W. 8th Street, Loveland, Colorado, next to a river, and approximately one mile from the Circle K. A man, later identified as Clifford Lewis, was standing outside the car, allegedly "digging" in the driver's seat area.[2] Officer Dunlap asked Mr. Lewis if he had a gun. Mr. Lewis responded "no," and lifted his shirt to demonstrate that he did not. Officer Dunlap asked Mr. Lewis if he'd been in an altercation at the Circle K, he responded "no."[3] At this point, officers Nicholas Corrigan and Joshua Marner arrived on scene in two separate SUVs. Officer Dunlap then gave Mr. Lewis directives to walk toward the back of the Durango, put his hands on top of his head, and spread his feet, all while Officer Dunlap had his gun trained on Mr. Lewis. Mr. Lewis complied with each of those commands. Officer Corrigan frisked and handcuffed Mr. Lewis and

---

[1] The facts contained herein are based on discovery provided by the government, including police reports, body worn camera (BWC), and surveillance video. Video from the BWC of two officers was provided. The reports of seven other officers indicate that they too recorded video, but that was not discovered to Mr. Lewis. Should those videos exist and materially impact the instant motion, Mr. Lewis will move to supplement this motion.

[2] Of the four on-scene, only the BWC of Sergeant Roberts, who arrived after Mr. Lewis was handcuffed, frisked, and placed in the backseat of a police car, was provided in discovery. Therefore, everything before Sgt. Roberts's arrival is based on police reports.

[3] Officer Dunlap's report says he asked about "Diamond Shamrock (Circle K)," but his exact wording is unknown.

placed him in his patrol car. The frisk revealed a knife. Mr. Lewis asked if he was under arrest and was told he was not. Just after Mr. Lewis was handcuffed, officer Dunlap searched Mr. Lewis's car, looking "underneath the driver's seat, and in the immediate reach and did not see a gun in plain view." At approximately 1:29PM, Sergeant Matt Roberts arrived, activated his BWC and captured officer Corrigan telling Mr. Lewis, "you are not under arrest right now, just give me a second to move my car." At 1:31PM, officer Corrigan moved his car with Mr. Lewis handcuffed in the back. At the same time Sgt. Roberts, the fourth officer on-scene, looked into the Durango through an open rear window and with a flashlight and did not see anything.

For the next several minutes, the four officers discussed next steps with each other and Mr. Lewis. The officers reviewed Mr. Lewis's outstanding warrants and officer Corrigan determined they were non-extraditable. After making this determination, at 1:34PM, officer Corrigan turned from Mr. Lewis to Sgt. Roberts and said "we've got nothing, right?" Sgt. Roberts responded "we have to search that car…I think we need to frisk it at least." Officer Corrigan returned to Mr. Lewis, again told him he was not under arrest and "not going to jail on the warrant," but instructed him to put his legs inside the car so he could shut the door (again). Mr. Lewis obeyed the command but pleaded with the officers saying, "guys, come on, please man." The officers responded by telling him to watch his toes and slamming the door shut. Sgt. Roberts commented, "I don't want him interrupting."

After shutting the door on Mr. Lewis, the officers again discussed whether they had enough to "frisk [the car] at least."[4] A few minutes later, officer Corrigan pulled Mr. Lewis, still handcuffed, out of the police car and frisked him again. Sgt. Roberts told Mr. Lewis they were going to search the

---

[4] Sgt. Roberts relayed what an officer on-scene at the Circle K had told him about the surveillance video. He told the other three officers; a gun could be seen "clear as day." That was not true. The on-scene officer said the person in the gas station surveillance video looked like he was "concealing the gun."

3

Durango. Mr. Lewis responded "no, I have other people's property in there and I don't know what's in my car so I am not giving you permission to search my car." Roberts replied, "we are not asking for permission." Mr. Lewis continued to deny consent to search, following up with "well you can't just search my car like that…I know my rights." At some point, before being advised of his *Miranda* rights, Mr. Lewis told the officers: "I did not have a gun, I had my phone in my hand when I got out of my car…I was trying to talk to my friend to see who was following me… I had my phone in my hand."

Sgt. Roberts persisted, telling Mr. Lewis they were going to *Terry* Frisk his car, "we have evidence…or at least suspect that a firearm is involved." To which Mr. Lewis responded, "I didn't have one." Officer Roberts continued, "so what we are doing is investigating that allegation, there are alot of different laws, this one specifically is a *Terry* frisk, if we have evidence that people have guns we get to frisk you and the vehicle to ascertain." He continued, "you can frisk people's car based on *Terry v. Ohio*."

At 1:40PM Mr. Lewis, still handcuffed, was returned to the back of officer Corrigan's vehicle and told "you are not under arrest." Seconds later, officers Dunlap and Marner began to search Mr. Lewis's car.

## APPLICABLE LAW

"The Fourth Amendment provides that 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." *Terry v. Ohio*, 392 U.S. 1, 8 (1968). The "seizure" of a "person," under the Fourth Amendment refers to an arrest. *Torres v. Madrid*, 141 S. Ct. 989, 996 (2021).

There are three types of police/citizen encounters: consensual encounters, investigative stops, and arrests. *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000). The least intrusive is a so-called

"consensual encounter." *Id.* The most intrusive is an arrest. *Id.* An investigative detention, or "*Terry* stop," falls in the middle. It is a seizure within the meaning of the Fourth Amendment, but unlike an arrest, it need not be supported by probable cause. *Id.* Because it need not be supported by probable cause, the permissible scope of an investigative stop is limited, "[*Terry*]created a narrowly drawn exception to the probable cause requirement for lesser intrusions into an individual's liberty." *U.S. v. King,* 990 F.2d 1552, 1557 (10th Cir. 1993). The police can stop, briefly detain, and frisk a person for investigative purposes if the stop is "justified at the inception" by "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *Id.* (internal citations omitted). They cannot, however, "[when] a person…is no more than suspected of criminal activity…carry out a full search of the person or of his automobile or other effects." *Florida v. Royer,* 460 U.S. 491, 500 (1983).[5] Instead, after determining whether a stop was justified at its inception, a court must determine whether the officer's actions during the stop were "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio,* 392 U.S. 1, 21 (1968).

The permissible scope of the intrusion varies based on "the particular facts and circumstances of each case." But, "this much, however, is clear: an investigative detention must be temporary and last no long than is necessary to effectuate the purpose of the stop." *Royer,* 460 U.S. at 500. *Royer* continues, "the investigative methods employed should be the least intrusive means reasonably available to dispel the officer's suspicion in a short period of time." *Id.* The scope and duration of an investigative stop must be carefully tailored to its underlying justification. *King,* 990 F.2d at 1559.

Not only are investigative stops limited in scope and time, but the police "cannot seek to verify their suspicions by means that approach the conditions of an arrest." *Royer,* 460 at 499. An arrest,

---

[5] In other words, there is no such thing as a "*Terry* frisk" of a car.

5

versus a de minimus intrusion, occurs when "an officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *U.S. v. Mendenhall*, 446 U.S. 544, 552 (1980). *Mendenhall* concludes the key question is whether "a reasonable person would have believed that he was not free to leave." Although police are allowed to take some steps necessary to protect their personal safety during a *Terry* stop, those actions are limited. Any display of force must be supported by "circumstances that reasonably warrant such measures." *United States v. Melendez-Garcia,* 28 F.3d 1046, 1053 (10th Cir. 1994). The use of firearms, handcuffs, and other forceful techniques during a stop transform a *Terry* stop into an illegal arrest in "most scenarios." *Id.* When such techniques are unwarranted, they transform an investigative stop into an arrest and an arrest is "a more serious intrusion on [one's] personal liberty than is allowable on mere suspicion of criminal activity." *Royer,* 460 U.S. at 502.

It is the government's burden to demonstrate that the seizure of a defendant was based on reasonable suspicion and that it was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure. *Melendez-Garcia*, 28 F.3d at 1052.

Here, the stop of Mr. Lewis was not justified at the inception, it was not reasonably limited in scope, and the conditions of the stop almost immediately converted the detention into an arrest.

## ARGUMENT

### I.   Mr. Lewis's detention was not justified at the inception.

When officer Dunlap pulled up behind Mr. Lewis, he knew only that the car Mr. Lewis was standing next to matched the description of one involved in an "altercation," and that the driver of the Durango was alleged to have had a gun. No license plate was provided by the 911 caller to match with the car. Immediately, Mr. Lewis denied having a gun and showed officer Dunlap his waist band to demonstrate the same. At that point, there was no reasonable articulable suspicion that criminal

6

activity was afoot, and Mr. Lewis should have been allowed to leave. Instead, he was detained while police continued to investigate.

## II.     The investigative detention of Mr. Lewis exceeded its permissible scope.

Assuming arguendo that the *Terry* stop of Mr. Lewis was justified at its inception, it far exceeded the time and means necessary to effectuate the purpose of that stop. The officers certainly did not employ the least intrusive means reasonably available to dispel their suspicions in a short period of time. Indeed, all of the least intrusive means were exhausted before Sgt. Roberts arrived and activated his BWC at 1:29PM. Those means should have dispelled the officers' suspicions. Nonetheless the detention and investigation continued.

Before 1:29PM, Mr. Lewis told officers he did not have a gun. He complied with officer commands and was frisked, revealing a knife, not a gun. The officers then placed Mr. Lewis in the back of a police car and (impermissibly) searched the driver's seat of his car. Again, they did not find a gun or see anything suspicious in plain view. At that point (before 1:29PM), all evidence indicated either that Mr. Lewis was *not* the person from the Circle K, or that he did not have a gun, as alleged. But Mr. Lewis remained handcuffed in a police car.

## III.    Mr. Lewis's detention was not a *Terry* stop, but an illegal arrest.

Despite being told numerous times he was not under arrest (because the police knew they did not have probable cause to arrest him), Mr. Lewis was under arrest. For at least eleven minutes before the search of his car, he was handcuffed in the back of a police car, with the door closed at various times. Mr. Lewis was under arrest from the moment officer Dunlap took out his firearm and aimed it at Mr. Lewis while officer Corrigan handcuffed him, frisked him, and placed in the back of a police

7

vehicle. *See United States v. Melendez-Garcia,* 28 F.3d 1046, 1053.[6] All signs thereafter also evidence that Mr. Lewis was under arrest.

First, officer Corrigan moved his car approximately 20 feet with Mr. Lewis handcuffed inside and clearly unable to leave. Second, at no point during his detention did the officers tell Mr. Lewis he was free to leave. The opposite, he was shut (likely locked) in the police car several times despite apparent pleas to leave. *See U.S. v. Hill,* 626 F.2d 429, 435–36 (5th Cir. 1980).[7] Although Mr. Lewis repeatedly asked the officers if he was under arrest, and they said he was not, they never uncuffed him or otherwise indicated he could drive away. Third, the officers asked Mr. Lewis questions throughout his time handcuffed, even after resolving the basic question of whether he had a gun. The highly intrusive precautionary measures employed, displaying a firearm, placing Mr. Lewis in handcuffs, and locking him in a police car, all demonstrate that even if the *Terry* stop was lawful at the inception, it quickly become an arrest without probable cause, in violation of the Fourth Amendment. Assurances that he was not under arrest were meaningless, Mr. Lewis was not free to leave.

**IV.     *Terry* does not allow for the search of vehicles.**

The Tenth Circuit and Supreme Court disagree with Sgt. Roberts' characterization of *Terry*. In fact, they've unequivocally condemned the actions of the officers here: "in the name of investigating a person who is no more than suspected of criminal activity, the police may not carry out a full search

---

[6] *See U.S. v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993); *See also United States v. Merkley,* 988 F.2d 1062, 1064 (10th Cir.1993) (holding officers' display of firearms and use of handcuffs was reasonable only when informed suspect threatened to kill someone and observed suspect violently pounding fists); *U.S. v. Burciaga-Burciaga*, 147 Fed. Appx. 725, 730 (10th Cir. 2005) (unpublished) (holding officers' conduct during stop appropriate *in relation* to perceived threat when officers displayed their weapons only as long as necessary to ensure the vehicle and its occupants posed no threat).

[7] Finding an investigative detention turned into arrest when interrogation was not "brief" or "on-the-spot", defendant was never informed he was "free to go," and defendant would have been physically restrained if he had refused to comply with officers' commands.

of the person or of his automobile or other effects." *Royer,* 460 U.S. 491 499. Instead, police must have probable cause to search a vehicle. *See United States v. Jurado-Vallejo,* 380 F.3d 1235 (10th Cir. 2004). Even if there was such a thing as a "vehicle frisk" justified by reasonable suspicion alone (and there is not), that frisk was already conducted by both officers Dunlap and Sgt. Roberts. Dunlap looked under the driver's seat and in plain view. Roberts looked through an open rear window and shined his flash light into other windows. Any suspicions of criminal activity were therefore dispelled. No reasonable suspicion, let alone probable cause, existed to search the car.

## V.   The evidence found during the search of Mr. Lewis's vehicle was fruit of Mr. Lewis's illegal detention.

Even assuming there was probable cause to search the car, the vehicle search was tainted by Mr. Lewis's unlawful seizure. Evidence found in Mr. Lewis's car was the fruit of that seizure and should be suppressed. *See Wong Sun v. United States,* 371 U.S. 471 (1963).

When a search follows a Fourth Amendment Violation, the government must establish a "break in the causal connection between the illegality and the evidence thereby obtained." *Melendez-Garcia,* 28 F.3d at 1053. But for Mr. Lewis's illegal seizure, Mr. Lewis's vehicle would not have been searched. Instead, he would and should have been on his way. The Supreme Court in *Wong Sun v. U.S.* cautioned "the history of the use, and not infrequent abuse, of the power to arrest cautions that a relaxation of the fundamental requirements of probable cause would 'leave law-abiding citizens at the mercy of the officers' whim or caprice." 371 U.S. 471, 479 (1963). Such whims were evident in this case. The evidence seized from Mr. Lewis's car was the "fruit" of his illegal seizure. That evidence cannot be used as proof against the victim of a search and should be suppressed. *Id.* at 484.

9

**CONCLUSION**

For the forgoing reasons, this Court should suppress all evidence derived from the unlawful seizure of Mr. Lewis and the subsequent search his car.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender


<u>s/Laura H. Suelau</u>
LAURA H. SUELAU
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
laura.suelau@fd.org
Attorney for Defendant

**CERTIFICATE OF SERVICE**

  I hereby certify that on **December 9, 2021**, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

  Rajiv Mohan, rajiv.mohan@usdoj.gov
  Assistant United States Attorney

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

  Clifford Lewis (U.S. Mail)

            s/Laura Suelau
            LAURA SUELAU
            Assistant Federal Public Defender
            633 17th Street, Suite 1000
            Denver, CO  80202
            Telephone:  (303) 294-7002
            FAX:  (303) 294-1192
            laura.suelau@fd.org
            Attorney for Defendant