IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 21-cr-00268-RBJ

UNITED STATES OF AMERICA,

    Plaintiff,

v.

CLIFFORD LEWIS,

    Defendant.

## RESPONSE TO MOTION TO SUPPRESS

    The United States of America submits this response to defendant Clifford Lewis's motion to suppress, which the Court should deny for the reasons given below.

## BACKGROUND

    In the early afternoon of April 22, 2021, an employee at a Circle K gas station in Loveland called 911 to report that the driver of a forest green Dodge Durango, with a trailer, had pointed a gun at the driver of a black Nissan Altima. According to the caller, the Altima nearly ran over the driver of the Durango, who then pointed a handgun at the car. The caller said that the driver was the only occupant of the Durango, and described him as younger, with a beard, wearing a hat and sunglasses. She said that she saw him drive away southbound on Wilson Avenue.

    Loveland Police Department officers responded to the area. At 1:19 PM, Officer Evan Dunlap located a forest green Dodge Durango—with a trailer—parked on the shoulder of the 2000-block of W. 8th Avenue, by the river. Dunlap saw a man, with a

1

beard, wearing a hat, standing next to the car (no sunglasses). The map below illustrates the lay of the land, and how close the Durango was to the gas station.



Dunlap turned on his overhead lights, pulled behind the Durango, and got out of his car. Meanwhile, other officers arrived. Dunlap told the man to put his hands on top of his head. Instead, the man reached toward his waistband, which prompted Dunlap to say, "don't reach for anything dude." Dunlap pulled out his gun. Dunlap told him again to put his hands on top of his head, and the man complied. Dunlap told the man to walk backwards and to his left. Officer Nicholas Corrigan then told the man to get on his

knees.  Corrigan placed the man in handcuffs and put him in the back of a police car.  Corrigan told the man he was being detained so that officers could investigate further.

Meanwhile, at about 1:28 PM, Officer Erin Berry responded to the gas station.  She immediately spoke with an employee who showed her surveillance footage of the incident.  The employee points out that, "you can see him pull the gun."  Over the radio, Berry conveyed what she saw on the footage, namely that "the male goes across the parking lot, the black Nissan drives towards the male, and he pulls out a gun, but you can see him conceal the gun as he's walking towards it."  Berry spoke with and obtained written statements from three employees who saw the incident.  She also recorded the surveillance footage and sent it to Corrigan and Sergeant Matthew Roberts.  Here is a photo from the surveillance footage of the man pointing the gun at the Altima.



3

Back at the Durango, Corrigan had dispatch run the plates on the car and the name Clifford Lewis came back. Dispatch further advised that Lewis had an outstanding warrant. Dispatch would later advise that Lewis was a convicted felon and had other outstanding warrants. In response to Lewis's questions, Corrigan explained the situation at the Circle K and why officers had responded. Corrigan again told Lewis he was not under arrest. Lewis said he knew nothing about a gun and seemed to deny that he was "Clifford." Corrigan went back to his computer to look into the nature of the warrant. Then Roberts explained to Corrigan what was on the surveillance video. At this point, officers decided to "frisk" the car. Lewis told the officers that he did not want them to search the car. Roberts explained to him why the officers were doing so. Corrigan read Lewis his *Miranda* rights. Lewis maintained he did not know anything about having a gun and that he did not know who the person in the black Altima was.

Dunlap and Officer Paul Ashe then began to look inside the Durango. They found a shoulder holster and loaded magazine near the front-passenger seat, along with a lower received in a box next to the driver's seat, and ammunition. Dunlap found what officers believed to be a suspected explosive device and paused the search. Ashe asked the Northern Colorado Bomb Squad for help. A technician arrived and took custody of the device. Officers resumed the search and found various firearm parts and accessories, ammunition, suspected silencers, a .22 caliber revolver, a short-barreled shotgun, drug paraphernalia, and a small amount of suspected methamphetamine. Corrigan placed Lewis under arrest for unlawful possession of a firearm.

Lewis is charged with being a felon-in-possession of a firearm, in violation of 18

U.S.C. § 922(g)(1).  He now moves to suppress the evidence found in the car.[*]

## ARGUMENT

Lewis argues that his detention and the search of his car violated the Fourth Amendment.  This Court should deny the motion because Lewis was detained in accordance with the Fourth Amendment, and the search of the car was justified on a number of grounds.

**I.     Lewis was detained in accordance with the Fourth Amendment.**

As for the detention, Lewis contends that the officers lacked reasonable suspicion to detain him in the first place, that they then exceeded the scope of a permissible investigative detention, and that their conduct converted the detention into an unlawful arrest unsupported by probable cause.  Each argument is meritless, as explained in turn below.

**A.     The officers had reasonable suspicion to detain Lewis.**

To make an investigative stop, or what is commonly known as a *Terry* stop, officers need reasonable suspicion, based on the totality of the circumstances, that the person may be involved in criminal activity.  *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015).  Reasonable suspicion must be "particularized and objective," but it "is not, and is not meant to be, an onerous standard."  *Id.* (cleaned up).  It "requires 'considerably less' than a preponderance" and exists "even if it is more likely than not that the individual is *not* involved in any illegality."  *Id.* (cleaned up).   Reasonable

---

[*] The government is submitting the Loveland Police Department reports as Exhibit 1; Officer Dunlap's body-cam footage as Exhibit 2; Officer Corrigan's body-cam footage as Exhibit 3; and Officer Berry's body-cam footage as Exhibit 4.

suspicion is viewed objectively "from the perspective of the reasonable *officer*"—not the defendant—with the actual officers' knowledge. *United States v. Guerrero*, 472 F.3d 784, 787 (10th Cir. 2007) (cleaned up).

Here, the officers received a call that a man with a beard and a hat pointed a gun at the black Altima and then drove away in a forest green Dodge Durango with a trailer. This was putative criminal activity the officers were entitled to investigate. *See* C.R.S. §§ 18-3-206 (felony menacing with a real of simulated weapon) & 18-12-106(1)(a) (crime to "knowingly and unlawfully aim[ ] a firearm at another person"). When the officers encountered Lewis, they saw that he had a beard and a hat, and was standing by a forest green Dodge Durango with a trailer just a short distance from the gas station and a short time after the incident. These facts establish reasonable suspicion that Lewis was involved in criminal activity, namely, the incident at the gas station. *See United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003) ("[P]olice observation of an individual, fitting a police dispatch description of a person involved in a disturbance, near in time and geographic location to the disturbance, establishes a reasonable suspicion that the individual is the subject of the dispatch.").

Lewis's responses miss the mark. He says that no license plate number "was provided by the 911 caller to match the car." Mot. 6. But reasonable suspicion does not require certainty. It exists even when it is more likely that someone is *not* involved in criminal activity. *Pettit*, 785 F.3d at 1379. There may have been no license plate number provided, but Lewis matched the caller's description down to the beard and hat, and the Durango matched down to the color and trailer. If that were not enough, the

6

officers found Lewis and the Durango in close proximity to the gas station shortly after the incident. All this was enough to establish reasonable suspicion, whatever minimal uncertainties might have remained.

Lewis also says that he denied having a gun and showed Dunlap his waistband to prove it. But reasonable suspicion is viewed from the perspective of the reasonable officer and takes "into account an officer's reasonable inferences based on training, experience, and common sense." *United States v. Garcia*, 751 F.3d 1139, 1143 (10th Cir. 2014). Common sense suggests that putative criminals do not always tell the truth about their criminal activity, and nothing in the Fourth Amendment requires officers to take a suspect's word and cease all investigation. In fact, the purpose of an investigative detention is to allow officers to "take additional steps to investigate further." *Hiibel v. Sixth Judicial Dist. of Nev., Humboldt County*, 542 U.S. 177, 185 (2004). Lewis did lift up his waistband, but that was not the only place where there could have been a gun, and officers "need not rule out of the possibility of innocent conduct" anyway. *United States v. Arvizu*, 534 U.S. 266, 277 (2002).

### B. The officers did not exceed the scope of an investigative detention.

Lewis next contends that, even if the detention was justified at the start, the officers exceeded its permissible scope because they "did not employ the least intrusive means reasonably available to dispel their suspicions[.]" Mot. 7. The problem with this argument is that the Fourth Amendment does "not require [officers] to use the least intrusive means in the course of a detention, only reasonable ones." *United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994). Lewis specifically says that

officers were forestalled from any further investigation after he said he did not have a gun and a frisk did not turn up one. Again, however, the officers were not required to take Lewis's word as the final one. As explained below, moreover, their further investigative steps were justified under the Fourth Amendment.

### C. The officers' actions did not turn the detention into an arrest.

Lewis goes on to say that the means of detention—displaying firearms, putting him in handcuffs, and placing him in the back of a police car—converted the *Terry* stop into an arrest that required probable cause.

"'Under certain circumstances, the steps officers may permissibly take to protect their safety'" during a *Terry* stop "include drawing their weapons, placing a suspect in handcuffs, or forcing a suspect to the ground." *United States v. Mosley*, 743 F.3d 1317, 1329 (10th Cir. 2014) (cleaned up). They also include placing the detainee in the back of a police car. *United States v. Burciaga-Burciaga*, 147 F. App'x 725, 730 (10th Cir. 2005). These actions are permissible when a "man of reasonable caution" would believe they are "appropriate" based on the facts available at the time of the seizure. *Id.* (cleaned up).

For example, in *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993), the officers were justified in pointing their guns at a suspect and forcing him to the ground based merely on the fact that he was driving toward a house where they knew there were guns. *See id.* ("The officers knew that guns were found on the property where marijuana was being cultivated. This fact alone justifies any concern the officers had for their personal safety."). To take another example, officers employed measures similar

to the ones here in *United States v. Windom*, 863 F.3d 1322, 1333 (10th Cir. 2017), where the stop occurred in a high-crime area, and officers received "a tip that would have led a reasonable officer to believe that one of the occupants of the vehicle they had just stopped had flashed a firearm in public, *and* had also proclaimed membership in the Crips[.]"  And in *United States v. Copening*, 506 F.3d 1241, 1243 (10th Cir. 2007) (cleaned up), officers were justified in effecting a "felony takedown" when they encountered a suspect and car in a location that lined up with an anonymous tip that "a bald, African-American man" exited a car with a specific license plate, dropped a pistol outside of a convenience store, picked the pistol back up, and stashed it in the car.  Thw felony takedown procedure was virtually identical to the one employed here.[†]  At bottom the risk that the suspect was armed justified the measures taken.  *Id.* at 1248 ("The safety risk attendant to detaining the truck's occupants on a suspected weapons violation along justified the use of handcuffs[.]").

      The same risk was on full display here.  The officers reasonably suspected that Lewis was armed or otherwise had ready access to a firearm.  They were, after all, responding to a report that a man who matched Lewis's description pulled out a gun and drove away in a car that matched Lewis's car in the direction where Lewis was

---

[†] *Copening*, 506 F.3d at 1245 ("Officer Dupler described the felony takedown procedure as follows: the officers (1) exit their cruisers, staying behind their driver's-side door, with their guns drawn; (2) obtain a view of the occupants' hands; (3) direct the driver to throw the vehicle's keys on the ground, using only their left hand; (4) order the occupants to exit the vehicle, one at a time, with their hands above their head; (5) tell the suspects to back up, *i.e.,* facing away from the officers, toward the police cruisers; and (6) handcuff the suspects, either standing, kneeling, or in a prone position, from behind. Throughout the takedown officers keep guns fixed on both the vehicle and the suspects.  In this case, at least six officers participated in the felony takedown.")

found shortly after the incident. On top of that, when Dunlap told Lewis to put his hands on his head, Lewis instead reached for his waistband, which amplified the officer-safety concerns. It was only at that point that Dunlap raised his gun, and the measures that Lewis challenges followed.

### D. Officers had probable cause to arrest Lewis anyway.

Even if there were an arrest, the officers had probable cause to support it. Probable cause is, of course, is more demanding than reasonable suspicion, but likewise does not require certainty. Rather, "probable cause exists when under the totality of the circumstances there is a reasonable probability that a crime is being committed." *United States. v. Traxler*, 477 F.3d 1243, 1247 (10th Cir. 2007) (cleaned up). Officers need not "rule out all innocent explanations" for probable cause to lie. *Rife v. Oklahoma Dep't of Pub. Safety*, 854 F.3d 637, 644-45 (10th Cir. 2017).

Here, the officers had probable cause that the conduct at the gas station was criminal. C.R.S. §§ 18-3-206 & 18-12-106(1)(a). In this vein, "an officer's assessment … need not be perfect because the Fourth Amendment allows for some mistakes on the part of government officials, including reasonable mistakes of law." *United States v. Diaz*, 854 F.3d 197, 203 (2d Cir. 2017) (cleaned up); *see also Heien v. North Carolina*, 574 U.S. 54, 61 (2014); *Herring v. United States*, 555 U.S. 135, 139 (2009).

The officers also had probable cause that Lewis was the man at the gas station. To see why consider *United States v. Soza*, 686 F. App'x 564, 567 (10th Cir 2017), where the Tenth Circuit contrasted the insufficient facts there with the sufficient facts in two other cases involving how closely a suspect must match a description for probable

10

cause to exist, *Chambers v. Maroney*, 399 U.S. 42 (1970) and *United States v. Miller*, 532 F.2d 1335 (10th Cir. 1976).  In *Chambers*, probable cause existed because "officers knew that the perpetrators of an armed robbery were driving a blue compact station wagon, that four people were in the station wagon, that one of the station wagon's occupants was wearing a green shirt, and that another of the station wagon's occupants was wearing a trenchcoat."  *Soza*, 686 F. App'x at 567.  Similarly, in *Miller*, "the officers knew that the unidentified perpetrators of a bank robbery were driving a black over gold or tan Cadillac" with a specific license plate number and "that the two perpetrators were wearing distinct or unusual items of clothing[.]"  *Id.*  In contrast to these two cases, all the officers had in *Soza* was "an adult Hispanic male who was wearing a baseball cap and a grey sweatshirt."  *Id.* at 566.  The Tenth Circuit reasoned that the specificity in *Chambers* and *Miller*, "from a purely statistical perspective, had a much higher probability of positively identifying the perpetrators."  *Id.* at 567.

What was true in *Chambers* is also true—even more true—here.  In both cases, you have a description of the car, the number of occupants, and their physical appearance.  Here, you have the additional distinguishing characteristic of the trailer.  As the Tenth Circuit observed about *Chambers*, "the chances the officers would have discovered *two* individual blue compact station wagons in the vicinity carrying four people, two of whom were wearing a green shirt and a trenchcoat, would have been substantially unlikely."  *Soza*, 686 F. App'x at 567.

Equally, what were the chances that officers would have found another forest green Dodge Durango, with a trailer, a short trip away from the gas station, a short while

11

after the incident, with one man who had a beard and was wearing a hat?

## II.     The search of the car was in accordance with the Fourth Amendment.

As for the search of the car, Lewis says that such a search must be supported by probable cause, and nothing less.  He further contends that, even if the search here was supported by probable cause, the evidence seized was the fruit of his unlawful detention and must be suppressed.  These arguments fail as well.

### A.     The search was justified as a protective one for weapons.

Lewis asserts that there is no such thing as a "vehicle frisk" under *Terry* and takes issue with the officers' assertions along those lines on the body-cam footage.‡  In his view, evidently, all searches of cars must be supported by probable cause.

Specific nomenclature aside, in connection with a *Terry* stop, officers may conduct a protective search of a car on less than probable cause and indeed on reasonable suspicion.  To wit, officers may search a car, "limited to those areas in which a weapon may be placed or hidden," on a "reasonable belief" that a "suspect is dangerous and [ ] may gain immediate control of weapons."  *Michigan v. Long*, 463 U.S. 1032, 1049 (1983); *see also United States v. Palmer*, 360 F.3d 1243, 1246 (10th Cir. 2004).  At the risk of repetition, this belief must be "particularized and objective" but "need not rule out the possibility of innocent conduct."  *United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004) (cleaned up).  "Evidence falling considerably short of a preponderance satisfies this standard."  *United States v. Winder*, 557 F.3d 1129, 1134

---

‡ The officers' subjective justifications are irrelevant.  *See, e.g.*, *Devenpeck v. Alford*, 543 U.S 146, 153 (2004)

(10th Cir. 2009) (cleaned up).

Here, the officers had reason to believe that Lewis was dangerous and could gain immediate control of weapons for many of the reasons that justified both his detention in the first instance and the measures officers used in connection therewith, which need not be recited in detail again. Ultimately, the officers responded to a report of a man who pulled a gun at gas station—unquestionably dangerous conduct—and discovered a suspect who matched the report shortly thereafter in the area. That there was no gun on Lewis's person only increased the chance that it was in the car. That he might have thrown it in the river is of no moment, since officers need not rule out the possibility of innocent conduct. *Vercher*, 358 F.3d at 1261.

It does not matter that Lewis was handcuffed and in the back of a police car during the search. While there must exist the possibility that the suspect could gain immediate control of weapons, the relevant time period is not limited to while the search is being conducted. Rather, "the time period during which the detainee 'may gain immediate control' is the entire period from the initial stop to the detainee's departure." *Palmer*, 360 F.3d at 1246. Moreover, "the fact that the detainee is 'under the control' of officers does not eliminate the risk that he will gain access to a weapon." *Id.* As the Supreme Court put it in *Long*, "if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside." 463 U.S. at 1052. That risk was present here and justified the search.

**B.     The search was supported by probable cause.**

Under the so-called automobile exception to the Fourth Amendment's warrant

13

requirement, officers may search a car without a warrant where they have probable cause to believe the car contains contraband or evidence of a crime. *United States v. Bernard*, 680 F.3d 1206, 1210 (10th Cir. 2012). At the risk of further repetition, probable cause requires a "fair probability that the car contains contraband or evidence." *Bernard*, 680 F.3d at 1210. (cleaned up). The standard is an objective one. *United States v. Lopez*, 849 F.3d 921, 928 (10th Cir. 2017). And it is based on the "facts available" to the officer. *Florida v. Harris*, 568 U.S. 237, 243 (2013) (cleaned up).

Here, for all the reasons that officers had probable cause to arrest Lewis for the incident at the gas station, they had probable cause to search the car. That is to say, if officers had the necessary certainty that Lewis pulled a gun at the gas station, they had the necessary certainty that the car would contain evidence of that crime. The car was present at the scene of the crime. So at the very least, there was probable cause that it would contain evidence of ownership and occupancy, which would constitute evidence of crime (to say nothing of firearms, firearm parts, ammunition, and so forth).

**C.     If Lewis was arrested, the search was lawfully incident to that arrest.**

If the Court concludes that the officers' conduct turned Lewis's detention into an arrest, and that the arrest was supported by probable cause, the subsequent search of the car was justified by *Arizona v. Gant*, 556 U.S. 332 (2009). Under *Gant*, officers may search a car incident to arrest "when it is reasonable to believe that evidence of the offense of arrest may be found in a vehicle." *Id.* at 335. Lest this justification be duplicative of the otherwise available automobile-exception, the standard "requires less than probable cause" and "is akin to the 'reasonable suspicion' standard required to

14

justify a *Terry* search." *United States v. Vinton*, 594 F.3d 14, 25 (D.C. Cir. 2010). If, as just argued above, the officers had probable cause to believe the car contained evidence of the incident at the gas station, they necessarily had the reason to believe the same.

**D.     If there was probable cause to search the car, the evidence seized was not the fruit of any unconstitutionality as to the detention.**

Lewis contends that even if there were probable cause to search the car, the evidence seized was the fruit of the supposedly poisonous detention and must be suppressed. Of course, Lewis's detention comported with the Fourth Amendment, which renders any fruit safe for consumption. Besides, any problem with the detention would not taint a search of the car based on probable cause. "At a minimum," Lewis must show that "the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct." *United States v. Nava-Ramirez*, 210 F.3d 1128, 1132 (10th Cir. 2000). Here, recall, that officers came across the Durango parked on the shoulder with Lewis outside of it. If the officers had probable cause to search the car, they could have done so irrespective of his detention or the means employed therewith. That severs any putative causal chain between the detention and the search of the car as justified on this ground.§

## CONCLUSION

The Court should deny the motion to suppress.

---

§ The same perhaps cannot be said for the other grounds, based on *Long* and *Gant*, which are connected with the detention. *See* 6 Wayne LaFave et. al., *Search & Seizure: A Treatise on the Fourth Amendment* § 11.4(d).

Dated:  December 23, 2021

Respectfully submitted,

COLE FINEGAN
United States Attorney

By:  s/ *Rajiv Mohan*
Rajiv Mohan
Assistant U.S. Attorney
U.S. Attorney's Office
1801 California Street, Suite 1600
Denver, CO 80202
Telephone: 303-454-0100
Fax:  303-454-0406
E-mail:  Rajiv.Mohan@usdoj.gov

Attorneys for Government

## **CERTIFICATE OF SERVICE**

      I hereby certify that on December 23, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record in this case.  I further certify that the conventionally submitted materials included in this filing have also been served on counsel of record, who has received such materials in discovery.

Laura Suelau                                  Laura_Suelau@fd.org

By: s/ *Rajiv Mohan*
Rajiv Mohan
Assistant U.S. Attorney
U.S. Attorney's Office
1801 California Street, Suite 1600
Denver, CO 80202
Telephone: 303-454-0100
Fax:  303-454-0406
E-mail:  Rajiv.Mohan@usdoj.gov