IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 21-cr-00268-RBJ

UNITED STATES OF AMERICA,

       Plaintiff,

v.

**CLIFFORD LEWIS**,

       **Defendant.**

---

**DEFENDANT'S REPLY TO GOVERNMENT REPONSE TO
MOTION TO SUPPRESS EVIDENCE**

---

Clifford Lewis, through counsel, Assistant Federal Public Defender Laura H. Suelau, submits this reply to the government's response to his Motion to Suppress Evidence. Docs. 35, 26.

**FACTUAL BACKGROUND**

As outlined in his Motion to Suppress, and Motion to Reply/Supplement, the government did not provide Mr. Lewis with Exhibits 2, 3, and 4, and approximately 15 other body-worn camera videos until *after* the filing of his Motion to Suppress Evidence. Upon review of those videos, Mr. Lewis submits the following modified factual background of his illegal seizure.

At approximately 1:19PM on April 22, 2021, an employee of Circle K gas station at 2500 W. Eisenhower Boulevard called 911 to report that drivers of two cars –a Nissan and a green Dodge Durango with a trailer – had an altercation at the gas station. According to the 911 caller, the driver of the Dodge Durango had a gun, and the driver of the Nissan nearly ran him over. The caller described the driver of the Dodge as "younger" with a beard, hat, and glasses. The Loveland Police Department was dispatched.

1

In the course of responding to the call, Loveland police officer Evan Dunlap saw a green Dodge Durango with a trailer pulled over on the shoulder of the 2000 block of W. 8th Street, Loveland, Colorado, next to a river, and approximately one mile from the Circle K. A man, later identified as Clifford Lewis, was standing outside the car, allegedly "digging" in the driver's seat area.

Officer Dunlap's body-worn camera was activated at 1:24PM, after officer Joshua Marner also arrived on scene and one or both officers asked Mr. Lewis to step to the back of his car. Before that, Officer Dunlap apparently asked Mr. Lewis if he had a gun. Mr. Lewis responded "no," and lifted his shirt to demonstrate that he did not. Officer Dunlap asked Mr. Lewis if he'd been in an altercation at the Circle K, he responded "no."

As a third officer, Nicholas Corrigan, arrived on-scene, officer Dunlap began to give Mr. Lewis directives to put his hands on top of his head and spread his feet, all while his gun was trained on Mr. Lewis. Mr. Lewis complied with each of those commands. The government states that Mr. Lewis "reached toward his waistband," implying that Officer Dunlap did not pull out his gun until that occurred. However, it is not clear when Dunlap drew his weapon, nor is it clear that Mr. Lewis was reaching for his waist. Instead, it appears Mr. Lewis simply did not hear Dunlap's initial command. Exhibit 2. In any event, officer Corrigan drew his firearm immediately upon arrival and trained it on Mr. Lewis despite the fact that he was already standing with his hands on his head, in compliance with Dunlap's commands. Exhibit 3.

Officer Corrigan frisked and handcuffed Mr. Lewis. Corrigan was non-responsive to Mr. Lewis's questions about why he was being placed in handcuffs. Instead, officer Corrigan again asked Mr. Lewis if anyone else was in his car and if there were weapons in his car – Mr. Lewis responded "no." Mr. Lewis persisted asking why he was being detained and officer Corrigan responded by

verbally and physically forcing him into the patrol car (stating "get in the car" no less than six times), taking Mr. Lewis's keys from his waistband, and shutting the door.[1]

After shutting and locking a hand-cuffed Mr. Lewis in a patrol car, the three officers approached the Durango. The officers looked through an open rear-window, and in the open driver's-side door. They looked in and under the driver's seat, leaning well into the confines of the car, and saw "nothing." One of the officers stated, "I don't see a gun under the seat, but [that] doesn't mean there's not one." The officers then speculated, not for the first time, that any firearm might have been thrown in the river directly next to the Durango.

At 1:29PM, approximately five minutes after first detaining Mr. Lewis, officer Corrigan opened the door to his patrol car and re-engaged Mr. Lewis. A minute later, he shut Mr. Lewis in patrol car a second time, stating "you are not under arrest right now, just give me a second to move my car." He moved his car from behind the Durango and trailer to in front of the Durango with Mr. Lewis handcuffed in the back. Corrigan then opened the door and reinitiated questioning Mr. Lewis, asking "so did he point a gun at you?" To which Mr. Lewis responded, "I don't know what they're talking about with a gun."

At 1:30PM officer Berry and a gas station attendant reviewed the surveillance video. Both remarked about the poor quality of the surveillance video – "it's hard to see," and "yeah, these cameras are not the greatest." Officer Berry joked, in reference to her vision that she had "old eyeballs." And both concluded they could not read the license plate of the car that tried to run over Mr. Lewis. Nonetheless, at 1:31PM Berry relayed (after viewing the video a single time) "it looks like the male in the Durango[…] he pulls out a gun."

---

[1] It appears the "knife" that was found in initial frisk was actually a non-concealed "neck knife" Mr. Lewis was wearing as a necklace.

Back on-scene, officer Corrigan determined that Mr. Lewis's out-of-state misdemeanor warrant was non-extraditable. At 1:34 PM officer Corrigan concluded, "alright cool, let me get you out of the handcuffs." But Mr. Lewis was never uncuffed. Instead, a fourth officer, Sgt. Matthew Roberts stopped Corrigan, telling him "we need to search that car…I think we need to frisk it at least." Officer Corrigan returned to Mr. Lewis, again told him he was not under arrest and "not going to jail on the warrant," but instructed him to put his legs inside and shut him inside the car for a third time. Mr. Lewis obeyed the command but pleaded with the officers saying, "guys, come on, please man." The officers responded by telling him to watch his toes and slamming the door shut. Sgt. Roberts commented, "I don't want him interrupting."

After shutting the door on Mr. Lewis, the officers discussed whether they had enough to "frisk [the car] at least." Sgt. Roberts relayed that officer Berry said the gun could be seen "clear as day," on surveillance and "there's an altercation." That was not what officer Berry said, nor was that true. Two of the officers discussed that there was "no victim" and they did not know whether or not Mr. Lewis was a prohibited person. Nonetheless, at 1:35 Roberts concluded: "let's search the car for a gun…I think we got at least enough to detain him." The officers then split up, with Corrigan and Roberts returning to Mr. Lewis and Marner and Dunlap searching the Durango.

Sgt. Roberts told Mr. Lewis they were going to search the Durango. Mr. Lewis responded "no, I have other people's property in there and I don't know what's in my car so I am not giving you permission to search my car." Roberts replied, "we are not asking for permission." Mr. Lewis continued to deny consent to search, following up with "well you can't just search my car like that…I know my rights." At some point, before being advised of his *Miranda* rights, Mr. Lewis told the officers: "I did not have a gun, I had my phone in my hand when I got out of my car…I was trying to talk to my friend to see who was following me… I had my phone in my hand." Sgt. Roberts was

4

undeterred, telling Mr. Lewis they were going to *Terry* Frisk his car, "we have evidence…or at least suspect that a firearm is involved." To which Mr. Lewis responded, "I didn't have one." Officer Roberts continued, "so what we are doing is investigating that allegation, there are alot of different laws, this one specifically is a *Terry* frisk, if we have evidence that people have guns we get to frisk you and the vehicle to ascertain." He continued, "you can frisk people's car based on *Terry v. Ohio*."

At 1:40PM, while officers were searching the Durango, the Mr. Lewis was forced back into officer Corrigan's car, and the door was shut a fourth time. Again, he was told "you are not under arrest right now, you are just being detained." At 1:43PM the officers established that Mr. Lewis was a convicted felon and, after finding a firearm in his car, told him he was under arrest for "being in possession of a firearm."

## ARGUMENT

### I. Mr. Lewis's encounter with police was an arrest without probable cause from the outset.

Mr. Lewis does not concede that police had reasonable suspicion to conduct a *Terry* stop. But that question is virtually moot because the stop quickly became an illegal arrest. Mr. Lewis's encounter with the police crossed the line between *Terry* stop and arrest at 1:24PM when officer Dunlap's initial conversation with Mr. Lewis was accompanied by two additional officers, drawn weapons, handcuffs, and the forceful placement of Mr. Lewis into a police car.

The government frames the police officers drawing their weapons and handcuffing Mr. Lewis as a question of whether or not such actions can be "permissible" during a *Terry* stop. That is not the proper analysis. The question is whether their actions exceed what was reasonably necessary under the totality of the circumstances – did the circumstances of Mr. Lewis's stop "warrant such measures"? If not, they converted the stop to an arrest. *U.S. v. Melendez-Garcia,* 28 F.3d 1046, 1052. (10th Cir. 1994). Therefore, it is useful to examine what police knew about Mr. Lewis and the circumstances of the

5

crimes alleged at the time three officers, weapons drawn, placed him in handcuffs and shut him in the back of a police car.

### A. Mr. Lewis was being investigated for a misdemeanor.

At the point at which officer Dunlap first approached Mr. Lewis (before 1:24PM), he knew Mr. Lewis was driving a car that matched the description of a car from the Circle K and that the driver of that car was both accused of aiming a gun and identified as the victim of an attempted vehicular assault. The government cites Colorado Revised Statutes § 18-3-206 (menacing), and § 18-12-106 (1)(a) (misdemeanor aiming of a firearm), as the conduct the police were investigating when they approached Mr. Lewis. Of note, menacing requires placing "another person in fear of imminent or serious bodily injury," yet the driver of the other car did not call 911 and had not been identified. The police officers on-scene, who are charged with knowing the law they enforce, clearly understood that there is no menacing without a victim. First an officer expressed concern about the continuing an investigation with "no victim," and later one reiterated "we don't have a victim." It was not until nearly twenty minutes after Mr. Lewis's detention began that the police began to consider whether there might be some other crime to investigate – including whether Mr. Lewis was a prohibited person. However, at 1:25PM, when Mr. Lewis was first instructed to put his hands on his head, police were investigating a victim-less menacing, and a misdemeanor aiming of a firearm. If there was reasonable suspicion, it existed only as to the misdemeanor aiming. Therefore, the scope of the *Terry* stop should have been limited to the "goal" of investigating that crime. *Melendez-Garcia,* 28 F.3d at 1051.

### B. Mr. Lewis was immediately cooperative and compliant.

When officer Dunlap approached Mr. Lewis, he was on the driver's side of his car, but willingly and calmly engaged with Dunlap, complying with the request to step to the back of his car. When two other officers arrived, at least one of them immediately drew his firearm. Officer Dunlap then drew

and kept drawn his firearm as Mr. Lewis complied with all officer commands: "put your hands on top of your head…turn around…spread your feet…don't move… walk backwards to the sound of my voice…keep walking back…stop…take some steps to your left…keep stepping left…get on your knees."[2] Throughout those directives, and as he was being hand cuffed, Mr. Lewis was calm and compliant. A frisk of Mr. Lewis did not reveal a firearm. Mr. Lewis both denied (again) having a firearm and denied that there was another person in the car. Nonetheless, the police placed him, handcuffed, in the back of a police car and shut the door – refusing to answer his questions and using physical force to shove him in the car.

Under a totality of the circumstances, including – the nature of the crime alleged, the dearth of evidence, and Mr. Lewis's behavior – the level of force and measures used on Mr. Lewis were not reasonable. But the police did not end their so-called *Terry* stop there, they continued the intrusion on Mr. Lewis's liberty while they conducted an illegal search, one that undercut any reason to believe Mr. Lewis had committed a crime.

### C. The first illegal search of Mr. Lewis's car weakened any claim of reasonable suspicion.

The government conflates what happened after Mr. Lewis was shut in the police car for the first time, the protective sweep of his car for weapons, with the later search of the car. Doc. 36, at 12. They are distinct searches and require different levels of legal scrutiny. They are related only because the first search underscores the illegality of the second search.[3]

---

[2] Although the government and the officers on-scene rely heavily on a brief apparent reach towards his waist, it is clear from the video that Mr. Lewis simply did not hear the officer's initial command to put his hands on his head and he immediately complied when the officer raised his voice. *See* Exhibit 2, at 0:20 (corresponding with 19:25:00 AXON BODY 2).

[3] Mr. Lewis did not challenge the first search, although illegal, because nothing of evidentiary value was found. It is the second search that is the subject of Mr. Lewis's suppression motion.

At 1:27PM police searched Mr. Lewis's car for the first time for approximately a minute and found nothing. That first search "a protective search for weapons…" was of the type that would permissible be under *Michigan v. Long* and *United States v. Palmer* if it were "limited in the sense that the officer conducting the protective search must first have reasonable suspicion that the suspect is dangerous, and the protective sweep must be directed only to locations which may contain a weapon to which the suspect my have access." 360 F.3d 1243, 1248 (10th Cir.).[4] But the facts of *Palmer* clearly distinguish that circumstance from Mr. Lewis's, rendering the first search impermissible. In *Palmer,* the police and a witness observed Mr. Palmer trying to hide something in the glove box after the police initiated a traffic stop and the police had information that Mr. Palmer was an "ex-convict" who was armed and dangerous. Here, the police had no knowledge of Mr. Lewis's criminal history or if he was known to be armed and dangerous. Although Mr. Lewis was apparently reaching under the driver's seat, it was clearly not for the purpose of concealing anything as he did not know officer Dunlap was approaching.

The first illegal search is significant because it demonstrates the gross illegality of the second search that occurred ten minutes later. First, it is evidence that the officers here were not acting reasonably from the inception. Instead, they conducted a protective sweep of Mr. Lewis's car without the requisite reasonable suspicion. Second, the illegal search contradicted their suspicion that Mr. Lewis did, in fact, possess and aim a gun. No gun was found in, under, or around the driver's seat and none could be seen through the other windows. Third, the scope of the first search clearly demonstrates that the second search, the one the officer's called a "*Terry* frisk" cannot fairly be

---

[4] The officers in *Palmer* were permitted to sweep the glove compartment because there was ample evidence that Mr. Palmer tried to hide something in the glove box before the police officer approached. d

8

characterized as a "protective sweep" of the type contemplated *Palmer* because that type of search had already occurred.

## II. Mr. Lewis's detention became more than a *Terry* stop after the first illegal search.

Assuming, but not conceding, that police had reasonable suspicion when they first put Mr. Lewis in handcuffs, and further assuming, but not conceding, that handcuffing him at gunpoint and shutting him in a police car while they searched his car was reasonably within the scope of a *Terry* stop – that *Terry* stop should have ended after the first search concluded at 1:28:33. Not only did they not have probable cause, but any reasonable suspicion had clearly dissipated. Their investigation demonstrated there was *not* a reasonable probability that a crime was committed. Mr. Lewis's statements that he did not have a firearm and he was alone in the car had proven truthful, he was compliant with police commands, and he should have been released. He was not. With even less reason to believe that he'd committed either § 18-3-206 (menacing) or § 18-12-106 (1)(a) (aiming a firearm) than when they'd initially approached Mr. Lewis, police continued to keep him in custody and investigate.[5]

Over the next ten minutes, Mr. Lewis was told repeatedly he was not under arrest, likely because the police *knew* they did not have probable cause to arrest him. Nonetheless, he was shut in the police car on three more occasions, he was never permitted to leave the confines of police car (only have the door open), and the handcuffs were never removed. The police had possession of his car keys and at all times between three and four police officers stood between him and his car. He was not free to leave and yet justification for the narrowly draw scope of an investigative detention had

---

[5] Importantly, Officer Berry did view the contents of the "not very good" surveillance footage until minutes after the first search of the car and she did not send the officers on-scene the video until after they searched Mr. Lewis's car the second time.

long evaporated. *See U.S. v. King,* 990 F.2d 1552, 1557 (10th Cir. 1993). Mr. Lewis was unlawfully seized.

### III. The search of Mr. Lewis's car was not lawful.

The government advances three arguments to justify the second search of Mr. Lewis's car. None provide the requisite justification.

#### 1. The second search of the car was not a "protective sweep."

First, the government alleges the search of the car was a protective sweep for weapons. As outlined *supra,* a protective sweep for weapons did occur and no weapons were found. The second search (the one Mr. Lewis challenges) cannot accurately be characterized as a protective sweep pursuant to *Terry* and *Michigan v. Long.* Not only because that search had already occurred, but also because "in the name of investigating a person who is no more than suspected of criminal activity, the police may not carry out a full search of the person or of his automobile or other effects." *Royer,* 460 U.S. 491 499. The second search of Mr. Lewis's car was a full search. Police must have probable cause to conduct a full search and they did not. *See United States v. Jurado-Vallejo,* 380 F.3d 1235 (10th Cir. 2004).

#### 2. The search of the car was not supported by probable cause.

Next the government argues that the search was supported by probable cause. That argument fails for multiple reasons. First, it fails because there was not probable cause to believe the car contained evidence of a crime – either menacing or aiming a firearm.[6] After the first fruitless search, the officers heard from officer Berry about "not very clear" surveillance video. But her report did not

---

[6] The government's argument concerning probable cause of "ownership and occupancy" almost does not warrant response, not in the least because Mr. Lewis never denied ownership or occupancy of the car. Nor does occupying a car that was at the scene of an alleged crime itself constitute a crime.

make it any more likely that a gun would be found in the car. Cutting against that probability was the officers' own repeated speculation that if Mr. Lewis *did* have a gun, it was likely in the river next to the car. They also had Mr. Lewis's statement that it was a cell phone, not a gun, in his hand. The officers conduct and statements before and during the search demonstrate that even they did not think they had probable cause. If Sgt. Roberts thought there was probable cause to search Mr. Lewis's car, he would not have gone to tortured lengths to characterize the second search as a "frisk" and part of a *Terry* stop rather than a search supported by probable cause. *See* Exhibit 3, at 11:55 (19:36).

Second, even if this Court finds the police did eventually develop probable cause to search the car, there was no break in the causal connection between the illegality of Mr. Lewis's arrest and the evidence obtained in the search of the car. Mr. Lewis's illegal seizure began, at the latest, at 1:28PM. *See supra,* I. Developing probable cause after-the-fact cannot cure an initial illegality. *See United States v. Shrum,* 908 F.3d 1219, 1231 (10th Cir. 2018). Indeed, *Wong Sun* and the suppression doctrine exist to disincentivize police committing illegalities in the name of eventually obtaining evidence. *See* Doc. 35.

### 3. The search of Mr. Lewis's car was not a lawful search incident to arrest.

The government's final argument is that the search of the car was a "lawfully incident to arrest." This argument also fails. First, it requires Mr. Lewis's arrest to be lawful and supported by probable cause. It was not. However, even if this Court finds that Mr. Lewis was under arrest (despite being told several times he was not) and that arrest was legal, such an arrest does not justify the search of Mr. Lewis's car. Contrary to the government's erroneous interpretation, *Arizona v. Gant* held: "police [may] search a vehicle incident to a recent occupant's arrest *only* when an arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." 556 U.S. 332,

343 (2009)(emphasis added).[7] Mr. Lewis's entire motion is the result of the fact that he was secured long before the time of the search and far from reaching distance of the passenger compartment of the car. Like in *Gant,* "neither the possibility of access nor the likelihood of discovering offense-related evidence authorized the search in this case." *Id.* at 344.

### IV.     The evidence found during the search of Mr. Lewis's vehicle was fruit of Mr. Lewis's illegal detention.

The fact that Mr. Lewis was not actively driving at the time of his illegal seizure does not break the causal connection between that detention and the search of his car. When officer Corrigan initially forcefully removed Mr. Lewis's keys from his waist, Mr. Lewis asked "what are you doing? Why are you taking my keys?" and repeatedly asked "why are you all stopping me?" Mr. Lewis explained he merely stopped to look for his cigarettes. Absent his illegal seizure, Mr. Lewis would have found his cigarettes, gotten back in his car, and driven away. Evidence obtained after that seizure is fruit of the poisonous tree and should be suppressed. *See Wong Sun v. United States,* 371 U.S. 471 (1963).

---

[7] *United States v. Vinton,* 594 F.3d 14 (D.C.Cir. 2010) cited by the government is both non-binding and factually inapposite. In *Vinton,* the defendant was properly stopped on a traffic violation, the officer was working alone, and the officer saw another knife within reaching distance of the driver, thus justifying the search for additional weapons.

## CONCLUSION

For the forgoing reasons, this Court should suppress all evidence derived from the unlawful seizure of Mr. Lewis and the subsequent search his car.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender

s/Laura H. Suelau
LAURA H. SUELAU
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
laura.suelau@fd.org
Attorney for Defendant

**CERTIFICATE OF SERVICE**

  I hereby certify that on **January 13, 2022**, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

  Rajiv Mohan, rajiv.mohan@usdoj.gov
  Assistant United States Attorney


and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

  Clifford Lewis (U.S. Mail)


            s/Laura Suelau
            LAURA SUELAU
            Assistant Federal Public Defender
            633 17th Street, Suite 1000
            Denver, CO  80202
            Telephone:  (303) 294-7002
            FAX:  (303) 294-1192
            laura.suelau@fd.org
            Attorney for Defendant