1                IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF COLORADO

3
     Criminal Action No. 21-CR-00268-RBJ
4

5    UNITED STATES OF AMERICA,

6            Plaintiff,

7            vs.

8    CLIFFORD LEWIS,

9            Defendant.

10   ------------------------------------------------------------

11                    REPORTER'S TRANSCRIPT
                        Motions Hearing
12
     ------------------------------------------------------------

13
             Proceedings before the HONORABLE R. BROOKE JACKSON,
14   Senior Judge, United States District Court for the District of
     Colorado, commencing on the 28th day of January, 2022, in
15   Courtroom A902, United States Courthouse, Denver, Colorado.

16                           APPEARANCES

17   For the Plaintiff:
     RAJIV MOHAN, U.S. Attorney's Office, 1801 California St., Ste.
18   1600, Denver, CO 80202

19   For the Defendant:
     LAURA H. SUELAU, Office of the Federal Public Defender, 633
20   Seventeeth St., Ste. 1000, Denver, CO 80202

21

22

23

24
         Sarah K. Mitchell, RPR, CRR, 901 19th Street, Room A252,
25                  Denver, CO 80294, 303-335-2108

             Proceedings reported by mechanical stenography;
                  transcription produced via computer.

21-CR-00268-RBJ        Motions Hearing        01/28/2022    2

1                *       *        *        *         *

2         (The proceedings commenced at 9:01 a.m.)

3              THE COURT:  This is United States versus Lewis,

4    21CR268.  This is a hearing on the defendant's motion to

5    suppress, ECF No. 35.  The Court is conducting the hearing

6    remotely for several reasons.  Number one, obviously the

7    pandemic and the difficulties that places on everyone.  Now

8    we've lost somebody.

9              MS. SUELAU:  Your Honor, I believe we lost Mr. Lewis.

10   I'll see if he's having any issues reconnecting.

11             THE COURT:  There he is.  As I was saying, the reason

12   we're doing it remotely is because of the pandemic and the

13   desirability to avoid in-person hearings when we can.  Second,

14   we have the consent of all parties to proceed remotely in this

15   hearing.  Third, I happen to be in Arizona this morning which

16   explains why I'm not wearing a robe.  I don't have one here.

17   What you see is the best I've got as of today.

18             Let me have your appearances.

19             MR. MOHAN:  Good morning, Your Honor.  Rajiv Mohan

20   and Albert Buchman for the United States.

21             MS. SUELAU:  Good morning, Your Honor.  Laura Suelau

22   on behalf of Clifford Lewis, and Mr. Lewis is present.  He is

23   out of custody, so he's appearing from his halfway house.

24             THE COURT:  Okay.  Thank you all.  I've read your

25   papers, and I think I understand the issues.  Does the

21-CR-00268-RBJ        Motions Hearing        01/28/2022    3

1   Government intend to present some evidence today?

2           MR. MOHAN:  Your Honor, the parties have agreed that

3   the Court can admit and consider the exhibits we submitted

4   with our response as the basis of the record for this motion

5   and proceed to argument on that record, and in addition to

6   that, we do not intend to produce any further evidence.

7           THE COURT:  Okay.  Given that, what I'd like to do

8   then is using my notes that I've taken from your respective

9   documents, I'd like to try to summarize what I think the facts

10  are so that you folks in turn can set me straight on anything

11  that I've misunderstood.  Is that acceptable?  I think

12  Mr. Mohan said yes, but he was muted.

13          MR. MOHAN:  Yes, Your Honor.  That is correct.

14  Sorry.

15          THE COURT:  And, Ms. Suelau?

16          MS. SUELAU:  Yes, Your Honor.

17          THE COURT:  All right.  So here's -- here's what I

18  took from your papers.  On April 22nd, 2021, employees at a

19  Circle K in Loveland called 911 and described an incident that

20  had just occurred.  This was in the early afternoon of that

21  day.  The employee indicated that the driver of a forest green

22  Dodge Durango with a trailer had just pointed a gun at the

23  driver of the Nissan Altima there at the Circle K gas station

24  area.  And she described the driver as younger, having a

25  beard, wearing a hat and wearing sunglasses.  And she claimed

1    that the driver of the Durango after pointing the gun at the

2    Nissan which appeared to be driving at him drove away

3    southwest on Wilson Avenue.

4            At approximately 1:19 p.m. -- and incidentally, I

5    will note here that in the defendant's motion the defendant

6    said that the employee called at approximately 1:19 p.m.  In

7    the Government's document it states that Officer Dunlap

8    responded and at 1:19 p.m. he located a forest green Dodge

9    Durango with the trailer on the shoulder of the 2000 block of

10   West 8th Avenue.  Now, I mention those two times to indicate

11   that according to your papers the employee's call and Dunlap

12   spotting the Durango occurred at the same time.  That wouldn't

13   be the case.  I'll simply infer that they were relatively

14   approximate but not at the same time.

15           Officer Dunlap observed in addition to the green

16   Dodge Durango with the trailer on the shoulder was a man with

17   a beard and a hat, although no sunglasses there.  The location

18   of the Dodge Durango on the shoulder on West -- was on

19   West 8th a little bit southeast of the Circle K, approximately

20   one mile away from the Circle K and alongside a ditch.  Dunlap

21   apparently stopped and inquired whether the driver had a gun

22   and at some point had been in an altercation at the Circle K.

23   The driver indicated no.  Dunlap states that the driver

24   reached for something in his waistband, and at that point

25   Dunlap ordered him to place his hands on his head, which he

1  did, and to walk backwards toward him, which he did.  I

2  observed that, by the way, on the videos which were sent to me

3  and which I have reviewed.

4          The second officer, Officer Corrigan, arrived and

5  directed the driver of the vehicle to get on his knees, placed

6  him in cuffs, and placed him in back of the police car.

7  Another officer, Officer Berry, arrived at about 1:28 p.m. --

8  I'm sorry -- Officer Berry at 1:28 p.m. went to the Circle K

9  where the employee confirmed what she had said, as did other

10 employees, and there he obtained surveillance footage from the

11 Circle K, which he brought back to the scene and either

12 brought back to the scene or sent it to Officers Corrigan and

13 Dunlap and Sergeant Roberts, who by then had also reported to

14 the scene.

15          Officer Corrigan had dispatched and run the plates.

16 They discovered that there was at least one warrant

17 outstanding for the driver, who is the defendant.  And later

18 on -- well, at some point the officers decided that the

19 warrants were not extraditable, and later at some point they

20 also learned that the driver Mr. Lewis was a convicted felon

21 and had other warrants.  Corrigan at this point after learning

22 about the warrant told the driver that he was not under

23 arrest, and I note that Sergeant Roberts also at about

24 1:29 p.m. had said that he was not under arrest.

25          The defendant, by the way, has taken the position

21-CR-00268-RBJ      Motions Hearing      01/28/2022   6

1   that he was, at least at that point, under arrest because of

2   he was handcuffed, placed in a police car at gunpoint, was not

3   free to leave, and was questioned about the gun.  So there's a

4   dispute as to whether at this point he had been arrested or,

5   as the officers were stating, he was not yet under arrest.

6   The defendant in response to questions from the officers said

7   he had no knowledge of the gun.  He did not at least initially

8   acknowledge that he was, in fact, Mr. Clifford (sic).  He said

9   that he had a phone in his hand and he was trying to talk to a

10  friend to see who was following him, being that black Nissan

11  that was involved in the incident at the Circle K.

12        Officer Roberts -- I should say Sergeant Roberts told

13  the defendant what was on the surveillance video.  The

14  officers decided they were going to either, quote, frisk,

15  closed quote, or search the car.  The defendant did not

16  consent to the search.  At this point in the chronology,

17  Officer Corrigan gave Mr. Lewis his Miranda rights.  After the

18  Miranda rights had been administered the defendant again

19  stated that he had no knowledge of the gun.  Officers Dunlap

20  and Ash proceeded to search the car.

21        In the course of their search they found a shoulder

22  holster, a loaded magazine, ammunition, something that they

23  described as an explosive device which the defendant said was

24  fireworks he had purchased in Wyoming, firearm parts and

25  accessories, a suspected silencer, a .22 caliber revolver, a

1    short barrel shotgun, drug paraphernalia, and some

2    methamphetamine.  After finding those objects, the officers

3    placed the defendant under arrest charged with unlawful

4    possession of a firearm.

5            I'm looking back at my notes.  I think that covers

6    the chronology as I understand it.  Obviously there is a

7    dispute here whether there was a legitimate Terry stop,

8    whether there was an arrest, when, if so, that arrest

9    occurred, and whether these statements that were made by Mr.

10   Lewis before he was Mirandized should be suppressed, whether

11   the entire search should be suppressed, and so forth.  Those

12   are the facts as I understand them to be.

13           Mr. Mohan, are those facts, in your view, accurate?

14           MR. MOHAN:  They are, Your Honor.  I would just note

15   a couple of points.  On the timing issue, I believe I will

16   concede error on the 1:19 timestamp for Dunlap's arrival on my

17   part.  I believe Ms. Suelau is correct.  I believe that is

18   confirmed by the timestamp on the body cam which is closer to

19   1 minute 24 seconds, so I think that clears that up.  And with

20   respect to --

21           THE COURT:  Wait a minute, what time do you believe

22   the incident occurred at the Circle K?  Ms. Suelau said 1:19.

23           MR. MOHAN:  We believe that the 911 call was around

24   1:19, and that Officer Dunlap encountered the Dodge around

25   1:24, which I think is consistent with what Ms. Suelau said.

                        Sarah K. Mitchell, RPR, CRR

21-CR-00268-RBJ       Motions Hearing       01/28/2022    8

1    I think what I had mistakenly said in my briefing which the

2    Court pointed out was that those both were around 1:19.

3             THE COURT:  Okay.  I got it.

4             MR. MOHAN:  And the second point that I would just

5    offer a little bit of color on is that in terms of when

6    Officer Berry conveyed to the officers on the scene, she

7    radioed what she saw on the video around 1:30, and you can

8    hear that on Exhibit 2 at about the 5-minute-32 mark, she did

9    not actually send the video until after the search of the car

10   had begun.  But with those minor points, I think I generally

11   agree with the Court's characterization.

12            THE COURT:  In other words, you say Officer Berry --

13   I'm sorry I described her as a he.  I didn't know, or didn't

14   remember -- looked at the surveillance video and then by radio

15   communicated what she had seen, but they didn't actually --

16   the officers on the scene at the shoulder on 8th Avenue hadn't

17   seen the actual video themselves until after the search.

18            MR. MOHAN:  Correct.

19            THE COURT:  All right.  Ms. Suelau, what would you

20   like to add or correct?

21            MS. SUELAU:  Your Honor, as to the timing, I agree

22   with Mr. Mohan, the only slight difference being that Officer

23   Dunlap's body camera video was activated at 1:24.  However,

24   his report, which I believe the Government submitted as

25   Exhibit 1, indicates that he had a brief conversation with Mr.

1   Lewis before the body-worn camera was activated.  That when he

2   drove up, Mr. Lewis was standing at the driver side door, and

3   then at his command walked to the back of the car, which is --

4   and they already had a brief conversation about whether or not

5   Mr. Lewis was at the Circle K, and that's when the body-worn

6   camera is activated.  So I do think it was going to be a

7   little bit before 1:24.

8           The other point I want to clarify is that Mr. Lewis

9   was not ordered to put his hands up in response to reaching

10  for his waist.  He was ordered to put his hands up and from my

11  viewing doesn't exactly hear what he's being told and motioned

12  for his waist or sort of is turning, and then they order again

13  put your hands up, and that's when he puts his hands up.  So

14  it wasn't that he was told to put his hands up in response to

15  any motioning that the officers construed as a motioning to

16  his waist.  He was being already told before any motioning to

17  put his hands up.

18          THE COURT:  Okay.

19          MS. SUELAU:  And with that, I also agree with what

20  Mr. Mohan stated about the officers on scene not having been

21  sent the -- it's not clear when they were sent the footage,

22  but it wasn't until after -- if they were sent it, it wasn't

23  until after the second search of the car.

24          THE COURT:  Okay.  All right.  So we have a set of

25  facts that I think with your comments added to them both sides

1   agree to, and I'll assume that those are the facts.  One thing

2   I haven't asked yet is whether Mr. Lewis himself wishes to

3   testify and to add or subtract anything from the facts.

4        MS. SUELAU:  No, Your Honor.  I don't intend to call

5   Mr. Lewis as a witness.

6        THE COURT:  All right.  Then the question is what is

7   the significance of all of that.  Again, if it would be

8   helpful, I will tell you what I'm thinking so that you'll know

9   what to shoot at.  I don't know what the significance is of

10  the officers telling the defendant twice he was not under

11  arrest.  Apparently the officers at least felt that he was not

12  under arrest.  The defendant believes that he was already

13  under arrest.  If, in fact, he was under arrest, then the

14  question is was there probable cause to arrest him.

15       When I look at the facts that were known to the

16  officers, they were, first, that the incident at the Circle K

17  involved the driver of a forest green Dodge Durango pulling a

18  trailer, with the driver being a younger individual with a

19  beard, a hat and sunglasses.  That description fits almost

20  exactly the description of the vehicle found by Officer Dunlap

21  on the side of the road.  It was, indeed, a forest green Dodge

22  Durango pulling a trailer.  The driver had a beard.  To me at

23  least he is a relatively younger man.  He's wearing a hat, and

24  he did not have glasses on.  But there is substantial identity

25  in terms of the description.

1    Secondly, the location of the vehicle that was found

2   on the shoulder was only a mile from the Circle K.  Third, the

3   timeframe between the 911 call and the arrival by Officer

4   Dunlap was at most five minutes, and according to Ms. Suelau,

5   less than five minutes.  And, fourth, by pointing the gun at

6   the Dodge Durango the defendant has ostensibly committed one

7   of two crimes as described by the Government in its response.

8   One is Colorado Revised Statute 18-3-206, felony menacing with

9   a real or simulated weapon, and the other is C.R.S. 18-12 -- I

10   believe it's 106(1)(a) knowingly and unlawfully aiming a

11   firearm at another person.

12    So when I combine all of those facts and that law

13   together, my impression is, as Ms. Suelau said, he was likely

14   either under arrest or at least the officers in my view had

15   probable cause to arrest him.  If I give the benefit to the

16   defendant, ironically, that he was not under arrest yet

17   despite the defendant's argument, then I would say that the

18   statements by the defendant before he received his Miranda

19   warnings that he had no knowledge of the gun, that he did not

20   acknowledge being Mr. Clifford initially, and even that he did

21   not consent to the search, that he had a phone in his hand,

22   that he was trying to talk to a friend to see who was

23   following him, all the statements that were made before he was

24   Mirandized -- well, if he was under arrest, then I guess I

25   would suppress those, wouldn't I, because he hadn't been

21-CR-00268-RBJ        Motions Hearing        01/28/2022    12

1   Mirandized.  If he wasn't under arrest -- so I guess I said it

2   backwards before.

3        If he wasn't under arrest, then those statements

4   would be potentially admissible.  But I think he probably was

5   under arrest, so I would be somewhat inclined to suppress

6   those statements, but when they gave the Miranda warnings, and

7   he repeated again that he had no knowledge of the gun, I

8   wouldn't be inclined to suppress that statement.  But my own

9   belief is that he was under arrest way back at the beginning

10  for all the reasons that Ms. Suelau said and that that would

11  cause me to exclude certain statements that he made, yes.  But

12  it seems to me that if he was under arrest, then the search

13  was probably proper incident to the arrest or as an inventory

14  search, either one.  So those are my impressions.

15        Ms. Suelau, it's your motion, so I think I should

16  give you the first opportunity to convince me that I've gone

17  astray somewhere.

18        MS. SUELAU:  Thank you, Your Honor.  I obviously

19  agree.  I think Mr. Lewis was arrested from nearly the

20  inception.  However, there was not probable cause to support

21  that arrest.  You know, I won't belabor this point because it

22  seems that Your Honor agrees on this, but if we're comparing

23  to the case on point, which is United States vs. Royer, in

24  Royer they ask Mr. Royer to come to a small room.  They

25  retained his ticket for the airplane and his driver's license,

1   and they don't tell him you're free to leave.

2           Here we have Mr. Lewis is in the back of a car.  They

3   draw their guns immediately.  You know, one of the officers in

4   his report said something -- made some sort of claim like he

5   -- he deployed his service weapon but didn't point it at Mr.

6   Lewis, and that really makes very little sense.  So to the

7   extent that the Government -- nor is it supported by the body

8   camera.  So to the extent the Government is going to claim

9   that the weapon -- their weapons weren't drawn, Your Honor

10  only needs to review the body camera.

11          They place him in handcuffs.  They take his keys, and

12  they lock him in the back of the car, and all that happens

13  within a minute or two of the body-worn camera starting and a

14  minute or two after the stop begins.  And then the question is

15  is they're framing it as a Terry stop, and I think they're

16  doing that because they don't have probable cause.  In many

17  ways it's -- they're saying we don't have probable cause, so

18  we need to frame it as a Terry stop, but they're executing all

19  of the things that would say it is an arrest.  So if we're

20  under a Terry stop, they need to use the least intrusive means

21  reasonably available, and I would say that reasonableness is

22  modified by least intrusive, not the reverse as suggested by

23  the Government.

24          And they need to do that to either dispel or verify

25  what their suspicions are, which is that Mr. Lewis not only

1  was the person at the gas station station, but, in fact, had a

2  gun.  And so if we're talking about does Mr. Lewis have a gun,

3  I think that we don't have probable cause to support that, and

4  if we're in the context of a Terry stop, they have a limited

5  amount of time and a limited scope to verify or dispel that.

6  So what we know is that when Officer Dunlap approaches, yes,

7  Mr. Lewis is close to the gas station, but I would say his

8  proximity to the gas station actually cuts against probable

9  cause of if he had a firearm at the gas station.  Someone who

10  had just pointed a gun at a gas station is going to go further

11  than a few blocks away to stop and get out of his car and look

12  for his cigarette.

13         So, you know, we have these other cases cited by the

14  Government such as *Perdue* and *Windom* where people are

15  basically fleeing from the police officers, and the police

16  say, well, there's probable cause because they're fleeing.  We

17  have the opposite of that here.  Mr. Lewis stopped close by.

18  When he's approached by Officer Dunlap, he immediately

19  complies with his directives.  He tells him I don't have a

20  gun, and he obeys all commands.  So that would cut against

21  probable cause to believe that he had, in fact, committed a

22  crime at the gas station.

23         But then we don't just have that.  We have illegal

24  search number one, which is the sweep of this car.  So instead

25  of letting Mr. Lewis leave, they take his keys, put him in

1   handcuffs in the back of the police car, and I would say that

2   was, you know -- in that the Government cites I believe it's

3   -- I'm not remembering the name -- basically that you can do a

4   sweep if you have reason to believe a person is dangerous, and

5   the case they cite to the police had information that the

6   driver was armed and dangerous.  They saw a knife immediately

7   in the car, and so under those circumstances they're allowed

8   to do a sweep of the car.  They don't have that here, but they

9   do a sweep of the car anyway.

10          And even if we, you know, set aside that that sweep

11  was not supported by the requisite things necessary to make it

12  legal, that sweep tells them, again, that their suspicion

13  should be dispelled.  The sweep is pretty extensive.  They're

14  looking in the car with their bodies in the car.  They're

15  looking under the driver's seat and through the back windows,

16  and all three of the officers who were involved in this say, I

17  don't see anything.  I don't see a gun under the seat.  And if

18  we had like any doubt that -- if we're in a Terry world, and

19  we say you have this time to verify or dispel your suspicion,

20  this is it.

21          This is 1:28 p.m. they conclude I don't see a gun

22  under the seat.  They walk back to the car to talk to Mr.

23  Lewis, and at that point he should have been let go.  That's

24  when this should have ended completely.  They did not have

25  probable cause.  They had dispelled their suspicions under

1  Terry.  But instead they just keep investigating, and you

2  cannot arrest someone for the purpose of investigating.  And I

3  want to note that it wasn't until after four minutes after

4  they do this sweep and say I don't see a gun under the seat

5  that Officer Berry replays information about the contents of

6  the security camera over the radio.

7          And I first want to point out that Officer Berry's

8  description was not accurate.  She -- you can see what she's

9  seeing on her body-worn camera.  You can hear her talking to

10 the clerk, and it's not clear that they're looking at the

11 person with a gun.  But, in any event, her relaying of that

12 information doesn't change the quantum of evidence against Mr.

13 Lewis.  They're still investigating the same thing they were

14 at the beginning, which is whether or not he has a firearm and

15 is aiming it.

16          I know that the Government alleges felony menacing.

17 Felony menacing requires another person to have actually been

18 in fear, and the officers here knew that the person in the

19 Nissan who had tried to run Mr. Lewis down in the gas station

20 did not call 911 and did not assert a gun was drawn on them.

21 So what we have strongest evidence of presumably would be the

22 misdemeanor aiming.  And I don't think that Officer Berry's

23 relaying of this information over the radio changes anything.

24 So they're still investigating the same thing they were when

25 they stopped -- started this alleged Terry stop.

1          They've also done what's required to dispel their

2    suspicion.  Mr. Lewis said he doesn't have a gun.  They don't

3    see a gun, and then other statements of his turn to be true,

4    and they say is there someone else in the car, and he says no,

5    there's not someone else in the car.  He's cooperative.  He's

6    not showing himself to be dangerous, and he should have been

7    released.

8          THE COURT:  Can I ask --

9          MS. SUELAU:  Yes.

10          THE COURT:  I didn't want to interrupt until you were

11    finished, but I have some questions.

12          MS. SUELAU:  Uh-huh.

13          THE COURT:  Do you want to finish first or do you

14    want me to interrupt you, which I already have by accident.

15          MS. SUELAU:  Either way, Your Honor.

16          THE COURT:  Just to clarify the citation you

17    mentioned, you said United States vs. Royer.  I think it's

18    *Florida vs. Royer*.

19          MS. SUELAU:  That's right, Your Honor.  It's *Florida

20    vs. Royer*.  That's my mistake.

21          THE COURT:  250 U.S. 491 (1983).  And I think the

22    point of that case, and you cite page 500, is that you can't

23    conduct a full search of the car based only on suspicion.  I

24    don't know if that's still good law or not, but you can't sort

25    of have it both ways.  You're saying this wasn't a Terry stop.

1    It wasn't just suspicion, but was an actual arrest, although

2    you deny probable cause.  But if there was an arrest, that I

3    think would probably make *Florida vs. Royer* not relevant.  Do

4    you agree or disagree?

5          MS. SUELAU:  I think that hinges on the probable

6    cause question.  *Florida vs. Royer* is still good law, and I

7    would say if there's anything, it was reasonable suspicion.

8    It's clear that the officers believe there's only reasonable

9    suspicion.  They're telling Mr. Lewis there's only reasonable

10   suspicion.  So in saying to them, well, because you conducted

11   an illegal arrest, then you get to do all the things that come

12   with an arrest, but you don't have to Mirandize him, was

13   really undercut the delineation between a Terry stop and an

14   arrest, and it would sort of incentivize this kind of illegal

15   arrest where you don't have to give Mr. Lewis the rights he's

16   entitled to, but you do get to do a search incident to arrest.

17          And as to the search of the car, I don't believe that

18   the Government has -- if you're doing a search incident to

19   arrest, if we're in that scenario, you still don't get to

20   search the car because Mr. Lewis is confined in the back of

21   the police car.  He does not have ready access to the car, and

22   they don't have probable cause to believe there's evidence of

23   a crime in the car, in large part because of this first

24   illegal sweep of the car.

25          THE COURT:  Well, you obviously do not believe that

21-CR-00268-RBJ        Motions Hearing        01/28/2022    19

1   what the officers said is significant.  The officers said you

2   are not under arrest, but you don't believe that's significant

3   because you believe the facts say that he was under arrest.

4   Oh, I think we lost her.

5            MS. SUELAU:  Can you see and hear me now?

6            THE COURT:  I can see you and hear you.  I don't know

7   if you could hear me when you were temporarily not on the

8   screen, but what I was saying was the officer said you're not

9   under arrest, but you believe he was under arrest.  So I infer

10  from that that you believe the fact that the officers say

11  you're not under arrest -- she's gone again.  She's back.

12           MS. SUELAU:  My apologies.  I think I've resolved the

13  issue.

14           THE COURT:  Okay.  I think you may have probably

15  missed part of what I was saying.  You believe -- and I think

16  I also believe -- that the fact that the officer says you're

17  not under arrest is not dispositive, right?

18           MS. SUELAU:  Yes.

19           THE COURT:  You believe, and I am inclined to agree

20  with you that he was under arrest, and the reason I think so,

21  for pretty much the same reasons you think so, they had

22  pointed their gun at him, and they had placed him on the

23  ground.  They had handcuffed him.  They had put him in the

24  police car.  When I look at the -- and at that point what they

25  believed was there was a gun in the car.  When you put that

1   together, to me it looks a lot like an arrest.  What they

2   didn't have yet was the telephone call from Berry.

3          But they did know that the employees at the Circle K

4   had called in that this man driving this vehicle had pointed a

5   gun at the Nissan Altima, which, if they didn't have probable

6   cause by now to arrest, then when Berry calls and says I've

7   seen the surveillance video and, yes, the guy did point a gun

8   at the Nissan Altima -- now, whether or not the surveillance

9   is clear, Berry communicates that to the officer at the scene,

10  so now they have confirmation from video in addition to what

11  the employee said that he had a gun.

12         And now if there was any question in my mind about

13  whether he'd been arrested now, I'm even more convinced that

14  he was arrested.  I understand that you disagree that there

15  was probable cause, and that we can debate.  But if there was

16  probable cause to arrest, and he was arrested, then that has

17  two consequences, I think.  One, he was Mirandized, and

18  therefore statements that he volunteered after that would be

19  admissible so long as they were voluntary; and, two, there are

20  two different reasons maybe more for searching the car.

21         One is they had to believe that there was a gun in

22  the car; and, two, it's a search incident to an arrest anyway;

23  and, three, because he was arrested, they could conduct an

24  inventory search of the contents of the vehicle, right?  So it

25  all comes back to whether they have probable cause to arrest.

21-CR-00268-RBJ        Motions Hearing        01/28/2022    21

1   Yes or no?

2            MS. SUELAU:  Your Honor, in some ways it does.  I

3   would point out in addition to the things that cut against

4   probable cause, we also have all of the speculation by

5   everyone on scene that if there was a gun, it had been

6   disposed of in the river, so I think that cuts against

7   probable cause.  But --

8            THE COURT:  Why?  Why?

9            MS. SUELAU:  Because --

10           THE COURT:  That's pure speculation.

11           MS. SUELAU:  Well, because at this point they've

12   looked in the car, and they didn't see a gun.  And so --

13           THE COURT:  They looked through a window, and they

14   didn't see a gun.

15           MS. SUELAU:  No.  They're looking through an open

16   driver's door leaning well across the interior of the car

17   under the seat and then looking through the back window.  This

18   is more just a peek through a window.  The door is open, and

19   they have their body in the car.  And then as to -- so even if

20   we're at, okay, Your Honor believes there was probable cause,

21   Mr. Lewis is under arrest, neither of the two things that Your

22   Honor cited would be a reason to search this car.  The first

23   is the incident to arrest, because even assuming this was an

24   arrest, first, an incident to arrest can only happen in

25   circumstance of a lawful arrest.  But you can get a search

21-CR-00268-RBJ       Motions Hearing       01/28/2022    22

1    incident to arrest of a car if the arrestee is unsecured and

2    was in reaching distance of the passenger compartment.

3              THE COURT:  I'm not sure I agree with that.  I think

4    that was once upon a time the law, but I think that law was

5    changed.  I think there's a decision by Rehnquist, if I

6    recall.

7              MS. SUELAU:  Your Honor, I believe --

8              THE COURT:  There are situations where a guy -- the

9    defendant is in a car and cuffed and the car is on its way out

10   of the parking lot, and I think the law still is that they can

11   search incident to the arrest.  Maybe that's -- maybe there's

12   something very recent that I'm not familiar with.

13             MS. SUELAU:  Your Honor, I'm referring to Arizona vs.

14   Gant.  That's 556 U.S. 332, and that's 2009, which I have in

15   my reply brief.  Police may search a vehicle incident to a

16   recent occupant's arrest only when the arrestee is unsecured

17   and is in reaching distance of the passenger compartment at

18   the time of the search.

19             THE COURT:  Yeah, well, I am not sure that's current

20   law.  Even if it were, they would conduct an inventory search

21   anyway, and they would find whatever is in there once they've

22   arrested him.  There was no other driver around to take the

23   vehicle away.  They're going to take that vehicle in the

24   impound.  They're going to do an inventory search.

25             MS. SUELAU:  Your Honor, for that I would visit

                    Sarah K. Mitchell, RPR, CRR

21-CR-00268-RBJ     Motions Hearing     01/28/2022    23

1   United States vs. Sanders, which sets essentially the

2   standard, and for that I'm looking at -- I will get Your Honor

3   a citation on that in one moment.  But they're saying

4   essentially you don't get an automatic inventory search.  You

5   have show that the inventory is justified by certain things,

6   either a community caretaking exception, in addition to the

7   regulations of a certain department.  And so it's not an

8   automatic you get to impound and inventory every car.

9        The Government also hasn't raised this argument, and

10  they've been silent on what the regulations of the Loveland

11  Police Department are.  If Your Honor is inclined to deny the

12  motion on that basis, I'd ask for the opportunity to brief

13  that issue as the Government did not raise impoundment and

14  inventory as an alternative legal basis for the search.

15       THE COURT:  Okay.  We'll hear what Mr. Mohan has to

16  say.  Go ahead with your argument if you have more.

17       MS. SUELAU:  Your Honor, I'd only just conclude that

18  at -- it is troubling to me that we would be in a situation

19  where Your Honor would conclude that the police, in fact,

20  arrested Mr. Lewis.  Again, I'd assert that arrest is without

21  probable cause, that that arrest somehow triggers for the

22  police the ability to search his car but doesn't trigger the

23  necessity to Mirandize, and so instead --

24       THE COURT:  Well, they didn't Mirandize.

25       MS. SUELAU:  Eventually after or contemporaneous with

1   the search of the car.  My position would be that they did not

2   have probable cause.  This arrest was illegal.  Mr. Lewis

3   should have been released because they had -- if we're in a

4   Terry stop, which this should have been, their suspicions are

5   dispelled.  He should have been released.  He would have been

6   on his way, and this car would not have been searched.

7          THE COURT:  Okay.  So --

8          MS. SUELAU:  The fact that he was, in fact, arrested

9   illegally without probable cause does not trigger for the

10  Government certain rights to his car.  As I stated, it can't

11  be a search incident to an invalid arrest even.  If it's a

12  valid arrest, they don't have the necessary components to

13  conduct a lawful search incident to arrest, and they have not

14  raised the issue of whether or not this was a valid inventory

15  search.  It is their burden to show that the search was valid,

16  and they have met that.

17          THE COURT:  Okay.  So one more question, Ms. Suelau.

18  This is more a matter of common sense than anything else

19  possibly.  We have a situation where the officers were very

20  sure that the vehicle stopped there on the shoulder was the

21  vehicle in the incident at the Circle K.  They're very sure of

22  that because it's a unique description of a green -- forest

23  green Dodge Durango, check; pulling a trailer, check; driven

24  by a man with a beard, check; wearing a hat, check; within

25  three or four minutes of the incident, check; and in the

1   location approximate to the incident, check.  The officers are

2   very sure that this is the vehicle and the man involved in the

3   Circle K incident, whatever the incident was.

4           Secondly, they have an eyewitness who called in a 911

5   who said she saw the driver of that vehicle point a gun at the

6   black Nissan Altima.  Third, once another officer has a chance

7   to view the surveillance video, and that's also within minutes

8   of the incident, she is convinced that it does show a man

9   pointing a gun at the black Nissan, and she calls that in to

10  the officers at the scene.  At that point, you're suggesting

11  that these officers, despite that information, should just let

12  him go on his way and say have a nice day because they don't

13  have enough at that point to arrest him for pointing a gun at

14  a person or on suspicion of felony menacing?  That's -- as a

15  common sense, that just doesn't -- it just doesn't seem to

16  make sense to me.

17          MS. SUELAU:  Your Honor, what I'm saying is that when

18  they approached Mr. Lewis, they were investigating whether or

19  not he had a firearm.  I agree that the evidence that he was

20  probably the person at the gas station was strong.  They have

21  a 911 call that says this person has a firearm.  And so under

22  those circumstances, they would have enough for Terry, and

23  they had a limited scope.  So the illegal arrest kind of, you

24  know, doesn't just wash away what they're allowed to do under

25  Terry.  The fact that they illegally arrested him doesn't

1   undercut the small scope of Terry, which is a brief

2   investigative detention.  So then in that brief time, in the

3   brief investigative detention, they did a few things which

4   should have dispelled the idea that he, in fact, had a gun.

5          THE COURT:  What was that?

6          MS. SUELAU:  And that was, one, that he didn't have a

7   gun on his person when he was frisked.  Two, he denied having

8   a gun.  Three, they look in the car under the driver's seat,

9   in the passenger compartment and say -- I think one of the

10  officers said something like I don't see a gun in the car.

11  And then his statement -- pair that with his behavior.  He's

12  being cooperative.  He's obeying all commands, and none of

13  that is indicative of criminality when we're talking about

14  those amorphous factors like flight and not being cooperative.

15  We don't have any of that here.

16         THE COURT:  Well, I think we do.  I think we do,

17  because they asked him -- they ran the plates and found out

18  that he was Mr. Clifford and there were warrants for his

19  arrest outstanding, and they asked him are you Clifford, and

20  he said -- I can't remember the words, but he said no, or I'm

21  not going to answer, or something to that effect.  That's not

22  cooperative.

23         MS. SUELAU:  Your Honor, that interaction is long

24  after when the demarcation would have been that he should have

25  been released.  It's my position that he should have been

1   released after they search in the car and they don't find a

2   gun the first time, and that's about 1:27, 1:28 p.m.

3           THE COURT:  Okay.

4           MS. SUELAU:  The interaction later on in my opinion

5   is clearly Mr. Lewis not being funny but attempting to be

6   funny.  Both he and the officers clearly know that he's

7   Clifford Lewis, and at this point he's understandably

8   frustrated because he has been illegally arrested.  He has

9   been handcuffed and shut in the back of a police car at that

10  point I think three different times, and they're driving down

11  the street with him in the back.  So I don't think that

12  evidence is him uncooperative.  First, it's after he should

13  have been released; and, second, I don't think it goes to him

14  not being cooperative.

15          If we're looking at the beginning of Exhibit 2 when

16  Officer Dunlap arrives, at that point Mr. Lewis had already

17  stepped away from the driver side as directed.  He walked to

18  the back of the car as directed.  He puts his hands on his

19  head.  He walks back, walks back, walks back with his hands

20  up, gets on his knees, and he's interacting with them

21  willingly.

22          THE COURT:  Okay.  Well, they asked him if they could

23  search the car and he said no.  That was within his rights.

24  He absolutely didn't have to consent to a search of the car,

25  but you're making such a point about how cooperative he was,

21-CR-00268-RBJ      Motions Hearing      01/28/2022    28

1    he wasn't cooperative on that.  He asserted his rights as he

2    had a right to.

3          MS. SUELAU:  Your Honor, that -- that conversation

4    about him saying you cannot search the car, again, happened

5    long after 1:28 p.m.  That happened well after the initial

6    search of his car.

7          THE COURT:  I guess I don't know the difference

8    between what you call the initial search and the search.

9          MS. SUELAU:  Well, Your Honor, the initial search --

10   if Your Honor looks at Exhibit 2 -- and would it be helpful if

11   I played now and we can walk through it?  Mr. Mohan has agreed

12   to help me and play that, and I think the beginning of it is

13   just a few minutes, but it would help illustrate this point.

14         THE COURT:  If you want to do that, that's fine.  I

15   have looked at it.  I tried to look at all the videos, and I

16   can't remember exactly what happened when.

17         MS. SUELAU:  Okay.  So Mr. Mohan has kindly agreed to

18   help me with technology and is going to share a screen and

19   play Exhibit 2 from the beginning.

20         And then, Mr. Mohan, will you just stop when it's at

21   1:29 p.m. on the video.  Thank you.

22         MR. MOHAN:  Just give me one minute to pull it up.

23         THE COURT:  I see it but cannot hear anything.

24         MR. MOHAN:  I will unmute myself and see if that

25   cures the problem.

Sarah K. Mitchell, RPR, CRR

21-CR-00268-RBJ      Motions Hearing      01/28/2022    29

1            THE COURT:  Yes.

2      (Video played.)

3            MR. MOHAN:  Would you like any more, Laura?

4            MS. SUELAU:  Just another like 30 seconds.  Thank you

5  Rajiv.

6      (Video played.)

7            THE COURT:  Okay.  Yes, that clarifies what you call

8  the initial search.  Thank you.

9            MS. SUELAU:  So, Your Honor, in reference to that, I

10  would just say that I think the police were right in that they

11  were in a Terry stop situation.  They were wrong in that they

12  effectuated an arrest instead of a Terry stop.  But they were

13  -- they only had the ability to do what is allowed under

14  Terry, which is verify or dispel.  Here they clearly dispelled

15  -- I mean, I would consider that search fairly extensive.

16  They conclude there is not a gun.  They speculate it might be

17  in the river.  Mr. Lewis at this point is being fully

18  cooperative, and that's when he should have been released.

19  They do not --

20            THE COURT:  I think you're leaving out part of that

21  video, frankly.  They went over -- they couldn't see in the

22  back of the vehicle because it had tinted windows.  They had

23  the doors open.  They looked in.  They didn't see anything in

24  plain view that was a gun.  They said I don't see a gun under

25  the seat, but doesn't mean it isn't there.  They didn't, as

1   far as the video showed, go in there with a flashlight and

2   kneel down and look under the seat or reach in with their arms

3   and feel around.  Basically they were just looking to see what

4   they could see, I think.  Do you disagree with me?

5          MS. SUELAU:  Your Honor, if you look, a portion of

6   the back window is open, so they do look through that.  I

7   don't -- I don't disagree that they don't have flashlights.  I

8   do agree that it wasn't an extensive search.  But my position

9   is they didn't even have probable cause or enough reasonable

10  suspicion under the case law cited by the Government, because

11  in order to search a car in a Terry situation, you need

12  evidence of dangerousness and evidence that this person is

13  going to access something dangerous.  So I would say the

14  search was illegal all around, but to the extent that they

15  conducted it, it was thorough enough to dispel suspicion.

16         THE COURT:  Okay.

17         MS. SUELAU:  And I do have a citation, Your Honor, on

18  *Sanders*, and that is the impound inventory case, which is

19  *United States vs. Sanders*, 796 F.3d 1241, and that's a 2015

20  case from the Tenth Circuit that talks about the factors that

21  a Court has to consider in whether or not an impoundment and

22  subsequent inventory are justified under the law.  It has to

23  be pursuant to standardized policy.  The Government has not

24  proven any evidence of a Loveland Police policy.  There's a

25  consideration of whether it's on public or private property.

21-CR-00268-RBJ      Motions Hearing      01/28/2022   31

1    Here we do have a public property.

2           They have to explore whether or not there's an

3    alternative to impoundment, and no one else was with Mr.

4    Lewis, but they did not ask Mr. Lewis can someone come get the

5    car and drive it away, and surely he has family and friends in

6    the area who could have come and gotten the car and driven it

7    away.  He's implicated in the crime and whether or not the

8    person consented to impoundment.  So those are all factors for

9    this Court to consider whether or not the impoundment, and

10   therefore inventory, was valid.

11          THE COURT:  I agree with you.

12          MS. SUELAU:  Then unless Your Honor has further

13   questions, I would just ask to have a brief reply to the

14   Government's argument.

15          THE COURT:  Okay.  Mr. Mohan, your turn.

16          MR. MOHAN:  Thank you, Your Honor.  I would like to

17   start with the question of whether or not there was an arrest,

18   and I certainly understand Your Honor's perception that the

19   measures that the officers use are typically ones that we

20   would associate with an arrest, guns drawn, handcuffs, and the

21   like.  But I want to do my best to dispel that notion under

22   the case law, and the Tenth Circuit has in a number of cases

23   addressed these sorts of measures; namely, officers drawing

24   their guns, using handcuffs, placing a suspect in the

25   backseat.

1           And it's held that while they are normally associated

2    with an arrest, there are sometimes when officers may use

3    those measures in connection with a mere Terry stop, and the

4    test for that is whether a man of reasonable caution would

5    believe they are appropriate for officer safety, and that was

6    stated by the Tenth Circuit in the *Mosley* case, which is 743

7    F.3d at 1329.  And I just wanted to cite some of the examples

8    where the Tenth Circuit has held that such measures are

9    appropriate, because I think the facts here compare favorably

10   to them.

11           First off, in *United States vs. Copening*, which is

12   506 F.3d. 1241 at 1244, the officers essentially had an

13   anonymous tip that the detainee had dropped the gun, picked it

14   up and stuck it underneath the seat in a vehicle, and when the

15   officers encountered him, they did so with guns drawn and so

16   forth.  In *United States vs. Perdue*, the detainee was simply

17   driving towards the house where the officers knew that there

18   had been a gun.  And in *United States vs. Windom*, 863 F.3d at

19   1333, the officers had a tip that a gang member had flashed a

20   gun in a public area, and they had stopped the car in a high

21   crime area.

22           Now, none of these cases involve the exact same facts

23   here, but I think the fact that you have a 911 call, not an

24   anonymous call, by the way, where the report was that the man

25   who matched the description had brandished a gun a short time

21-CR-00268-RBJ       Motions Hearing       01/28/2022    33

1   before gave rise to a reasonable officer that there were

2   genuine officer safety concerns that justified their use of

3   handcuffs, that justified their guns being drawn without

4   converting this into a Terry stop.

5           THE COURT:  Okay.  Let me stop you right there.

6           MR. MOHAN:  Sure.

7           THE COURT:  Let's say that I agree with you, and

8   certainly I do.  There was unquestionably sufficient

9   information to conduct a detention, a Terry stop.  I don't

10  have any question about that.  My question to you then is if

11  that is what they were doing, then what is the significance of

12  that?  You're now saying they hadn't arrested him yet.  When

13  they said you're not under arrest, that was true.  They were

14  conducting a Terry stop.  But, number one, doesn't that lead

15  you right into Ms. Suelau's argument on *Florida vs. Royer*?

16  And, number two, in your brief don't you say in the

17  alternative they had probable cause to arrest.

18          MR. MOHAN:  We do, Your Honor.  I think there is

19  probable cause to arrest.  I think -- you know, the

20  consequences, here's how I would describe them.  I think with

21  respect to the search of the car, there may be three separate

22  roads that justify the search.  One, it's sort of if the

23  initial stop was a Terry stop.  One is if the initial stop was

24  an arrest.  And the second I think is applicable to both of

25  those regardless of whether it was a Terry stop or an arrest.

1          So the consequence if the initial stop was a Terry

2    stop and not an arrest is that under *Michigan vs. Long*, in

3    connection with a Terry stop, officers may search locations

4    where a gun may be fit in or placed based on a reasonable --

5    one second -- based on a belief that the suspect is dangerous

6    and may gain immediate control of weapons.  And I just want to

7    highlight that the immediate control of weapons, this is based

8    on the theory that if it is merely a Terry stop, there's a

9    possibility that the detainee will be returned to the car and

10   at that point have access to weapons.  So the fact that he is

11   in handcuffs, in the back of the car while the search is

12   ongoing does not eliminate the officer safety concerns in that

13   respect, and the Tenth Circuit made that abundantly clear in

14   *United States vs. Palmer*.

15          And, again, under *Long* it's sort of this search is

16   limited to areas where a weapon may be placed or hidden, and

17   in that respect I sort of just want to address this issue of

18   the two searches that we have seen.  As the Court just saw on

19   the video, the first search was Officer Dunlap simply looking

20   underneath the driver's seat.  What Ms. Suelau calls the

21   second search, I would submit, was still limited to areas

22   where a weapon may be placed or hidden, which is what is the

23   touchstone of the scope of the search under *Michigan vs. Long*.

24   They were looking in the front seat and the driver seat, and I

25   think if there's any doubt about the scope of the search under

21-CR-00268-RBJ      Motions Hearing      01/28/2022    35

1  *Michigan vs. Long*, there's no doubt that extends to the

2  passenger compartment, and if they did not have probable cause

3  before, their almost immediate discovery of the holster, the

4  lower receiver and the ammunition certainly gave them probable

5  cause at that point.

6          THE COURT:  So let me stop you there.  Make sure

7  we're -- I understand exactly what you're saying.  You're

8  saying that when they first arrived at the scene, they had

9  reasonable suspicion based on the description of the vehicle

10 and the 911 call's indication that he had pointed a gun.  That

11 gave them reasonable suspicion to believe that a crime had

12 been committed or might have been committed.  So far so good

13 with your theory?

14         MR. MOHAN:  Yes.

15         THE COURT:  And based on the reasonable suspicion

16 under your, I guess, *Palmer* case, one of your cases that you

17 cited, they have the right given the nature of the suspicion

18 to do a search limited to the places where the driver likely

19 might have placed the gun, i.e., driver seat and the passenger

20 seat next to him, center console, that kind of thing, correct?

21         MR. MOHAN:  Yes.

22         THE COURT:  But there still had not been an arrest.

23 You say, in other words, that Corrigan said you're not under

24 arrest, and what Roberts said you're not under arrest, if it

25 was Roberts -- two of them said you're not under arrest, they

21-CR-00268-RBJ       Motions Hearing       01/28/2022    36

1   were right, according to your theory.  He wasn't under arrest

2   yet.

3           MR. MOHAN:  Yes.  According to one of our theories,

4   Your Honor.

5           THE COURT:  Well, both sides seem to be claiming more

6   than one theory here.  I'm just trying to understand as best I

7   can what you honestly believe happened here, and I think what

8   you're saying is what I honestly believe happened was they had

9   reasonable suspicion that a crime had been committed based on

10  the description of a vehicle and the description that he had

11  pointed a gun at another car.  Based on the reasonable

12  suspicion, for officer safety reasons they were entitled to

13  put him in handcuffs, put him in the police car, get him out

14  of the way so they're safe, to do what comes next, and that is

15  a brief, not full, but brief search of the places in the

16  vehicle where a gun likely would have been stashed by the

17  driver.  They're entitled to do that even though he's in the

18  vehicle in cuffs for officer safety reasons, because when he

19  is taken out of cuffs and returned to the vehicle, he still is

20  a safety risk.  So far so good?

21          MR. MOHAN:  Yes, Your Honor.

22          THE COURT:  Okay.  And then you say during this

23  initial reasonable suspicion search, they discover the

24  shoulder holster, and was it something else that they

25  discovered during this limited search?

                    Sarah K. Mitchell, RPR, CRR

21-CR-00268-RBJ     Motions Hearing     01/28/2022   37

1          MR. MOHAN:  Almost immediately, Your Honor, they

2    discover the shoulder holster and the lower receiver of the

3    firearm, a firearm, and some ammunition.

4          THE COURT:  And that cements in your theory -- or one

5    of your theories -- that they now have probable cause to

6    arrest.  And so you're saying that they arrested him, gave him

7    his Miranda rights, and then did a full search incident to the

8    arrest.

9          MR. MOHAN:  Either incident to the arrest or simply

10   under the automobile exception as justified by probable cause

11   that the car contained evidence of a crime.

12         THE COURT:  Okay.  So I'm the one that got everybody

13   off track when I went down the rabbit hole of the inventory

14   search.  Ms. Suelau is absolutely correct, number one, you

15   didn't raise it; and, number two, there are a whole bunch of

16   things the Court has to find for an inventory search to be

17   justifiable, so we're not --

18         MR. MOHAN:  We're not relying on that, Your Honor.

19         THE COURT:  You're not relying on that, and I should

20   have kept that to myself.  You're relying on the search

21   incident to arrest, or what you call the automobile exception,

22   reasonable cause to believe that there was a gun inside.

23   Okay.  I get it.

24         MR. MOHAN:  Sure, Your Honor.  And I just want to

25   clarify sort of the law on the search incident to arrest.

Sarah K. Mitchell, RPR, CRR

1  Ms. Suelau appropriately cited United States -- or excuse me

2  -- *Arizona v. Gant* which dealt with this issue.

3       THE COURT:  Was that a recent decision?

4       MR. MOHAN:  It was 2009, Your Honor.  I believe Chief

5  Justice Rehnquist may have retired, but I'm not sure who wrote

6  the opinion.  I believe it was Justice Scalia, if memory

7  serves, but that may be incorrect.  In any event, one of the

8  things that *Gant* talks about is what Ms. Suelau referred to;

9  namely, the justification based on the arrestee's immediate

10 access to the firearm.  But *Gant* also offered a new basis for

11 a search incident to arrest, which is, quote, when it is

12 reasonable to believe that evidence of the offense of arrest

13 may be found in a vehicle, and that's at 556 U.S. 332,

14 page 335.  So it's not just limited to immediate access to the

15 firearm.  There's also an evidence-based justification under

16 *Arizona v. Gant* which the Court added.

17       Now, as I said, that's one of our theories.  I do

18 think there was probable cause for an arrest even if the Court

19 deems it that way.  I want to address some of the more

20 specific factual and legal points on that score.  Ms. Suelau

21 talked about whether this was -- whether what happened at the

22 gas station was felony menacing, and sort of her assertion is

23 that, well, you need a victim for it to be felony menacing,

24 and the Colorado Court of Appeals has held that, We conclude

25 that it is unnecessary for the victim to actually hear or be

1   cognizant of any threat from the defendant.  Instead, if there

2   is evidence from which the jury could reasonably find that the

3   defendant knew his actions, if discovered, would place the

4   victim in fear of imminent serious bodily injury, then the

5   intent element of the offense may be satisfied.  That's *People*

6   *vs. Saltray*, 969 P.2d 729, at page 732.  So I think whether

7   you view it as felony menacing or misdemeanor pointing of a

8   gun and your aiming of a gun, there is probable cause as to

9   both.

10          And just a few points from the body cam.  As the

11   Court saw, at the very beginning of Exhibit 2, which we played

12   for you, from the officer's perspective, Officer Dunlap tells

13   him, Put your hands on your head.  Mr. Lewis reaches towards

14   his handgun, and at which point Officer Dunlap says, Don't

15   reach for anything, dude.

16          THE COURT:  He reached toward his waist, not toward

17   his handgun.

18          MR. MOHAN:  Reached towards his waistband, excuse me,

19   Your Honor.  And this prompted Dunlap to say, Don't reach for

20   anything, dude.  But I think the point is that from the

21   officer's perspective, that raised some concern.  And it was

22   true that he did comply thereafter with the officers'

23   commands, but I think some of his statements raised more

24   questions than answers.  If the Court looks at Exhibit 3 at

25   the 3:44 mark, Mr. Lewis is talking with Officer Corrigan, and

21-CR-00268-RBJ        Motions Hearing        01/28/2022     40

1    Mr. Lewis confirms that he was at the gas station.  He offers

2    a different view of what happened, but he nonetheless

3    confirmed that he was there.  And then at Exhibit 3 at about

4    5 minutes and 40 seconds, this is when Officer Corrigan asks,

5    Are you Clifford?  And Mr. Lewis says, It's hard to know,

6    which it may have been a joke on Mr. Lewis's part, but from

7    the officer's perspective it was certainly a suspicious

8    answer.

9            So we think when the Court considers all of those

10   facts, there was probable cause, there was certainly

11   reasonable suspicion, and I think there are multiple tracks --

12   I know it's confusing for us to advance so many theories, but

13   I think the reality is the officers have multiple theories in

14   mind too.  I think you can hear on the body cam when Sergeant

15   Roberts is talking about the basis for the search and talks

16   about a frisk of the car, but he also says I think we have

17   probable cause.  So I think these officers were operating in

18   realtime.  They were thinking about a lot of things, and I

19   think there are multiple tracks by which this Court can

20   conclude that both Mr. Lewis's detention and the subsequent

21   search of the car was lawful.  Thank you.

22           THE COURT:  Thank you.  Ms. Suelau, you wanted to

23   reserve a little time for rebuttal.

24           MS. SUELAU:  Yes.  Thank you, Your Honor.  I think

25   the Government's argument sort of highlights the issue here,

1   which is that police need to essentially pick a track.  Either

2   it's a Terry stop and it should be limited as Courts direct us

3   a Terry stop should be limited, or they have probable cause.

4   This idea that they can both act as if they have probable

5   cause and then not Mirandize Mr. Lewis in the other aspect

6   really cuts down on a defendant's rights when they're

7   confronted by police.

8           And if we're in the Government's first track, I'll

9   call, a Terry stop world, I don't believe that the cases cited

10  by the Government for the police's actions here are justified.

11  If we look at *United States vs. Perdue*, for example, that they

12  cite for the proposition that police could have ordered Mr.

13  Lewis handcuffed, and they could have held him at gunpoint,

14  the facts on that case are completely different than what we

15  have here.

16          They have a building in the middle of nowhere where

17  they found 500 marijuana plants, and that's down a long dirt

18  road.  A car starts driving down that long dirt road, and then

19  when they see the police, they turn around and start to flee.

20  Finally they're stopped, and police use guns and handcuffs to

21  get the driver and passenger out of the car, and then

22  immediately the driver says, I know you found my marijuana.

23  That's just not this case.  We have -- all of those things cut

24  against what we have here.

25          And so also the analysis doesn't work because

21-CR-00268-RBJ        Motions Hearing        01/28/2022    42

1    Mr. Perdue immediately admits that he has committed a crime.

2    There's a passenger in the car.  Same with *Windom*.  The Court

3    talks about it's a different analysis when you have a

4    passenger in a car whether or not it's appropriate and

5    reasonable to put someone in handcuffs and draw your firearm.

6    Also in *Windom* we have someone flashing a gun claiming to be a

7    Crip gang member and not immediately stopping, and then

8    immediately after patting Mr. Windom down, they find a gun on

9    him.

10          So those cases don't work because immediately upon

11   putting this person in handcuffs at gunpoint the case elevates

12   from a Terry stop to a case of probable cause.  That's the

13   opposite of what we have here.  We have someone who remains in

14   handcuffs locked in the back of a police car after the police

15   now have evidence that cuts against the notion that the crime

16   they're investigating actually happened.

17          I would disagree that the first search of the car was

18   just Officer Dunlap looking in.  We can see on the camera

19   there's two officers fully looking in the car .  And in the

20   second search of the car, if the Government is saying we're

21   still in Terry, and the second search of the car is justified

22   under *Arizona v. Gant* and Terry or *Michigan v. Long* and

23   *Palmer*, which I highlighted in my reply, again, those cases

24   are not factually similar to this case, they are distinct in

25   very material ways, then I would say we don't have -- it cuts

21-CR-00268-RBJ        Motions Hearing        01/28/2022    43

1    out the automobile exception altogether.  If we say there

2    wasn't probable cause, it wasn't Terry, and the police get two

3    sweeps of a car for someone they don't have indication is

4    dangerous, who doesn't have access to his car, we might as

5    well cut out the probable cause altogether for searches of a

6    vehicle is essentially what the Government is saying.

7          So for those reasons, it's our position that the

8    police had reasonable suspicion for a Terry stop.  Their

9    suspicions were well dispelled after the first search of the

10   car.  Mr. Lewis should have been released, and everything that

11   followed that was on the basis of an illegal seizure of Mr.

12   Lewis.  They did not have probable cause to arrest him, and he

13   should have been released.  If he was released, the car would

14   have never been there, and all the things they found in the

15   car on the second search should be suppressed.

16         THE COURT:  Thank you.  Very interesting arguments

17   and situation.  I'm not sure that I agree with Ms. Suelau when

18   she says the Government should take one track or the other,

19   not alternative tracks, because I think these facts lead to

20   consideration of both Terry stops and arrests.  In my view,

21   the police had probable cause to arrest Mr. Clifford when

22   Mr. Dunlap, Officer Dunlap, first arrived at the scene.  That

23   is based on these facts which are essentially undisputed and

24   agreed by the Court and the parties at the beginning of this

25   hearing.

                    Sarah K. Mitchell, RPR, CRR

1          The 911 call reported a forest green Dodge pulling a

2   trailer as the vehicle, the driver as a gentleman who was

3   younger wearing a hat and a beard, and the caller said that

4   she had observed that individual point a gun at a black Nissan

5   Altima.  During the course of the hearing today it has been

6   agreed even by the defense counsel that the evidence that it

7   was, indeed, Mr. Clifford and his vehicle at the Circle K was

8   strong.  The Court finds that it was very strong and virtually

9   indisputable given the description of the vehicle, the

10  description of the defendant, the fact that the encounter

11  between Dunlap occurred three to five minutes after the

12  incident at the Circle K, the fact that it occurred within a

13  mile of the Circle K.  All those things to my mind give it's

14  probable cause to believe that Mr. Clifford is guilty of

15  felony menacing with a real or simulated weapon, and/or

16  knowingly and unlawfully aiming a firearm at another person,

17  those being respectively violations of the Colorado Revised

18  Statutes Sections 18-3-206 and 18-12-106(1)(a).

19          So I believe that had the Government taken the track

20  that there was a lawful arrest, they would have been on solid

21  ground, but the Government has chosen at least as its

22  preferred alternative to look at the situation differently.

23  They argue that there was at least a reasonable suspicion to

24  detain Mr. Clifford based on the same facts that I said in my

25  view support probable cause.  And there is no doubt that they

1   had that at least.  Even the defendant didn't dispute that.

2   Once they have reasonable grounds to detain, then given that

3   it had been said that he had a gun and had pointed it at

4   somebody, it was reasonable for officer safety to require that

5   he be handcuffed and placed away from the officers in a patrol

6   car.

7           And it would have also been reasonable incident to

8   the detention to do a minimal search of the places in the

9   vehicle.  So I don't have reason to condemn their search,

10  which I viewed on the video and which consisted of having the

11  doors -- front doors of the vehicle open, looking in to see

12  what they could see, even looking under the seat in the

13  passenger seat to see if there was a gun readily observable.

14  I think that is within the scope of a reasonable detention and

15  certainly would have been justified if there were, as I think

16  there was, probable cause to arrest.

17          As Mr. Mohan says, in the course of that initial less

18  than full search when they came upon a shoulder holster and a

19  firearm part, if they didn't have probable cause before to

20  arrest, they would have had it by then .  In my view at that

21  point they were entitled to conduct a full search of the

22  vehicle incident to the arrest, or alternatively, under the

23  automobile exception that permits a search of the vehicle

24  where there is a reasonable cause to believe that a weapon,

25  evidence of the crime, was present somewhere in the vehicle,

21-CR-00268-RBJ        Motions Hearing        01/28/2022    46

1    and during that full search they discovered the suspected

2    silencer, the .22 caliber revolver, short barrel shotgun, and

3    some additional ammunition, in addition, incidentally, too

4    some drug paraphernalia and some methamphetamine.  He wasn't

5    charged with any narcotics offense.

6            So the Court denies the motion to suppress the search

7    and the results of the search under either theory, the

8    reasonable suspicion evolving into an arrest or probable cause

9    to arrest initially.  If ironically you go down the track that

10   the Government has gone down that it was initially a Terry

11   stop and didn't progress to an arrest until they found the

12   initial indicia of firearm paraphernalia, one could question

13   whether the statements were made before he was Mirandized,

14   i.e., that he had no knowledge of the gun, that he was trying

15   to talk to a friend because he was concerned that he had been

16   followed by that black Nissan Altima, and possibly depending

17   on the timing even his so-called joke about his name might be

18   inadmissible, but the defendant hasn't argued that.

19           The defendant has argued that all those things

20   occurred after an arrest, that simply there was no probable

21   cause for the arrest.  That's an ironic position, but at this

22   point I don't have -- well, let me ask you.  Given what I've

23   said so far, what are your positions on whether or not the

24   statements he had no knowledge of the gun and so forth that

25   were made before he was Mirandized are or are not admissible?

Sarah K. Mitchell, RPR, CRR

1   Mr. Mohan?  Maybe you don't care.

2          MR. MOHAN:  That may ultimately be the answer, Your

3   Honor.  I would note that I don't read the defendant's motion

4   itself to seek suppression of those statements.  His request

5   simply asks that the Court suppress all evidence found in the

6   search of his car, so I would sort of leave it at that for

7   present purposes.

8          THE COURT:  Ms. Suelau?

9          MS. SUELAU:  Your Honor, as to the statements, if

10  Your Honor is finding that Mr. Lewis was, in fact, under

11  arrest, we would ask that all statements prior to his Miranda

12  warning be suppressed.  I do want to offer an important

13  clarification.  The shoulder holster and the firearm lower

14  that the Government referenced were not found in the first

15  search of the car.  They were found in the second full search

16  of the car, and I don't believe Mr. Mohan disputes that, and I

17  think the body cam is clear on that point that they did not

18  find any indicia of a firearm or a firearm itself on the first

19  search of a car.

20          THE COURT:  See, I think there's a dispute between

21  the parties as to how many searches occurred and what took

22  place in each of these so-called searches.  I heard Mr. Mohan

23  to say that it was during the initial limited search pursuant

24  to reasonable suspicion of the areas where a firearm would

25  likely be stashed that they came upon the shoulder holster and

1    at that point they had probable cause to arrest.  That's what

2    I thought he said.

3           MS. SUELAU:  Your Honor, if that is Mr. Mohan's

4    position, that is an inaccurate statement of fact based on the

5    evidence before this Court.

6           MR. MOHAN:  Your Honor, if I may clarify briefly.  I

7    think Ms. Suelau and I are in agreement that the holster was

8    not found when Officer Dunlap was looking underneath the seat,

9    which is what Ms. Suelau calls the first search.  I agree that

10   it was found in what Ms. Suelau calls the second search.  I

11   think we just disagree about the legal nature of those

12   respective searches.

13          THE COURT:  So you're saying -- when is it your

14   position that there was an arrest?

15          MR. MOHAN:  I think the officers had -- well, again,

16   it depends on the theory.  I think that under the Terry

17   theory, when the officers -- certainly by the time they found

18   the holster and the lower receiver, which is in what

19   Ms. Suelau calls the second search which we still think is a

20   limited protective search under *Long*, I think they certainly

21   had it at that point.  Again, our position is that they had it

22   at the outset, and we do not disagree with the Court on that

23   point.

24          THE COURT:  Well, you've got *Florida vs. Royer* which

25   says you can't conduct a full search of the car based only on

1   suspicion.

2         MR. MOHAN:  That's correct, Your Honor.  And my

3   point, which is under *Michigan vs. Long* and *Palmer,* is that

4   the area where the officers were searching in what Ms. Suelau

5   calls the second search, that was the passenger compartment.

6   Those were places where a firearm could be hidden or placed.

7   It's not as though they were searching the trunk or anything

8   like that at that point, and we think it was still within the

9   scope of a protective search.  It was not a full search of the

10  car.

11        THE COURT:  Okay.  Well, again, I believe that there

12  was probable cause to arrest way back at the beginning, but

13  they apparently did not arrest him.  They say they didn't

14  arrest him, and if I give the defendant the benefit of the

15  doubt, then although it wasn't raised in the motion, and

16  therefore I probably should not at this time comment on it, my

17  impression at trial would be that the statements that were

18  made before Miranda probably would not be admissible.

19        But if I stay locked in to the Government's main

20  theory that there was just a Terry stop going on until they

21  found the shoulder holster, I would be inclined, given the

22  circumstances, the knowledge of the gun, the likelihood that

23  the gun was there within reach of the driver, that the search

24  -- not a full search of the vehicle, but a search of the

25  passenger compartment would have been appropriate.  I think

Sarah K. Mitchell, RPR, CRR

21-CR-00268-RBJ       Motions Hearing       01/28/2022   50

1   for sure it's appropriate pursuant to an arrest on probable

2   cause, which is what I think actually happened.  Either way,

3   the Court is not going to grant the motion to suppress.

4          Now, when is the case set for trial?  Maybe I have a

5   note of it.  I don't remember.

6          MR. MOHAN:  I believe March 7th, Your Honor.

7          THE COURT:  March what?

8          MR. MOHAN:  7th.

9          THE COURT:  March 7th.  Okay.  And I know that I've

10   got a civil case starting on March 7th for three weeks, a

11   Black Lives Matter type lawsuit for damages arising from the

12   George Floyd protests, but your case would take priority as a

13   criminal case.  Given that there is a three-week civil trial

14   behind you, I guess it would be quite helpful if you're going

15   to have a disposition that you notify the Court sooner rather

16   than later.  That's just a request.  You don't have to honor

17   that request.

18          MS. SUELAU:  Your Honor, I have another trial set for

19   March 7th in front of Judge Blackburn that will proceed, and

20   we are having witnesses writ from the Bureau of Prisons, all

21   of which have been executed, so that trial needs to proceed at

22   that time.  So I anticipate if this case proceeds to trial

23   that I will be seeking additional time to prepare for that

24   trial.  Mr. Lewis is on bond and would not oppose a

25   continuance.

                    Sarah K. Mitchell, RPR, CRR

21-CR-00268-RBJ       Motions Hearing       01/28/2022    51

1          THE COURT:  Well, typically the Government doesn't

2    oppose exclusions of time for --

3          MR. MOHAN:  I am also handling that trial that

4    Ms. Suelau is referring to, so I think it works out for

5    everyone.

6          THE COURT:  Well, do you want to take care of that

7    now then?

8          MS. SUELAU:  Yeah.  In that regard, Your Honor, I'll

9    move orally for a motion excluding an additional 60 days from

10   the speedy trial clock.  I believe not only do I have a trial

11   set for March 7th, but also that Mr. Lewis's case warrants

12   additional investigation.  There may be issues as to the

13   nature of the firearms involved and what does and doesn't

14   qualify as a firearm or what does and doesn't qualify as a

15   destructive device.  For that I would need to visit the ATF or

16   whatever agency has custody of those items and visit them and

17   perhaps get an expert to opine on the nature of them.  So for

18   all of those reasons I ask the Court for an additional 60 days

19   to be excluded from the speedy trial clock.  As I stated Mr.

20   Lewis is on bond.  He's been doing well receiving treatment

21   and living at Emmy's House, which is a halfway house.

22         THE COURT:  I see.  How much time is remaining on

23   speedy at this point?

24         MS. SUELAU:  One moment.  I don't have access to all

25   of my drive.

Sarah K. Mitchell, RPR, CRR

21-CR-00268-RBJ       Motions Hearing       01/28/2022    52

1            THE COURT:  That's okay.  Would it be of any interest

2   to see if we can set a trial date and then exclude the amount

3   of time necessary to cover that trial date?

4            MS. SUELAU:  Your Honor, that would be of interest,

5   and so I think that it would be appropriate to set this in

6   early or mid-May.  Mr. Mohan can speak to his availability.  I

7   am available both the first, second, and third week of May.

8            MR. MOHAN:  As am I.

9            THE COURT:  Mr. Clifford, would that be -- or Mr.

10  Lewis, would that be acceptable to you, sir?  I think he might

11  be muted.

12           THE DEFENDANT:  Yes, sir.  That's fine, Your Honor.

13           THE COURT:  All right.  Julie, would there be any one

14  of those weeks in May where we could put this trial?

15           THE COURTROOM DEPUTY:  Your Honor, it's Julie.  Mary

16  is going to look for us, and she'll chime in.

17           THE COURT:  Okay.

18           THE COURTROOM DEPUTY:  Never mind.  Her audio is not

19  working.  We have May 9th available.

20           THE COURT:  Is that acceptable to everyone?

21           MR. MOHAN:  Yes, Your Honor.

22           MS. SUELAU:  Yes, Your Honor .

23           THE COURT:  Would it be acceptable then to exclude

24  time from speedy through the end of that week, which would be

25  May 13th, 2022, upon the Court's finding that the parties have

Sarah K. Mitchell, RPR, CRR

21-CR-00268-RBJ        Motions Hearing        01/28/2022     53

1   been diligent in pursuing this case, that counsel have

2   conflicts with another trial that interfere with the current

3   trial date, that both parties have agreed to vacate the

4   March 7th setting and to reset it for May 9th, that there is

5   no indication of prejudice to any person or to the public, and

6   that such an exclusion should be granted in the ends of

7   justice?

8            MS. SUELAU:  Yes, Your Honor.  I would agree with

9   that analysis.

10           MR. MOHAN:  As would I, Your Honor.  Thank you.

11           THE COURT:  All right.  I'll find and exclude time

12   through May 13th and set the trial in this case for May 9th,

13   wish you good luck on both sides with your trial in March, and

14   wish all of you continued health and safety in avoiding COVID.

15   If there's nothing else, that will conclude the hearing.  Does

16   anyone have anything else?

17           MR. MOHAN:  No, Your Honor.  Thank you.

18           MS. SUELAU:  No, Your Honor.  Thank you.  And same to

19   you on health and safety.

20           THE COURT:  All right.  I'll be back in the snow and

21   cold Monday morning bright and early wearing a robe.

22   Good-bye.

23           THE COURTROOM DEPUTY:  Court is in recess.

24       (The proceedings were concluded at 10:48 a.m.)

25


                    Sarah K. Mitchell, RPR, CRR

1                        <u>REPORTER'S CERTIFICATE</u>

2

3           I, SARAH K. MITCHELL, Official Court Reporter for the

4   United States District Court for the District of Colorado, a

5   Registered Professional Reporter and Certified Realtime

6   Reporter, do hereby certify that I reported by machine

7   shorthand the proceedings contained herein at the time and

8   place aforementioned and that the foregoing pages constitute a

9   full, true and correct transcript.

10          Dated this 2nd day of March, 2022.

11

12

13

14              <u>/s/ Sarah K. Mitchell</u>

15                    SARAH K. MITCHELL
                    Official Court Reporter
16            Registered Professional Reporter
                 Certified Realtime Reporter
17

18

19

20

21

22

23

24

25

                    Sarah K. Mitchell, RPR, CRR