IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 21-cr-00268-RBJ

UNITED STATES OF AMERICA,

        Plaintiff,

v.

**CLIFFORD LEWIS,**

        **Defendant.**

---

### DEFENDANT'S MOTION FOR VARIANT SENTENCE
---

Clifford Lewis, through Assistant Federal Public Defender Laura H. Suelau, respectfully requests this Court impose a sentence of 46 months. An 11-month variance in this case is supported by those factors outlined at 18 U.S.C. § 3553(a).[1]

**I.**    **Mr. Lewis's history and characteristics, and their relevance to the circumstances of this offense, support a variant sentence.[2]**

The Presentence Report paints something of a rosy picture of Mr. Lewis's upbringing up until the time of his mother's untimely and unexpected death from a brain aneurism when was he was 15 years old. That's not entirely accurate. Mr. Lewis's parents divorced when he was 13 years old. Prior to that, his father, Steve Lewis, was physically abusive to his mother, Mary Lewis. Steve Lewis was arrested in 1996, when Mr. Lewis was 12 years old for domestic violence.[3]

---

[1] 46 months is at the top of the guideline range contemplated in the Plea Agreement (37 to 46 months) and 11 months below the guideline range calculated in the PSR. At the time of the Plea Agreement, the parties estimated Mr. Lewis's criminal history category was III, not V.

[2] The information contained herein is based on counsel and Federal Public Defender Investigator David Staub's interviews with Mr. Lewis, Steve Lewis, Danae Lewis, and Vanessa Valois.

[3] *Colorado v. Steven Lewis*, 1996M200879, Larimer Co. (a protective order was issued for Mary, Danae, Jack and Clifford Lewis).

Prior to his parent's divorce, Mr. Lewis went on a camping trip with his paternal uncle, Brian Lewis. On the trip, Brian encouraged Mr. Lewis to sit on his lap, under the guise of teaching him to drive. Instead, Brian molested his young nephew. Mr. Lewis, then 10 years old, remained silent in his shame and discomfort. At the end of the trip, Mr. Lewis exited the shower to find his uncle taking nude photographs of him. Mr. Lewis yelled, but Brian acted as if that was an overreaction, and claimed the photos were innocent. After the trip, Mr. Lewis reported the abuse to his mother and father. Mr. Lewis and his sister Danae Lewis have slightly differing recollections of what happened next, but both agree that no legal actions were pursued against Brian Lewis and their parents dealt the with matter by speaking to Brian and their paternal grandmother (with whom Brian was living). Both Brian and the grandmother all but denied that the abuse occurred. After that, Mr. Lewis rarely saw his father's family. Mr. Lewis was never taken to counseling and because of his own shame and complicated emotions about the abuse, he did not speak of it with his parents or siblings again. He believed the best way to cope with the situation was to not talk about it. When contacted about the abuse, Steve Lewis reported to FPD Investigator David Staub, "that was dealt with," and indicated an unwillingness to speak further. At one point, he referred to the abuse as "rumors."

Steve Lewis was hardly an ideal father. While Mrs. Lewis cared for her children's emotional and physical needs and was involved in every aspect of their lives, Steve Lewis was emotionally unavailable and aloof towards his children. In 1999, the year before Mrs. Lewis's death, Steve Lewis was arrested on charges of child abuse and neglect and ordered to complete anger management classes.[4] Unsurprisingly, Steve Lewis was not prepared to help his young son deal with the sudden loss of his mother. Instead, the message that Mr. Lewis received from his father was that displays of emotion were unacceptable and talking about feelings represented weakness. Mrs. Lewis had always

---

[4] *Colorado v. Steven Lewis*, 1999M2000524, Larimer Co. Mr. Lewis does not recall the facts and circumstances of his father's arrest in this case.

2

created a safe space for her son to talk about his feelings and express his emotions. Without her, Mr. Lewis was bereft and alone. He never received grief counseling. Mr. Lewis's childhood and emotional development effectively ended after his mother's death.

The impact of the Adverse Childhood Experience (ACEs) Mr. Lewis experienced, and the untimely death of his mother, can clearly be seen in his lack of education, substance abuse, and criminal history.[5] After his mother's death Mr. Lewis "stopped caring." He began skipping school, using drugs, and engaging in self-destructive behaviors. Within a year of her death, he was committed to the Colorado Department of Youth Corrections (CDYC) for a two-year sentence.

ACEs impact brain development and are linked to adverse physical and mental health issues in adulthood including mental illness and substance abuse.[6] Studies have definitely linked those childhood experiences to the type of negative adult experiences Mr. Lewis suffered: lack of education, unemployment, and incarceration.[7] Because ACEs impact brain development, they are not something that simply resolve with time and age. The impact of ACEs are somewhat mitigated by "protective" factors in the form of safe, stable, and nurturing relationships. Mr. Lewis lost his protective factor, his mother, suddenly and was left with an aloof and disengaged caregiver.

---

[5] ACEs are traumatic events that occur before a child reaches 18. *See* Department of Health and Human Services, Child Welfare Information Gateway, https://www.childwelfare.gov/topics/preventing/overview/framework/aces/#:~:text=What%20Are%20ACEs%3F,%2C%20incarceration%2C%20and%20domestic%20violence (last accessed Aug. 18, 2022); *see also* Centers for Disease Prevention and Control (CDC), https://www.cdc.gov/violenceprevention/aces/fastfact.html.
[6] *See* CDC, Adverse Childhood Experiences Resources, various articles, https://www.cdc.gov/violenceprevention/aces/resources.html.
[7] *Id.*

**II.    Mr. Lewis's criminal history is the result of his untreated grief and substance abuse.**

Mr. Lewis is now 37 years old and has struggled significantly since his release from CDYC at 18 years old. His criminal history is clearly that of someone with substance use disorder. With few exceptions, his prior convictions are misdemeanor and traffic offenses related to drug and alcohol use. His only felony convictions are from Driving While Ability Impaired (with priors) in 2017 and a Violation of Bail Bonds for that same case in 2020. Those offenses, while serious, are non-violent and the direct result of his addiction, therefore somewhat non-volitional. Substance abuse experts describe the interplay between criminality and drug addiction in those terms, "if you see somebody who continues to use despite their lives being totally destroyed — losing their jobs, losing loved ones, ending up in jail — nobody would choose that. Nobody anywhere would ever choose that life. So clearly it is beyond this individual's control on some level."[8]

**III.   Mr. Lewis is at a turning point.**

Mr. Lewis is now 37 years old and his 38th birthday is just days before sentencing. He's facing his first federal felony conviction and, by far, his most serious felony conviction. Although he's received somewhat lengthy sentences in other cases, he's never *served* a sentence close to 46 months. He is also facing serious personal collateral consequences for his actions in this case and his relapse while on bond. His sister Danae Lewis, with whom he is very close, told him that she can no longer support him. At the time of his detention hearing Danae reported that she is his "biggest cheerleader." Doc. 19-1. Now, she's told Mr. Lewis that she will *only* support him after a proven track record of sobriety and non-recidivism. She was unwilling to write another letter to this court, something about which Mr. Lewis has great pain. Additionally, Mr. Lewis married Vanessa Valois last year and they

---

[8] Vox, *The opioid epidemic, explained,* German Lopez, https://www.vox.com/science-and-health/2017/8/3/16079772/opioid-epidemic-drug-overdoses (2017)

4

hope to start a life and family together upon his release. Like Danae Lewis, Ms. Valois has indicated an unwillingness to stand by Mr. Lewis if he does not make significant changes. He has no choice but to stop his path of destruction and every reason to commit to rehabilitation. He's realized that the grief over the loss of his mother may effectively lead to the loss of the rest of his family.

Mr. Lewis knows that he will need substantial support to not just get sober but stay sober and he intends to seek that out. He was diagnosed with PTSD in Denver County Jail in addition to anxiety and depression. While there, he was given access to medication and therapy that significantly alleviated his psychological distress. He hopes to continue counseling and medication (if appropriate) upon release.

Mr. Lewis would like to begin counseling and drug rehabilitation immediately, but he's unlikely to receive such services while in the Bureau of Prisons. Under the best of circumstances, the BOP manages to place just 17% of inmates who meet the criteria of "drug abuse or dependence" in RDAP.[9] Mr. Lewis is not entering the BOP in the best of circumstances, he's entering over two years into the COVID-19 pandemic, amid staff shortages and ever-changing operational modifications.[10] Likewise, the BOP has a dubious track-record of providing inmates with any, let alone adequate, mental health treatment.[11] A 2016 Department of Justice Study found that approximately 44.8% of all federal inmates have some mental health problem. And yet, prisons are ill-suited to treat mental illness. BOP psychologists are directed to give first priority to crisis intervention, suicide prevention, treatment of severely mentally ill inmates, treatment of BOP employees, and the initial screening of

---

[9] Redonna Chandler, Bennett Fletcher, and Nora Volkow, *Treating Drug Abuse and Addiction in the Criminal Justice System,* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2681083/.

[10] *See* NBC News, *Staffing shortages and deficient training leave First Step Act floundering, federal prison employees say* (July 28, 2022), https://www.nbcnews.com/news/us-news/staffing-shortages-deficient-training-leave-first-step-act-floundering-rcna40210; *See also* BOP Modified Operations, https://www.bop.gov/coronavirus/covid19_status.jsp (last accessed Aug. 18, 2022).

[11] *See* Christie Thompson et. al., *Treatment denied: The Mental Health Crisis in Federal Prisons*, The Marshall Project, November 21, 2018, https://bit.ly/MarshallProject-Mental-Illness.

5

inmates. Counseling, individual psychotherapy, and group therapy—the treatment options that an inmate can request by self-referral—are all prioritized after these more urgent mental health issues.[12] In fact, in 2017 the BOP classified just 3% of inmates as having a mental illness serious enough to require regular treatment. Again, these shortcomings have only gotten worse after COVID. Despite his documented mental health needs, Mr. Lewis is unlikely to get any treatment in the BOP. Therefore, a lengthy prison sentence is *not* the most effective to provide Mr. Lewis with the treatment and care. *See* 18 U.S.C. 3553(a)(2).

Nor is a sentence of incarceration beyond the 46 months requested necessary to further deter Mr. Lewis. A 2016 National Institute of Justice Study is unequivocal: sending a person convicted of a crime to prison isn't very effective and increasing the severity of punishment does little to deter crime.[13] A more severe punishment does not "chasten" individuals – "scientists have found *no* evidence for the chastening effect."[14]

A more powerful deterrent to crime is age – crime begins to decline steeply at age 35. Mr. Lewis will be almost 42 years old by the time of his release. While it is true that a prison sentence for someone naturally aging out of crime, like Mr. Lewis, achieves incapacitation, "that incapacitation is a costly way to deter future crimes by aging individuals who are already less likely to commit those crimes by virtue of age."[15] With proper substance abuse and mental health treatment, Mr. Lewis is unlikely to reoffend into his 40s.

---

[12] *See* U.S. Dept. of Justice, Fed. Bureau of Prisons, Program Statement P5310.17, Psychology Services Manual, at 4-5 (Aug. 25, 2016). https://www.bop.gov/policy/progstat/5310_017.pdf
[13] National Institute of Justice, *Five Things About Deterrence* (NIJ.gov, May 2016).
[14] *Id.* (emphasis added).
[15] *Id.*

**IV.     Conclusion.**

For the forgoing reasons, Mr. Lewis asks this Court to impose a variant sentence 46 months followed by three years of supervised release.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender

s/ Laura H. Suelau
LAURA H. SUELAU
Assistant Federal Public Defender
633 Seventeenth Street, Suite 1000
Denver, Colorado  80202
Telephone:  (903) 294-7002
FAX:  (903) 294-1192
laura.suelau@fd.org
Attorney for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on September 9, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

    Rajiv Mohan, Assistant United States Attorney
    rajiv.mohan@usdoj.gov


and I hereby certify that I have mailed or served the document or paper to the following non-CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

    Clifford Lewis (U.S. Mail)


                                s/ Laura H. Suelau
                                LAURA H. SUELAU
                                Assistant Federal Public Defender
                                633 Seventeenth Street, Suite 1000
                                Denver, Colorado  80202
                                Telephone:  (903) 294-7002
                                FAX:  (903) 294-1192
                                laura.suelau@fd.org
                                Attorney for Defendant