APPEAL,TERMED

# U.S. District Court – District of Colorado
## District of Colorado (Denver)
## CRIMINAL DOCKET FOR CASE #: 1:21–cr–00268–RBJ–1

Case title: USA v. Lewis

Date Filed: 08/11/2021

Date Terminated: 09/28/2022

---

Assigned to: Judge R. Brooke Jackson

Appeals court case number: 22–1336 USCA

**Defendant (1)**

| | | |
|---|---|---|
| **Clifford Lewis**<br>*TERMINATED: 09/28/2022* | represented by | **Laura Hayes Suelau**<br>Office of the Federal Public Defender<br>633 Seventeenth Street<br>Suite 1000<br>Denver, CO 80202<br>303–294–7002<br>Fax: 303–294–1192<br>Email: laura_suelau@fd.org<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Public Defender or Community Defender Appointment* |

| **Pending Counts** | **Disposition** |
|---|---|
| 18 U.S.C. § 922(g)(1) – Possession of a Firearm and Ammunition by a Prohibited Person<br>(1) | Defendant sentenced to 64 months imprisonment; 3 years of supervised release term; $100 special assessment fee. |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|

1

None

---

**Plaintiff**

**USA**                                    represented by   **Rajiv Mohan**
                                                            U.S. Attorney's Office
                                                            District of Colorado
                                                            1801 California Street
                                                            Suite 1600
                                                            Denver, CO 80202
                                                            303–454–0220
                                                            Email: Rajiv.Mohan@usdoj.gov
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*
                                                            *Designation: Federal Agency Attorney*

                                                            **Albert C. Buchman**
                                                            U.S. Attorney's Office
                                                            1801 California Street
                                                            Suite 1600
                                                            Denver, CO 80202
                                                            303–454–0228
                                                            Email: al.buchman@usdoj.gov
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Kurt J. Bohn**
                                                            U.S. Attorney's Office
                                                            District of Colorado
                                                            1801 California Street
                                                            Suite 1600
                                                            Denver, CO 80202
                                                            303–454–0100
                                                            Fax: 303–454–0407
                                                            Email: kurt.bohn@usdoj.gov
                                                            *ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 08/11/2021 | 1 | | INDICTMENT as to Clifford Lewis (1) count(s) 1. (Attachments: # 1 Criminal Information Sheet) (rvill, ) (Entered: 08/11/2021) |
| 12/09/2021 | 35 | | MOTION to Suppress *Evidence* by Clifford Lewis. (Suelau, Laura) (Entered: 12/09/2021) |
| 12/23/2021 | 36 | | RESPONSE to Motion by USA as to Clifford Lewis re 35 MOTION to Suppress *Evidence* (Attachments: # 1 Exhibit 1, # 2 Conventionally Submitted)(Mohan, Rajiv) (Entered: 12/23/2021) |
| 01/13/2022 | 42 | | REPLY TO RESPONSE to Motion by Clifford Lewis re 35 MOTION to Suppress *Evidence* (Suelau, Laura) (Entered: 01/13/2022) |
| 03/03/2022 | 50 | | TRANSCRIPT of Motions Hearing as to Clifford Lewis held on January 28, |

| | | | |
|---|---|---|---|
| | | | 2022 before Judge Jackson. Pages: 1–53.<br><br>**NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.**<br><br>Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (smitc, ) (Entered: 03/03/2022) |
| 05/16/2022 | 63 | | PLEA AGREEMENT as to Clifford Lewis (jdyne, ) (Entered: 05/16/2022) |
| 09/07/2022 | 75 | | OBJECTION/RESPONSE to Presentence Report 69 by Clifford Lewis (Attachments: # 1 Exhibit A)(Suelau, Laura) (Entered: 09/07/2022) |
| 09/09/2022 | 77 | | MOTION for Non–Guideline Sentence by Clifford Lewis. (Suelau, Laura) (Entered: 09/09/2022) |
| 09/16/2022 | 80 | | RESPONSE to Motion by USA as to Clifford Lewis re 77 MOTION for Non–Guideline Sentence (Mohan, Rajiv) (Entered: 09/16/2022) |
| 09/28/2022 | 84 | | JUDGMENT as to defendant Clifford Lewis (1). Count 1: Defendant sentenced to 64 months imprisonment; 3 years of supervised release term; $100 special assessment fee. Entered by Judge R. Brooke Jackson on 9/28/2022. (hguer) (Entered: 09/28/2022) |
| 10/05/2022 | 86 | | NOTICE OF APPEAL as to 84 Judgment by Clifford Lewis. (Suelau, Laura) (Entered: 10/05/2022) |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No. 21-cr-00268-RBJ

UNITED STATES OF AMERICA,

     Plaintiff,

v.

1. CLIFFORD LEWIS,

     Defendant.

---

## INDICTMENT

---

The Grand Jury charges:

## <u>COUNT 1</u>

On or about April 22, 2021, in the State and District of Colorado, the defendant, CLIFFORD LEWIS, knowing he had previously been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed a firearm and ammunition, in and affecting interstate and foreign commerce.

All in violation of Title 18, United States Code, Section 922(g)(1).

## <u>FORFEITURE ALLEGATION</u>

1.     The allegations contained in Count 1 of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 924(d) and Title 28, United States Code, Section 2461(c).

2.     Upon conviction of the violation(s) described in paragraph 1 above, the defendant shall forfeit to the United States, pursuant to Title 18, United States Code,

Section 924(d) and Title 28, United States Code, Section 2461(c), any firearm and ammunition involved in the commission of the offense, including but not limited to the following: (1) Charles Day Model 601 Honcho 12-gauge shotgun with serial number 19CH-00620; and (2) the recovered ammunition.

3.      If any of the property described in paragraph 2 above, as a result of any act or omission of the defendant:

      a)      cannot be located upon the exercise of due diligence;
      b)      has been transferred or sold to, or deposited with, a third party;
      c)      has been placed beyond the jurisdiction of the Court;
      d)      has been substantially diminished in value; or
      e)      has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property.

A TRUE BILL:

Ink Signature on File in Clerk's Office
FOREPERSON

MATTHEW T. KIRSCH
Acting United States Attorney

By:  *s/ Rajiv Mohan*
Rajiv Mohan
Assistant U.S. Attorney
U.S. Attorney's Office
1801 California St., Ste. 1600
Denver, CO 80202
Telephone: 303-454-0100
Fax:  303-454-0406
E-mail:  Rajiv.Mohan@usdoj.gov
Attorney for Government

2

| DEFENDANT: | CLIFFORD LEWIS |
|---|---|

YOB: 1984

COMPLAINT
FILED? _____ Yes  __X__ No

OFFENSE(S):   Count 1:  Possession of a Firearm and Ammunition by a
Prohibited Person, 18 U.S.C. § 922(g)(1)

LOCATION OF
OFFENSE:   Larimer County, Colorado

PENALTY:   Count 1:  NMT 10 years' imprisonment, NMT $250,000 fine, or
both; NMT 3 years' supervised release; $100 special assessment
fee.  If the sentencing enhancement in 18 U.S.C. § 924(e) applies,
then NLT 15 years' imprisonment, NMT $250,000 fine, or both;
NMT 5 years' supervised release; $100 special assessment fee.

AGENT:   Luke Hitt, Special Agent, ATF

AUTHORIZED BY:   Rajiv Mohan, Assistant U.S. Attorney

ESTIMATED TIME OF TRIAL:

 X  five days or less; __ over five days

THE GOVERNMENT

 X  will seek detention in this case based on 18 U.S.C. § 3142(f)(1).

The statutory presumption of detention is not applicable to this defendant.

6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 21-cr-00268-RBJ

UNITED STATES OF AMERICA,

      Plaintiff,

v.

**CLIFFORD LEWIS**,

      **Defendant.**

---

### MOTION TO SUPPRESS EVIDENCE

---

      Clifford Lewis, through counsel, Assistant Federal Public Defender Laura H. Suelau, respectfully requests this Court suppress all evidence obtained as the result of his illegal arrest and the illegal search of his vehicle. While standing outside his car, Mr. Lewis was approached by police officers, guns drawn. The officers then handcuffed and involuntarily placed him in the back of a police car while they conducted additional investigation. During that time, police had neither a warrant for his arrest, nor probable cause to arrest him. Knowing that, police officers told him repeatedly he was not under arrest, but his detention far exceeded the permissible scope of a *Terry* stop.

      Within minutes (perhaps seconds) of police initiating the encounter, Mr. Lewis's detention became an illegal arrest. After that illegal seizure, police searched Mr. Lewis's car. But for his illegal arrest, his car would not have been searched. Therefore, Mr. Lewis requests this Court suppress all evidence found in that search – the fruit of his illegal arrest.

1

## FACTUAL BACKGROUND[1]

At approximately 1:19PM on April 22, 2021, an employee of Circle K gas station at 2500 W. Eisenhower Boulevard called 911 to report that drivers of two cars –a Nissan and a green Dodge Durango with a trailer – had an altercation at the gas station. According to the 911 caller, the driver of the Dodge Durango had a gun, and the driver of the Nissan nearly ran him over. The caller described the driver of the Dodge as "younger" with a beard, hat, and glasses. The Loveland Police Department was dispatched.

In the course of responding to the call, officer Evan Dunlap saw a green Dodge Durango with a trailer pulled over on the shoulder of the 2000 block of W. 8th Street, Loveland, Colorado, next to a river, and approximately one mile from the Circle K. A man, later identified as Clifford Lewis, was standing outside the car, allegedly "digging" in the driver's seat area.[2] Officer Dunlap asked Mr. Lewis if he had a gun. Mr. Lewis responded "no," and lifted his shirt to demonstrate that he did not. Officer Dunlap asked Mr. Lewis if he'd been in an altercation at the Circle K, he responded "no."[3] At this point, officers Nicholas Corrigan and Joshua Marner arrived on scene in two separate SUVs. Officer Dunlap then gave Mr. Lewis directives to walk toward the back of the Durango, put his hands on top of his head, and spread his feet, all while Officer Dunlap had his gun trained on Mr. Lewis. Mr. Lewis complied with each of those commands. Officer Corrigan frisked and handcuffed Mr. Lewis and

---

[1] The facts contained herein are based on discovery provided by the government, including police reports, body worn camera (BWC), and surveillance video. Video from the BWC of two officers was provided. The reports of seven other officers indicate that they too recorded video, but that was not discovered to Mr. Lewis. Should those videos exist and materially impact the instant motion, Mr. Lewis will move to supplement this motion.

[2] Of the four on-scene, only the BWC of Sergeant Roberts, who arrived after Mr. Lewis was handcuffed, frisked, and placed in the backseat of a police car, was provided in discovery. Therefore, everything before Sgt. Roberts's arrival is based on police reports.

[3] Officer Dunlap's report says he asked about "Diamond Shamrock (Circle K)," but his exact wording is unknown.

2

placed him in his patrol car. The frisk revealed a knife. Mr. Lewis asked if he was under arrest and was told he was not. Just after Mr. Lewis was handcuffed, officer Dunlap searched Mr. Lewis's car, looking "underneath the driver's seat, and in the immediate reach and did not see a gun in plain view." At approximately 1:29PM, Sergeant Matt Roberts arrived, activated his BWC and captured officer Corrigan telling Mr. Lewis, "you are not under arrest right now, just give me a second to move my car." At 1:31PM, officer Corrigan moved his car with Mr. Lewis handcuffed in the back. At the same time Sgt. Roberts, the fourth officer on-scene, looked into the Durango through an open rear window and with a flashlight and did not see anything.

For the next several minutes, the four officers discussed next steps with each other and Mr. Lewis. The officers reviewed Mr. Lewis's outstanding warrants and officer Corrigan determined they were non-extraditable. After making this determination, at 1:34PM, officer Corrigan turned from Mr. Lewis to Sgt. Roberts and said "we've got nothing, right?" Sgt. Roberts responded "we have to search that car…I think we need to frisk it at least." Officer Corrigan returned to Mr. Lewis, again told him he was not under arrest and "not going to jail on the warrant," but instructed him to put his legs inside the car so he could shut the door (again). Mr. Lewis obeyed the command but pleaded with the officers saying, "guys, come on, please man." The officers responded by telling him to watch his toes and slamming the door shut. Sgt. Roberts commented,"I don't want him interrupting."

After shutting the door on Mr. Lewis, the officers again discussed whether they had enough to "frisk [the car] at least."[4] A few minutes later, officer Corrigan pulled Mr. Lewis, still handcuffed, out of the police car and frisked him again. Sgt. Roberts told Mr. Lewis they were going to search the

---

[4] Sgt. Roberts relayed what an officer on-scene at the Circle K had told him about the surveillance video. He told the other three officers; a gun could be seen "clear as day." That was not true. The on-scene officer said the person in the gas station surveillance video looked like he was "concealing the gun."

Durango. Mr. Lewis responded "no, I have other people's property in there and I don't know what's in my car so I am not giving you permission to search my car." Roberts replied, "we are not asking for permission." Mr. Lewis continued to deny consent to search, following up with "well you can't just search my car like that…I know my rights." At some point, before being advised of his *Miranda* rights, Mr. Lewis told the officers: "I did not have a gun, I had my phone in my hand when I got out of my car…I was trying to talk to my friend to see who was following me… I had my phone in my hand."

Sgt. Roberts persisted, telling Mr. Lewis they were going to *Terry* Frisk his car, "we have evidence…or at least suspect that a firearm is involved." To which Mr. Lewis responded, "I didn't have one." Officer Roberts continued, "so what we are doing is investigating that allegation, there are a lot of different laws, this one specifically is a *Terry* frisk, if we have evidence that people have guns we get to frisk you and the vehicle to ascertain." He continued, "you can frisk people's car based on *Terry v. Ohio.*"

At 1:40PM Mr. Lewis, still handcuffed, was returned to the back of officer Corrigan's vehicle and told "you are not under arrest." Seconds later, officers Dunlap and Marner began to search Mr. Lewis's car.

## APPLICABLE LAW

"The Fourth Amendment provides that 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." *Terry v. Ohio*, 392 U.S. 1, 8 (1968). The "seizure" of a "person," under the Fourth Amendment refers to an arrest. *Torres v. Madrid*, 141 S. Ct. 989, 996 (2021).

There are three types of police/citizen encounters: consensual encounters, investigative stops, and arrests. *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000). The least intrusive is a so-called

"consensual encounter." *Id.* The most intrusive is an arrest. *Id.* An investigative detention, or *"Terry*

stop," falls in the middle. It is a seizure within the meaning of the Fourth Amendment, but unlike an

arrest, it need not be supported by probable cause. *Id.* Because it need not be supported by probable

cause, the permissible scope of an investigative stop is limited, "[*Terry*]created a narrowly drawn

exception to the probable cause requirement for lesser intrusions into an individual's liberty." *U.S. v.*

*King,* 990 F.2d 1552, 1557 (10th Cir. 1993). The police can stop, briefly detain, and frisk a person for

investigative purposes if the stop is "justified at the inception" by "reasonable suspicion supported by

articulable facts that criminal activity 'may be afoot.'" *Id.* (internal citations omitted). They cannot,

however, "[when] a person…is no more than suspected of criminal activity…carry out a full search

of the person or of his automobile or other effects." *Florida v. Royer,* 460 U.S. 491, 500 (1983).[5] Instead,

after determining whether a stop was justified at its inception, a court must determine whether the

officer's actions during the stop were "reasonably related in scope to the circumstances which justified

the interference in the first place." *Terry v. Ohio,* 392 U.S. 1, 21 (1968).

The permissible scope of the intrusion varies based on "the particular facts and circumstances

of each case." But, "this much, however, is clear: an investigative detention must be temporary and

last no long than is necessary to effectuate the purpose of the stop." *Royer,* 460 U.S. at 500. *Royer*

continues, "the investigative methods employed should be the least intrusive means reasonably

available to dispel the officer's suspicion in a short period of time." *Id.* The scope and duration of an

investigative stop must be carefully tailored to its underlying justification. *King,* 990 F.2d at 1559.

Not only are investigative stops limited in scope and time, but the police "cannot seek to verify

their suspicions by means that approach the conditions of an arrest." *Royer,* 460 at 499. An arrest,

---

[5] In other words, there is no such thing as a "*Terry* frisk" of a car.

versus a de minimus intrusion, occurs when "an officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *U.S. v. Mendenhall*, 446 U.S. 544, 552 (1980). *Mendenhall* concludes the key question is whether "a reasonable person would have believed that he was not free to leave." Although police are allowed to take some steps necessary to protect their personal safety during a *Terry* stop, those actions are limited. Any display of force must be supported by "circumstances that reasonably warrant such measures." *United States v. Melendez-Garcia*, 28 F.3d 1046, 1053 (10th Cir. 1994). The use of firearms, handcuffs, and other forceful techniques during a stop transform a *Terry* stop into an illegal arrest in "most scenarios." *Id.* When such techniques are unwarranted, they transform an investigative stop into an arrest and an arrest is "a more serious intrusion on [one's] personal liberty than is allowable on mere suspicion of criminal activity." *Royer,* 460 U.S. at 502.

It is the government's burden to demonstrate that the seizure of a defendant was based on reasonable suspicion and that it was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure. *Melendez-Garcia*, 28 F.3d at 1052.

Here, the stop of Mr. Lewis was not justified at the inception, it was not reasonably limited in scope, and the conditions of the stop almost immediately converted the detention into an arrest.

## ARGUMENT

### I.    Mr. Lewis's detention was not justified at the inception.

When officer Dunlap pulled up behind Mr. Lewis, he knew only that the car Mr. Lewis was standing next to matched the description of one involved in an "altercation," and that the driver of the Durango was alleged to have had a gun. No license plate was provided by the 911 caller to match with the car. Immediately, Mr. Lewis denied having a gun and showed officer Dunlap his waist band to demonstrate the same. At that point, there was no reasonable articulable suspicion that criminal

6

activity was afoot, and Mr. Lewis should have been allowed to leave. Instead, he was detained while police continued to investigate.

## II. The investigative detention of Mr. Lewis exceeded its permissible scope.

Assuming arguendo that the *Terry* stop of Mr. Lewis was justified at its inception, it far exceeded the time and means necessary to effectuate the purpose of that stop. The officers certainly did not employ the least intrusive means reasonably available to dispel their suspicions in a short period of time. Indeed, all of the least intrusive means were exhausted before Sgt. Roberts arrived and activated his BWC at 1:29PM. Those means should have dispelled the officers' suspicions. Nonetheless the detention and investigation continued.

Before 1:29PM, Mr. Lewis told officers he did not have a gun. He complied with officer commands and was frisked, revealing a knife, not a gun. The officers then placed Mr. Lewis in the back of a police car and (impermissibly) searched the driver's seat of his car. Again, they did not find a gun or see anything suspicious in plain view. At that point (before 1:29PM), all evidence indicated either that Mr. Lewis was *not* the person from the Circle K, or that he did not have a gun, as alleged. But Mr. Lewis remained handcuffed in a police car.

## III. Mr. Lewis's detention was not a *Terry* stop, but an illegal arrest.

Despite being told numerous times he was not under arrest (because the police knew they did not have probable cause to arrest him), Mr. Lewis was under arrest. For at least eleven minutes before the search of his car, he was handcuffed in the back of a police car, with the door closed at various times. Mr. Lewis was under arrest from the moment officer Dunlap took out his firearm and aimed it at Mr. Lewis while officer Corrigan handcuffed him, frisked him, and placed in the back of a police

vehicle. *See United States v. Melendez-Garcia,* 28 F.3d 1046, 1053.[6] All signs thereafter also evidence that Mr. Lewis was under arrest.

First, officer Corrigan moved his car approximately 20 feet with Mr. Lewis handcuffed inside and clearly unable to leave. Second, at no point during his detention did the officers tell Mr. Lewis he was free to leave. The opposite, he was shut (likely locked) in the police car several times despite apparent pleas to leave. *See U.S. v. Hill,* 626 F.2d 429, 435–36 (5th Cir. 1980).[7] Although Mr. Lewis repeatedly asked the officers if he was under arrest, and they said he was not, they never uncuffed him or otherwise indicated he could drive away. Third, the officers asked Mr. Lewis questions throughout his time handcuffed, even after resolving the basic question of whether he had a gun. The highly intrusive precautionary measures employed, displaying a firearm, placing Mr. Lewis in handcuffs, and locking him in a police car, all demonstrate that even if the *Terry* stop was lawful at the inception, it quickly become an arrest without probable cause, in violation of the Fourth Amendment. Assurances that he was not under arrest were meaningless, Mr. Lewis was not free to leave.

### IV. *Terry* does not allow for the search of vehicles.

The Tenth Circuit and Supreme Court disagree with Sgt. Roberts' characterization of *Terry*. In fact, they've unequivocally condemned the actions of the officers here: "in the name of investigating a person who is no more than suspected of criminal activity, the police may not carry out a full search

---

[6] *See U.S. v. Perdue,* 8 F.3d 1455, 1463 (10th Cir. 1993); *See also United States v. Merkley,* 988 F.2d 1062, 1064 (10th Cir.1993) (holding officers' display of firearms and use of handcuffs was reasonable only when informed suspect threatened to kill someone and observed suspect violently pounding fists); *U.S. v. Burciaga-Burciaga,* 147 Fed. Appx. 725, 730 (10th Cir. 2005) (unpublished) (holding officers' conduct during stop appropriate *in relation* to perceived threat when officers displayed their weapons only as long as necessary to ensure the vehicle and its occupants posed no threat).

[7] Finding an investigative detention turned into arrest when interrogation was not "brief" or "on-the-spot", defendant was never informed he was "free to go," and defendant would have been physically restrained if he had refused to comply with officers' commands.

8

of the person or of his automobile or other effects." *Royer,* 460 U.S. 491 499. Instead, police must have probable cause to search a vehicle. *See United States v. Jurado-Vallejo,* 380 F.3d 1235 (10th Cir. 2004). Even if there was such a thing as a "vehicle frisk" justified by reasonable suspicion alone (and there is not), that frisk was already conducted by both officers Dunlap and Sgt. Roberts. Dunlap looked under the driver's seat and in plain view. Roberts looked through an open rear window and shined his flash light into other windows. Any suspicions of criminal activity were therefore dispelled. No reasonable suspicion, let alone probable cause, existed to search the car.

### V. The evidence found during the search of Mr. Lewis's vehicle was fruit of Mr. Lewis's illegal detention.

Even assuming there was probable cause to search the car, the vehicle search was tainted by Mr. Lewis's unlawful seizure. Evidence found in Mr. Lewis's car was the fruit of that seizure and should be suppressed. *See Wong Sun v. United States,* 371 U.S. 471 (1963).

When a search follows a Fourth Amendment Violation, the government must establish a "break in the causal connection between the illegality and the evidence thereby obtained." *Melendez-Garcia,* 28 F.3d at 1053. But for Mr. Lewis's illegal seizure, Mr. Lewis's vehicle would not have been searched. Instead, he would and should have been on his way. The Supreme Court in *Wong Sun v. U.S.* cautioned "the history of the use, and not infrequent abuse, of the power to arrest cautions that a relaxation of the fundamental requirements of probable cause would 'leave law-abiding citizens at the mercy of the officers' whim or caprice." 371 U.S. 471, 479 (1963). Such whims were evident in this case. The evidence seized from Mr. Lewis's car was the "fruit" of his illegal seizure. That evidence cannot be used as proof against the victim of a search and should be suppressed. *Id.* at 484.

## CONCLUSION

For the forgoing reasons, this Court should suppress all evidence derived from the unlawful

seizure of Mr. Lewis and the subsequent search his car.


Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender


s/Laura H. Suelau
LAURA H. SUELAU
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
laura.suelau@fd.org
Attorney for Defendant

10

## CERTIFICATE OF SERVICE

I hereby certify that on **December 9, 2021**, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Rajiv Mohan, rajiv.mohan@usdoj.gov
Assistant United States Attorney

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

Clifford Lewis (U.S. Mail)

s/Laura Suelau
LAURA SUELAU
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
laura.suelau@fd.org
Attorney for Defendant

11

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No. 21-cr-00268-RBJ

UNITED STATES OF AMERICA,

      Plaintiff,

v.

CLIFFORD LEWIS,

      Defendant.

---

## RESPONSE TO MOTION TO SUPPRESS

---

      The United States of America submits this response to defendant Clifford Lewis's motion to suppress, which the Court should deny for the reasons given below.

## BACKGROUND

      In the early afternoon of April 22, 2021, an employee at a Circle K gas station in Loveland called 911 to report that the driver of a forest green Dodge Durango, with a trailer, had pointed a gun at the driver of a black Nissan Altima. According to the caller, the Altima nearly ran over the driver of the Durango, who then pointed a handgun at the car. The caller said that the driver was the only occupant of the Durango, and described him as younger, with a beard, wearing a hat and sunglasses. She said that she saw him drive away southbound on Wilson Avenue.

      Loveland Police Department officers responded to the area. At 1:19 PM, Officer Evan Dunlap located a forest green Dodge Durango—with a trailer—parked on the shoulder of the 2000-block of W. 8th Avenue, by the river. Dunlap saw a man, with a

1

beard, wearing a hat, standing next to the car (no sunglasses). The map below illustrates the lay of the land, and how close the Durango was to the gas station.



Dunlap turned on his overhead lights, pulled behind the Durango, and got out of his car. Meanwhile, other officers arrived. Dunlap told the man to put his hands on top of his head. Instead, the man reached toward his waistband, which prompted Dunlap to say, "don't reach for anything dude." Dunlap pulled out his gun. Dunlap told him again to put his hands on top of his head, and the man complied. Dunlap told the man to walk backwards and to his left. Officer Nicholas Corrigan then told the man to get on his

2

knees.  Corrigan placed the man in handcuffs and put him in the back of a police car.
Corrigan told the man he was being detained so that officers could investigate further.

Meanwhile, at about 1:28 PM, Officer Erin Berry responded to the gas station.
She immediately spoke with an employee who showed her surveillance footage of the
incident.  The employee points out that, "you can see him pull the gun."  Over the radio,
Berry conveyed what she saw on the footage, namely that "the male goes across the
parking lot, the black Nissan drives towards the male, and he pulls out a gun, but you
can see him conceal the gun as he's walking towards it."  Berry spoke with and obtained
written statements from three employees who saw the incident.  She also recorded the
surveillance footage and sent it to Corrigan and Sergeant Matthew Roberts.  Here is a
photo from the surveillance footage of the man pointing the gun at the Altima.



Back at the Durango, Corrigan had dispatch run the plates on the car and the name Clifford Lewis came back.  Dispatch further advised that Lewis had an outstanding warrant.  Dispatch would later advise that Lewis was a convicted felon and had other outstanding warrants.  In response to Lewis's questions, Corrigan explained the situation at the Circle K and why officers had responded.  Corrigan again told Lewis he was not under arrest.  Lewis said he knew nothing about a gun and seemed to deny that he was "Clifford."  Corrigan went back to his computer to look into the nature of the warrant.  Then Roberts explained to Corrigan what was on the surveillance video.  At this point, officers decided to "frisk" the car.  Lewis told the officers that he did not want them to search the car.  Roberts explained to him why the officers were doing so.  Corrigan read Lewis his *Miranda* rights.  Lewis maintained he did not know anything about having a gun and that he did not know who the person in the black Altima was.

Dunlap and Officer Paul Ashe then began to look inside the Durango.  They found a shoulder holster and loaded magazine near the front-passenger seat, along with a lower received in a box next to the driver's seat, and ammunition.  Dunlap found what officers believed to be a suspected explosive device and paused the search.  Ashe asked the Northern Colorado Bomb Squad for help.  A technician arrived and took custody of the device.  Officers resumed the search and found various firearm parts and accessories, ammunition, suspected silencers, a .22 caliber revolver, a short-barreled shotgun, drug paraphernalia, and a small amount of suspected methamphetamine.  Corrigan placed Lewis under arrest for unlawful possession of a firearm.

Lewis is charged with being a felon-in-possession of a firearm, in violation of 18

U.S.C. § 922(g)(1).  He now moves to suppress the evidence found in the car.[*]

## ARGUMENT

Lewis argues that his detention and the search of his car violated the Fourth Amendment.  This Court should deny the motion because Lewis was detained in accordance with the Fourth Amendment, and the search of the car was justified on a number of grounds.

## I.  Lewis was detained in accordance with the Fourth Amendment.

As for the detention, Lewis contends that the officers lacked reasonable suspicion to detain him in the first place, that they then exceeded the scope of a permissible investigative detention, and that their conduct converted the detention into an unlawful arrest unsupported by probable cause.  Each argument is meritless, as explained in turn below.

### A.  The officers had reasonable suspicion to detain Lewis.

To make an investigative stop, or what is commonly known as a *Terry* stop, officers need reasonable suspicion, based on the totality of the circumstances, that the person may be involved in criminal activity.  *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015).  Reasonable suspicion must be "particularized and objective," but it "is not, and is not meant to be, an onerous standard."  *Id.* (cleaned up).  It "requires 'considerably less' than a preponderance" and exists "even if it is more likely than not that the individual is *not* involved in any illegality."  *Id.* (cleaned up).  Reasonable

---

[*] The government is submitting the Loveland Police Department reports as Exhibit 1; Officer Dunlap's body-cam footage as Exhibit 2; Officer Corrigan's body-cam footage as Exhibit 3; and Officer Berry's body-cam footage as Exhibit 4.

suspicion is viewed objectively "from the perspective of the reasonable *officer*"—not the defendant—with the actual officers' knowledge.  *United States v. Guerrero*, 472 F.3d 784, 787 (10th Cir. 2007) (cleaned up).

Here, the officers received a call that a man with a beard and a hat pointed a gun at the black Altima and then drove away in a forest green Dodge Durango with a trailer. This was putative criminal activity the officers were entitled to investigate.  *See* C.R.S. §§ 18-3-206 (felony menacing with a real of simulated weapon) & 18-12-106(1)(a) (crime to "knowingly and unlawfully aim[ ] a firearm at another person").  When the officers encountered Lewis, they saw that he had a beard and a hat, and was standing by a forest green Dodge Durango with a trailer just a short distance from the gas station and a short time after the incident.  These facts establish reasonable suspicion that Lewis was involved in criminal activity, namely, the incident at the gas station.  *See United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003) ("[P]olice observation of an individual, fitting a police dispatch description of a person involved in a disturbance, near in time and geographic location to the disturbance, establishes a reasonable suspicion that the individual is the subject of the dispatch.").

Lewis's responses miss the mark.  He says that no license plate number "was provided by the 911 caller to match the car."  Mot. 6.  But reasonable suspicion does not require certainty.  It exists even when it is more likely that someone is *not* involved in criminal activity.  *Pettit*, 785 F.3d at 1379.  There may have been no license plate number provided, but Lewis matched the caller's description down to the beard and hat, and the Durango matched down to the color and trailer.  If that were not enough, the

6

officers found Lewis and the Durango in close proximity to the gas station shortly after the incident.  All this was enough to establish reasonable suspicion, whatever minimal uncertainties might have remained.

Lewis also says that he denied having a gun and showed Dunlap his waistband to prove it.  But reasonable suspicion is viewed from the perspective of the reasonable officer and takes "into account an officer's reasonable inferences based on training, experience, and common sense."  *United States v. Garcia*, 751 F.3d 1139, 1143 (10th Cir. 2014).  Common sense suggests that putative criminals do not always tell the truth about their criminal activity, and nothing in the Fourth Amendment requires officers to take a suspect's word and cease all investigation.  In fact, the purpose of an investigative detention is to allow officers to "take additional steps to investigate further." *Hiibel v. Sixth Judicial Dist. of Nev., Humboldt County*, 542 U.S. 177, 185 (2004).  Lewis did lift up his waistband, but that was not the only place where there could have been a gun, and officers "need not rule out of the possibility of innocent conduct" anyway. *United States v. Arvizu*, 534 U.S. 266, 277 (2002).

**B.     The officers did not exceed the scope of an investigative detention.**

Lewis next contends that, even if the detention was justified at the start, the officers exceeded its permissible scope because they "did not employ the least intrusive means reasonably available to dispel their suspicions[.]"  Mot. 7.  The problem with this argument is that the Fourth Amendment does "not require [officers] to use the least intrusive means in the course of a detention, only reasonable ones."  *United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994).  Lewis specifically says that

officers were forestalled from any further investigation after he said he did not have a gun and a frisk did not turn up one.  Again, however, the officers were not required to take Lewis's word as the final one.  As explained below, moreover, their further investigative steps were justified under the Fourth Amendment.

### C.    The officers' actions did not turn the detention into an arrest.

Lewis goes on to say that the means of detention—displaying firearms, putting him in handcuffs, and placing him in the back of a police car—converted the *Terry* stop into an arrest that required probable cause.

"'Under certain circumstances, the steps officers may permissibly take to protect their safety'" during a *Terry* stop "include drawing their weapons, placing a suspect in handcuffs, or forcing a suspect to the ground." *United States v. Mosley*, 743 F.3d 1317, 1329 (10th Cir. 2014) (cleaned up).  They also include placing the detainee in the back of a police car. *United States v. Burciaga-Burciaga*, 147 F. App'x 725, 730 (10th Cir. 2005).  These actions are permissible when a "man of reasonable caution" would believe they are "appropriate" based on the facts available at the time of the seizure. *Id.* (cleaned up).

For example, in *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993), the officers were justified in pointing their guns at a suspect and forcing him to the ground based merely on the fact that he was driving toward a house where they knew there were guns.  *See id.* ("The officers knew that guns were found on the property where marijuana was being cultivated.  This fact alone justifies any concern the officers had for their personal safety.").  To take another example, officers employed measures similar

8

to the ones here in *United States v. Windom*, 863 F.3d 1322, 1333 (10th Cir. 2017), where the stop occurred in a high-crime area, and officers received "a tip that would have led a reasonable officer to believe that one of the occupants of the vehicle they had just stopped had flashed a firearm in public, *and* had also proclaimed membership in the Crips[.]"   And in *United States v. Copening*, 506 F.3d 1241, 1243 (10th Cir. 2007) (cleaned up), officers were justified in effecting a "felony takedown" when they encountered a suspect and car in a location that lined up with an anonymous tip that "a bald, African-American man" exited a car with a specific license plate, dropped a pistol outside of a convenience store, picked the pistol back up, and stashed it in the car.  Thw felony takedown procedure was virtually identical to the one employed here.[†]  At bottom the risk that the suspect was armed justified the measures taken.  *Id.* at 1248 ("The safety risk attendant to detaining the truck's occupants on a suspected weapons violation along justified the use of handcuffs[.]").

   The same risk was on full display here.  The officers reasonably suspected that Lewis was armed or otherwise had ready access to a firearm.  They were, after all, responding to a report that a man who matched Lewis's description pulled out a gun and drove away in a car that matched Lewis's car in the direction where Lewis was

---

[†] *Copening*, 506 F.3d at 1245 ("Officer Dupler described the felony takedown procedure as follows: the officers (1) exit their cruisers, staying behind their driver's-side door, with their guns drawn; (2) obtain a view of the occupants' hands; (3) direct the driver to throw the vehicle's keys on the ground, using only their left hand; (4) order the occupants to exit the vehicle, one at a time, with their hands above their head; (5) tell the suspects to back up, *i.e.,* facing away from the officers, toward the police cruisers; and (6) handcuff the suspects, either standing, kneeling, or in a prone position, from behind.  Throughout the takedown officers keep guns fixed on both the vehicle and the suspects.  In this case, at least six officers participated in the felony takedown.")

found shortly after the incident.  On top of that, when Dunlap told Lewis to put his hands on his head, Lewis instead reached for his waistband, which amplified the officer-safety concerns.  It was only at that point that Dunlap raised his gun, and the measures that Lewis challenges followed.

### D.  Officers had probable cause to arrest Lewis anyway.

Even if there were an arrest, the officers had probable cause to support it. Probable cause is, of course, is more demanding than reasonable suspicion, but likewise does not require certainty.  Rather, "probable cause exists when under the totality of the circumstances there is a reasonable probability that a crime is being committed."  *United States. v. Traxler*, 477 F.3d 1243, 1247 (10th Cir. 2007) (cleaned up).  Officers need not "rule out all innocent explanations" for probable cause to lie.  *Rife v. Oklahoma Dep't of Pub. Safety*, 854 F.3d 637, 644-45 (10th Cir. 2017).

Here, the officers had probable cause that the conduct at the gas station was criminal.  C.R.S. §§ 18-3-206 & 18-12-106(1)(a).  In this vein, "an officer's assessment … need not be perfect because the Fourth Amendment allows for some mistakes on the part of government officials, including reasonable mistakes of law."  *United States v. Diaz*, 854 F.3d 197, 203 (2d Cir. 2017) (cleaned up); *see also Heien v. North Carolina*, 574 U.S. 54, 61 (2014); *Herring v. United States*, 555 U.S. 135, 139 (2009).

The officers also had probable cause that Lewis was the man at the gas station. To see why consider *United States v. Soza*, 686 F. App'x 564, 567 (10th Cir 2017), where the Tenth Circuit contrasted the insufficient facts there with the sufficient facts in two other cases involving how closely a suspect must match a description for probable

cause to exist, *Chambers v. Maroney*, 399 U.S. 42 (1970) and *United States v. Miller*, 532 F.2d 1335 (10th Cir. 1976). In *Chambers*, probable cause existed because "officers knew that the perpetrators of an armed robbery were driving a blue compact station wagon, that four people were in the station wagon, that one of the station wagon's occupants was wearing a green shirt, and that another of the station wagon's occupants was wearing a trenchcoat." *Soza*, 686 F. App'x at 567. Similarly, in *Miller*, "the officers knew that the unidentified perpetrators of a bank robbery were driving a black over gold or tan Cadillac" with a specific license plate number and "that the two perpetrators were wearing distinct or unusual items of clothing[.]" *Id.* In contrast to these two cases, all the officers had in *Soza* was "an adult Hispanic male who was wearing a baseball cap and a grey sweatshirt." *Id.* at 566. The Tenth Circuit reasoned that the specificity in *Chambers* and *Miller*, "from a purely statistical perspective, had a much higher probability of positively identifying the perpetrators." *Id.* at 567.

What was true in *Chambers* is also true—even more true—here. In both cases, you have a description of the car, the number of occupants, and their physical appearance. Here, you have the additional distinguishing characteristic of the trailer. As the Tenth Circuit observed about *Chambers*, "the chances the officers would have discovered *two* individual blue compact station wagons in the vicinity carrying four people, two of whom were wearing a green shirt and a trenchcoat, would have been substantially unlikely." *Soza*, 686 F. App'x at 567.

Equally, what were the chances that officers would have found another forest green Dodge Durango, with a trailer, a short trip away from the gas station, a short while

11

after the incident, with one man who had a beard and was wearing a hat?

## II. The search of the car was in accordance with the Fourth Amendment.

As for the search of the car, Lewis says that such a search must be supported by probable cause, and nothing less. He further contends that, even if the search here was supported by probable cause, the evidence seized was the fruit of his unlawful detention and must be suppressed. These arguments fail as well.

### A. The search was justified as a protective one for weapons.

Lewis asserts that there is no such thing as a "vehicle frisk" under *Terry* and takes issue with the officers' assertions along those lines on the body-cam footage.[‡] In his view, evidently, all searches of cars must be supported by probable cause.

Specific nomenclature aside, in connection with a *Terry* stop, officers may conduct a protective search of a car on less than probable cause and indeed on reasonable suspicion. To wit, officers may search a car, "limited to those areas in which a weapon may be placed or hidden," on a "reasonable belief" that a "suspect is dangerous and [ ] may gain immediate control of weapons." *Michigan v. Long*, 463 U.S. 1032, 1049 (1983); *see also United States v. Palmer*, 360 F.3d 1243, 1246 (10th Cir. 2004). At the risk of repetition, this belief must be "particularized and objective" but "need not rule out the possibility of innocent conduct." *United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004) (cleaned up). "Evidence falling considerably short of a preponderance satisfies this standard." *United States v. Winder*, 557 F.3d 1129, 1134

---

[‡] The officers' subjective justifications are irrelevant. *See*, *e.g.*, *Devenpeck v. Alford*, 543 U.S 146, 153 (2004)

(10th Cir. 2009) (cleaned up).

Here, the officers had reason to believe that Lewis was dangerous and could gain immediate control of weapons for many of the reasons that justified both his detention in the first instance and the measures officers used in connection therewith, which need not be recited in detail again. Ultimately, the officers responded to a report of a man who pulled a gun at gas station—unquestionably dangerous conduct—and discovered a suspect who matched the report shortly thereafter in the area. That there was no gun on Lewis's person only increased the chance that it was in the car. That he might have thrown it in the river is of no moment, since officers need not rule out the possibility of innocent conduct. *Vercher*, 358 F.3d at 1261.

It does not matter that Lewis was handcuffed and in the back of a police car during the search. While there must exist the possibility that the suspect could gain immediate control of weapons, the relevant time period is not limited to while the search is being conducted. Rather, "the time period during which the detainee 'may gain immediate control' is the entire period from the initial stop to the detainee's departure." *Palmer*, 360 F.3d at 1246. Moreover, "the fact that the detainee is 'under the control' of officers does not eliminate the risk that he will gain access to a weapon." *Id.* As the Supreme Court put it in *Long*, "if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside." 463 U.S. at 1052. That risk was present here and justified the search.

**B.      The search was supported by probable cause.**

Under the so-called automobile exception to the Fourth Amendment's warrant

requirement, officers may search a car without a warrant where they have probable cause to believe the car contains contraband or evidence of a crime. *United States v. Bernard*, 680 F.3d 1206, 1210 (10th Cir. 2012). At the risk of further repetition, probable cause requires a "fair probability that the car contains contraband or evidence." *Bernard*, 680 F.3d at 1210. (cleaned up). The standard is an objective one. *United States v. Lopez*, 849 F.3d 921, 928 (10th Cir. 2017). And it is based on the "facts available" to the officer. *Florida v. Harris*, 568 U.S. 237, 243 (2013) (cleaned up).

Here, for all the reasons that officers had probable cause to arrest Lewis for the incident at the gas station, they had probable cause to search the car. That is to say, if officers had the necessary certainty that Lewis pulled a gun at the gas station, they had the necessary certainty that the car would contain evidence of that crime. The car was present at the scene of the crime. So at the very least, there was probable cause that it would contain evidence of ownership and occupancy, which would constitute evidence of crime (to say nothing of firearms, firearm parts, ammunition, and so forth).

**C.     If Lewis was arrested, the search was lawfully incident to that arrest.**

If the Court concludes that the officers' conduct turned Lewis's detention into an arrest, and that the arrest was supported by probable cause, the subsequent search of the car was justified by *Arizona v. Gant*, 556 U.S. 332 (2009). Under *Gant*, officers may search a car incident to arrest "when it is reasonable to believe that evidence of the offense of arrest may be found in a vehicle." *Id.* at 335. Lest this justification be duplicative of the otherwise available automobile-exception, the standard "requires less than probable cause" and "is akin to the 'reasonable suspicion' standard required to

14

justify a *Terry* search." *United States v. Vinton*, 594 F.3d 14, 25 (D.C. Cir. 2010). If, as just argued above, the officers had probable cause to believe the car contained evidence of the incident at the gas station, they necessarily had the reason to believe the same.

**D.      If there was probable cause to search the car, the evidence seized was not the fruit of any unconstitutionality as to the detention.**

Lewis contends that even if there were probable cause to search the car, the evidence seized was the fruit of the supposedly poisonous detention and must be suppressed. Of course, Lewis's detention comported with the Fourth Amendment, which renders any fruit safe for consumption. Besides, any problem with the detention would not taint a search of the car based on probable cause. "At a minimum," Lewis must show that "the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct." *United States v. Nava-Ramirez*, 210 F.3d 1128, 1132 (10th Cir. 2000). Here, recall, that officers came across the Durango parked on the shoulder with Lewis outside of it. If the officers had probable cause to search the car, they could have done so irrespective of his detention or the means employed therewith. That severs any putative causal chain between the detention and the search of the car as justified on this ground.[§]

**CONCLUSION**

The Court should deny the motion to suppress.

---

[§] The same perhaps cannot be said for the other grounds, based on *Long* and *Gant*, which are connected with the detention. *See* 6 Wayne LaFave et. al., *Search & Seizure: A Treatise on the Fourth Amendment* § 11.4(d).

Dated:  December 23, 2021

Respectfully submitted,

COLE FINEGAN
United States Attorney

By:  s/ *Rajiv Mohan*
Rajiv Mohan
Assistant U.S. Attorney
U.S. Attorney's Office
1801 California Street, Suite 1600
Denver, CO 80202
Telephone: 303-454-0100
Fax:  303-454-0406
E-mail:  Rajiv.Mohan@usdoj.gov

Attorneys for Government

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 23, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record in this case. I further certify that the conventionally submitted materials included in this filing have also been served on counsel of record, who has received such materials in discovery.

Laura Suelau                                        Laura_Suelau@fd.org


By:  s/ *Rajiv Mohan*
Rajiv Mohan
Assistant U.S. Attorney
U.S. Attorney's Office
1801 California Street, Suite 1600
Denver, CO 80202
Telephone: 303-454-0100
Fax:  303-454-0406
E-mail:  Rajiv.Mohan@usdoj.gov

**Loveland Police Department**
**810 E 10th St**
**Loveland, CO 80537**

## EVENT INFORMATION

| Date Reported | Date Occurred | Status |
|---|---|---|
| **04/22/2021 13:19** | **04/22/2021 13:18 - 04/22/2021 14:04** | **ARREST- ADULT** |

Incident Location
**2500 E EISENHOWER BLVD , LOVELAND, CO 80537**

**NOT APPLICABLE/NONE OF THE ABOVE**

Offense(s)

| | |
|---|---|
| **18-12-108(1): POSSESS WEAPON BY PREVIOUS OFFENDER - (F6)** | Counts: **1** |
| **16-3-102: WARRANT ARREST  -  MISDEMEANOR** | Counts: **1** |
| **16-3-102: WARRANT ARREST  -  MISDEMEANOR** | Counts: **1** |
| **16-3-102: WARRANT ARREST  -  MISDEMEANOR** | Counts: **1** |
| **16-3-102: WARRANT ARREST  -  MISDEMEANOR** | Counts: **1** |
| **18-12-108(1): POSSESS WEAPON BY PREVIOUS OFFENDER - (F6)** | Counts: **1** |
| **18-12-108(1): POSSESS WEAPON BY PREVIOUS OFFENDER - (F6)** | Counts: **1** |
| **18-12-108(1): POSSESS WEAPON BY PREVIOUS OFFENDER - (F6)** | Counts: **1** |
| **18-12-102(3): POSSESSING A DANGEROUS WEAPON - SUBSEQUENT VIOLATIONS - (F4)** | Counts: **1** |
| **18-12-102(3): POSSESSING A DANGEROUS WEAPON - SUBSEQUENT VIOLATIONS - (F4)** | Counts: **1** |
| **18-12-109(6): POSSESSION OF ANY EXPLOSIVE OR INCENDIARY DEVICE PARTS - EXPLOSIVES - (F4)** | Counts: **1** |
| **18-12-102(3): POSSESSING A DANGEROUS WEAPON - SUBSEQUENT VIOLATIONS - (F4)** | Counts: **1** |
| **18-12-102(3): POSSESSING A DANGEROUS WEAPON - SUBSEQUENT VIOLATIONS - (F4)** | Counts: **1** |
| **18-12-108(1): POSSESS WEAPON BY PREVIOUS OFFENDER - (F6)** | Counts: **1** |
| **42-2-138(1)(d)(I): DROVE (MOTOR/OFF-HIGHWAY) VEHICLE UPON HIGHWAY WHEN (LICENSE/ PRIVILEGE TO DRIVE) WAS RESTRAINED FOR EXPRESS CONSENT OR ALCOHOL/ DRUG RELATED OFFENSE** | Counts: **1** |
| **18-18-428: POSSESSION OF DRUG PARAPHERNALIA - (DPO)** | Counts: **1** |
| **18-18-403.5(2)(c): UNLAWFUL POSSESS SCHEDULE I OR II/METHAMPHETAMINE NO MORE THAN 4 GRAMS (DM1)** | Counts: **1** |
| **42-3-121(1)(b): (DISPLAYED/POSSESSED/OFFERED FOR SALE) (FICTITIOUS/CANCELLED/REVOKED/ SUSPENDED/ALTERED/STOLEN) (TITLE/NUMBER PLATE/VALIDATION TAB OR STICKER)** | Counts: **1** |
| **42-3-121(1)(b): (DISPLAYED/POSSESSED/OFFERED FOR SALE) (FICTITIOUS/CANCELLED/REVOKED/ SUSPENDED/ALTERED/STOLEN) (TITLE/NUMBER PLATE/VALIDATION TAB OR STICKER)** | Counts: **1** |
| **18-12-106: PROHIBITED USE OF WEAPONS - (M2)** | Counts: **1** |
| **18-12-102(3): POSSESSING A DANGEROUS WEAPON - SUBSEQUENT VIOLATIONS - (F4)** | Counts: **1** |

## PARTICIPANTS

**Suspect (1)** Lewis, Cliff Lin    **[AKA: ]**

| Date of Birth | Age | Race | Sex | Ethnicity | Height | Weight | Hair | Eyes |
|---|---|---|---|---|---|---|---|---|
| ▮▮▮/1984 | **36** | **W** | **M** | **N** | **6'00** | **200** | **BRO** | **HAZ** |

Address                                                                 Phone

                                                                        Phone

Offense(s)
**16-3-102: WARRANT ARREST  -  MISDEMEANOR**
**18-12-102(3): POSSESSING A DANGEROUS WEAPON - SUBSEQUENT VIOLATIONS - (F4)**
**18-12-106: PROHIBITED USE OF WEAPONS - (M2)**
**18-12-108(1): POSSESS WEAPON BY PREVIOUS OFFENDER - (F6)**
**18-12-109(6): POSSESSION OF ANY EXPLOSIVE OR INCENDIARY DEVICE PARTS - EXPLOSIVES - (F4)**
**18-18-403.5(2)(c): UNLAWFUL POSSESS SCHEDULE I OR II/METHAMPHETAMINE NO MORE THAN 4 GRAMS (DM1)**
**18-18-428: POSSESSION OF DRUG PARAPHERNALIA - (DPO)**
**42-2-138(1)(d)(I): DROVE (MOTOR/OFF-HIGHWAY) VEHICLE UPON HIGHWAY WHEN (LICENSE/ PRIVILEGE TO DRIVE) WAS RESTRAINED FOR EXPRESS CONSENT OR ALCOHOL/ DRUG RELATED OFFENSE**
**42-3-121(1)(b): (DISPLAYED/POSSESSED/OFFERED FOR SALE) (FICTITIOUS/CANCELLED/REVOKED/ SUSPENDED/ALTERED/STOLEN) (TITLE/NUMBER PLATE/VALIDATION TAB OR STICKER)**

**Victim (1)** society,   #Error   **AKA: ]**

**Summary Report**
**Report Date:** 04/22/2021 01:19
**Activity Num:** LP21-0002877

Loveland Police Department
810 E 10th St
Loveland, CO 80537

| Date of Birth | Age | Race | Sex | Ethnicity | Height | Weight | Hair | Eyes |
|---|---|---|---|---|---|---|---|---|

| Address | | | | | | | | Phone |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Phone |

Offense(s)
**16-3-102: WARRANT ARREST  -  MISDEMEANOR**
**18-12-102(3): POSSESSING A DANGEROUS WEAPON - SUBSEQUENT VIOLATIONS - (F4)**
**18-12-106: PROHIBITED USE OF WEAPONS - (M2)**
**18-12-108(1): POSSESS WEAPON BY PREVIOUS OFFENDER - (F6)**
**18-12-109(6): POSSESSION OF ANY EXPLOSIVE OR INCENDIARY DEVICE PARTS - EXPLOSIVES - (F4)**
**18-18-403.5(2)(c): UNLAWFUL POSSESS SCHEDULE I OR II/METHAMPHETAMINE NO MORE THAN 4 GRAMS (DM1)**
**18-18-428: POSSESSION OF DRUG PARAPHERNALIA - (DPO)**
**42-2-138(1)(d)(I): DROVE (MOTOR/OFF-HIGHWAY) VEHICLE UPON HIGHWAY WHEN (LICENSE/ PRIVILEGE TO DRIVE) WAS RESTRAINED FOR EXPRESS CONSENT OR ALCOHOL/ DRUG RELATED OFFENSE**
**42-3-121(1)(b): (DISPLAYED/POSSESSED/OFFERED FOR SALE) (FICTITIOUS/CANCELLED/REVOKED/ SUSPENDED/ALTERED/STOLEN) (TITLE/NUMBER PLATE/VALIDATION TAB OR STICKER)**

**Organization Involved -**  (1) CIRCLE K - WIL & EISENHOWER

| Address | Phone |
|---|---|
| **2500 W Eisenhower Blvd  Loveland, CO 80537** | |

**Witness Of Incident (1)** PETERSEN, SARAH BETH   **[AKA: ]**

| Date of Birth | Age | Race | Sex | Ethnicity | Height | Weight | Hair | Eyes |
|---|---|---|---|---|---|---|---|---|
| | 39 | U | F | U | 5'08 | 120 | BRO | HAZ |

| Address | Phone | Phone |
|---|---|---|
| Loveland CO 80538 | | |

**Witness Of Incident (2)** Ritchie, kimberly Dawn   **[AKA: ]**

| Date of Birth | Age | Race | Sex | Ethnicity | Height | Weight | Hair | Eyes |
|---|---|---|---|---|---|---|---|---|
| | 37 | U | F | U | 5'04 | 165 | BRO | BRO |

| Address | Phone | Phone |
|---|---|---|
| Loveland CO 80537 | | |

**Witness Of Incident (3)** Grund, Kayla Marie   **[AKA: ]**

| Date of Birth | Age | Race | Sex | Ethnicity | Height | Weight | Hair | Eyes |
|---|---|---|---|---|---|---|---|---|
| | 35 | W | F | U | 5'09 | 156 | BLN | BLU |

| Address | Phone | Phone |
|---|---|---|
| Loveland CO 80537 | | |

**Misc. Associated Names (4)** DOEHRING, JEFF   **[AKA: ]**

| Date of Birth | Age | Race | Sex | Ethnicity | Height | Weight | Hair | Eyes |
|---|---|---|---|---|---|---|---|---|
| | 72 | W | M | U | 5'07 | 190 | BRO | BLU |

| Address | Phone | Phone |
|---|---|---|
| Estes Park CO 80517 | | |

## PROPERTY

| Item | Status | Quantity | Value | Model |
|---|---|---|---|---|
| 1 | SEIZED | 1 | 1 | |
| | Description | | | Brand |
| | misc drug paraphernalia | | | |
| | Owner | | | Serial # |
| | **Cliff Lewis** | | | |

## DRUGS

| Item | Status | Type | Quantity | Description |
|---|---|---|---|---|
| 1 | SEIZED | AMPHETAMINES / METHAMPHETAMINES | 4.64 GM | 4.64g of suspected Methamphetamine |

## OFFICER

| Officer | Involvement Type | Report Date |
|---|---|---|
| **Berry, Erin M LP234** | **Reporting** | 04/22/2021 01:27 |

## OFFICER

**Summary Report**
**Report Date: 04/22/2021 01:19**
**Activity Num: LP21-0002877**

| Officer | Involvement Type | Report Date |
|---|---|---|
| Pack, Melissa LP765 | Supplementing | 04/22/2021 06:25 |

**OFFICER**

| Officer | Involvement Type | Report Date |
|---|---|---|
| Jones, Benny LP850 | Supplementing | 04/22/2021 07:18 |

**OFFICER**

| Officer | Involvement Type | Report Date |
|---|---|---|
| Ashe, Paul LP177 | Supplementing | 04/22/2021 08:24 |

**OFFICER**

| Officer | Involvement Type | Report Date |
|---|---|---|
| Pack, Melissa LP765 | Investigating | 04/22/2021 02:43 |

**OFFICER**

| Officer | Involvement Type | Report Date |
|---|---|---|
| Corrigan, Nicholas LP208 | Reporting | 04/22/2021 01:21 |

**OFFICER**

| Officer | Involvement Type | Report Date |
|---|---|---|
| Marner, Joshua LP197 | Supplementing | 04/22/2021 01:21 |

**OFFICER**

| Officer | Involvement Type | Report Date |
|---|---|---|
| Dunlap, Evan LP213 | Supplementing | 04/22/2021 01:21 |

**OFFICER**

| Officer | Involvement Type | Report Date |
|---|---|---|
| Berry, Erin M LP234 | Supplementing | 04/22/2021 01:25 |

**OFFICER**

| Officer | Involvement Type | Report Date |
|---|---|---|
| Ashe, Paul LP177 | Supplementing | 04/22/2021 01:20 |

**OFFICER**

| Officer | Involvement Type | Report Date |
|---|---|---|
| Roberts, Matthew D LP161 | Supplementing | 04/22/2021 01:21 |

**OFFICER**

| Officer | Involvement Type | Report Date |
|---|---|---|
| Jones, Benny LP850 | Supplementing | 04/22/2021 05:34 |

**OFFICER**

| Officer | Involvement Type | Report Date |
|---|---|---|
| Marner, Joshua LP197 | Approving | 04/23/2021 12:12 |

**OFFICER**

| Officer | Involvement Type | Report Date |
|---|---|---|
| Marner, Joshua LP197 | Approving | 04/23/2021 12:13 |

**OFFICER**

| Officer | Involvement Type | Report Date |
|---|---|---|
| Marner, Joshua LP197 | Supplementing | 04/23/2021 12:14 |

**OFFICER**

| Officer | Involvement Type | Report Date |
|---|---|---|
| Hutchison, Alex LP187 | Approving | 04/23/2021 05:22 |

**OFFICER**

| Officer | Involvement Type | Report Date |
|---|---|---|
| McAuley, Ryan LP194 | Supplementing | 04/23/2021 11:14 |

**OFFICER**

| Officer | Involvement Type | Report Date |
|---|---|---|
| Ertman, Ryan LP146 | Supplementing | 04/25/2021 06:12 |

**OFFICER**

**Loveland Police Department**
**810 E 10th St**
**Loveland, CO 80537**

| Officer | Involvement Type | Report Date |
|---|---|---|
| Hutchison, Alex LP187 | Approving | 04/23/2021 05:17 |

**OFFICER**

| Officer | Involvement Type | Report Date |
|---|---|---|
| Dunlap, Evan LP213 | Reporting | 04/22/2021 01:23 |

**OFFICER**

| Officer | Involvement Type | Report Date |
|---|---|---|
| Pack, Melissa LP765 | Approving | 04/27/2021 10:26 |

**OFFICER**

| Officer | Involvement Type | Report Date |
|---|---|---|
| Musselman, Patrick J LP154 | Approving | 04/27/2021 12:55 |

**OFFICER**

| Officer | Involvement Type | Report Date |
|---|---|---|
| Musselman, Patrick J LP154 | Approving | 04/27/2021 12:55 |

**OFFICER**

| Officer | Involvement Type | Report Date |
|---|---|---|
| Musselman, Patrick J LP154 | Approving | 04/27/2021 12:56 |

**OFFICER**

| Officer | Involvement Type | Report Date |
|---|---|---|
| Musselman, Patrick J LP154 | Approving | 04/27/2021 12:58 |

**OFFICER**

| Officer | Involvement Type | Report Date |
|---|---|---|
| McAuley, Ryan LP194 | Supplementing | 04/27/2021 03:33 |

**OFFICER**

| Officer | Involvement Type | Report Date |
|---|---|---|
| Jakobsson, Kristopher S LP151 | Approving | 04/27/2021 06:41 |

**OFFICER**

| Officer | Involvement Type | Report Date |
|---|---|---|
| Hines, Jennifer L LP134 | Supplementing | 04/28/2021 08:22 |

**OFFICER**

| Officer | Involvement Type | Report Date |
|---|---|---|
| Roberts, Matthew D LP161 | Supplementing | 04/29/2021 03:00 |

**OFFICER**

| Officer | Involvement Type | Report Date |
|---|---|---|
| Hutchison, Alex LP187 | Approving | 04/30/2021 08:50 |

**OFFICER**

| Officer | Involvement Type | Report Date |
|---|---|---|
| Jakobsson, Kristopher S LP151 | Approving | 04/30/2021 10:56 |

**OFFICER**

| Officer | Involvement Type | Report Date |
|---|---|---|
| Ertman, Ryan LP146 | Supplementing | 05/03/2021 03:23 |

**OFFICER**

| Officer | Involvement Type | Report Date |
|---|---|---|
| Pride, Rob LP96 | Approving | 05/04/2021 12:32 |

**OFFICER**

| Officer | Involvement Type | Report Date |
|---|---|---|
| Corrigan, Nicholas LP208 | Supplementing | 04/22/2021 02:36 |

**OFFICER**

| Officer | Involvement Type | Report Date |
|---|---|---|
| Hutchison, Alex LP187 | Approving | 05/21/2021 04:01 |

**RELATED CASES**

**Loveland Police Department**
**810 E 10th St**
**Loveland, CO 80537**

39
INV_00000082

**Loveland Police Department**
**810 E 10th St**
**Loveland, CO 80537**

## NARRATIVE - Berry, Erin M

Body Worn Camera Video Title: **2021-04-22 1328 Lpd234**

Officer Erin Berry reporting:

On 042221 I was dispatched to Circle K, located at 2500 W Eisenhower Blvd for a report that one male pulled a gun on another male in the parking lot. Both males had left.

I arrived at 1328 hours and I spoke to the three employees that witnessed the incident. KIMBERLY RITCHIE, DOB
SARAH PETERSON, DOB and KAYLA GUINEL, DOB all provided written statements accounting what they saw.

PETERSON assisted me in viewing the surveillance footage. The footage showed a green Dodge Durango (unreadable license plate) pulling a plywood style trailer pulling into the parking lot facing south, in the area near the carwash but not at a particular pump. About a minute later and black Nissan sedan, unreadable license plate, pulled up to the 3rd pump from the west. The black Nissan's door moved a few times but nobody exited. Then a white male, who appears to be concealing something appears from the green Dodge Durango and walks towards the black Nissan. The black Nissan begins driving, nearly striking the male walking. The male walking points an object that the employees described as a handgun at the black Nissan. The black Nissan exits the camera headed south behind the building. The male walks back to the Dodge Durango and leaves the parking lot in the same direction. I video recorded with my cell phone the security camera and sent it to Sergeant Roberts and Officer Corrigan because they were in contact with the Dodge Durango. I also logged it into evidence.

I provided the statements to Officer Nick Corrigan and I cleared the call.

## NARRATIVE - Pack, Melissa

Body Worn Camera Video Title: **2021-04-22 1431 LPD765**

Cpl CSO Pack Reporting:

On 4/22/21 at 14:15 hours, I assisted Officer Corrigan in booking with his arrestee CLIFFORD LIN LEWIS (DOB ).
Thompson Valley Ambulance was evaluating LEWIS and he wanted to go to the hospital due to a stomach ache. Officer Corrigan transported LEWIS and I followed to McKee Medical Center. While at McKee I completed the booking form. After LEWIS was released Officer Corrigan transported LEWIS back to booking. I met them in booking and I completed the Proof of Service. BWC interaction captured and uploaded to evidence.com.

NFI

## NARRATIVE - Jones, Benny

Body Worn Camera Video Title: **2021-04-22 1847 LPD850**

CSO Jones reporting:

On 2021-04-22 at approximately 1734 hours I assisted Officer Corrigan with booking and transporting CLIFF LEWIS to the Larimer County Jail.

Body worn camera captured video and footage was uploaded to evidence.com

## NARRATIVE - Ashe, Paul

40
INV_00000083

**Summary Report**
**Report Date: 04/22/2021 01:19**
**Activity Num: LP21-0002877**

**Loveland Police Department**
**810 E 10th St**
**Loveland, CO 80537**

Body Worn Camera Video Title: **2021-04-22 1339 LPD177**

On April 22, 2021 at approximately 1320 hours, I was dispatched to a weapons complaint at Circle K at 2500 West Eisenhower Boulevard in Loveland, Colorado. Dispatch stated the caller was a worker at Circle K and saw a guy driving a Green Dodge Durango pulling a trailer point a gun at another person in a black Nissan Altima. The caller stated both parties left the scene southbound on Wilson Avenue. This incident generated case number LP21-2877.

I began looking for the vehicles involved and heard Officer Evan Dunlap say over the radio he located the green Dodge Durango. I immediately began looking for the black Nissan Altima but was unable to locate it. The driver of the Altima never called in to make a report. I went to Officer Dunlap's location to see if I could assist in any manner. By the time I arrived, the male, who was later identified as CLIFFORD ELLIS DOB [ ] was detained and Officers Josh Marner and Dunlap were searching the vehicle. Officer Marner showed me a pistol that had been disassembled, I checked the gun parts for serial numbers but was unable to locate any identifying numbers.

Officer Dunlap then located a suspicious item and showed it to Officer Marner. Based on my training and experience, I immediately recognized the item as a suspicious explosive device. I placed it on the front seat of the vehicle and immediately called for a bomb technician. Sergeant Bryan Bartness took the original call and Detective Adam Braun of the Northern Colorado Regional Bomb Squad responded to the location and took custody of the suspicious device.

Officer Dunlap and I then continued the search of the vehicle and Detective Braun assisted. A search of the vehicle locate two more pistols, one loaded semi automatic pistol and an unloaded revolver. The pistol was located by Detective Braun in the rear passenger seat within arms reach of CLIFFORD as he was driving the vehicle. The revolver was located in the back cargo compartment of the vehicle in a bag with small propane and butane bottles. I also located a short barreled shotgun with a pistol grip in the rear cargo area inside a camo shotgun scabbard. The shotgun had one shell in the magazine and one in the chamber when checked. An AR15 stripped lower receiver was also located with the buffer spring.

The search of the vehicle also located numerous different types of ammunition to include, .22, 9mm, high powered rifle rounds and 12 gauge as well as multiple magazines for the handguns. Numerous items of drug paraphernalia, methamphetamine, pills not belonging to CLIFFORD, cellular phones and his wallet were also seized. The trailer of the vehicle had multiple items of luggage in it, all those items were placed in to the Durango and the vehicle was secured and left on scene.

Officer Dunlap and I took the items seized to the Loveland Police Department where they were processed and placed in to evidence. All the pills were identified and only one single pill was identified as a controlled substance. The pill identifier sheets were given to Officer Nick Corrigan who processed CLIFFORD for his arrest. During the detailed search of the items seized, a small clear container with a gray clayish substance was located. Sergeant Ryan Ertman responded and took possession of that substance for chemical testing.

NFI

## NARRATIVE - Corrigan, Nicholas

Body Worn Camera Video Title: **2021-04-22 1325 LPD208; 2021-04-22 1454 LPD208; 2021-04-22 1553 LPD208**

Original Report - Officer Corrigan Reporting

On 042221 at approximately 13:20 hours, I responded along with several other officers to the Circle K gas station located at 2500 W Eisenhower Blvd, Loveland CO 80538, after Dispatch received a 911 call from a gas station employee who stated a male driving a late model green Dodge Durango pulling a trailer, was involved in an altercation with the driver of a black Nissan Altima. The reporting party stated the male in the Durango had a gun during the altercation. The reporting party stated both vehicles left the parking lot heading south on Wilson Ave and the male driver of the Durango was wearing a hat and glasses and had a beard.

Officer E. Dunlap located the green Durango (CO: FOB100) and trailer on 2000 block of W 8th St and contacted the driver, who had been outside of the vehicle and appeared to be looking for something in the driver's area of the vehicle. Officer Dunlap asked CLIFFORD if he had a gun and just been in an altercation at the gas station, which CLIFFORD denied. Officer Dunlap transitioned to a high-risk stop when he observed CLIFFORD reaching for his waistband area. I arrived on scene and assisted officer Dunlap and Officer J. Marner in detaining the vehicle's driver, later identified as CLIFFORD LIN LEWIS. [ ] LEWIS was compliant during the detention and obeyed our commands. At the time of our contacting LEWIS, he was wearing grey sweat pants, a green shirt, a black and white hat and had a beard.

Dispatch advised that LEWIS had four failure to appear warrants out of Larimer County (DKT: C085202T001649; DKT:C0852020M001520; DKT: C085202M001595; DKT: C0852019T002323) as well as a non-extraditable warrant out of Nebraska. Also, Dispatch advised that LEWIS was on probation for driving under the influence at the time of his being detained and that his driver's license was revoked for felony MV/used, with eight additional active restraints including alcohol offenses. A criminal history for LEWIS revealed he is a convicted felon.

Officer E. Berry went to the Circle K gas station and procured video from the surveillance system that showed at approximately 13:18:05 hours, a green Durango pulling a trailer pulled into the gas station off of W Eisenhower Blvd and parked near the farthest

**Summary Report**
**Report Date: 04/22/2021 01:19**
**Activity Num: LP21-0002877**

**Loveland Police Department**
**810 E 10th St**
**Loveland, CO 80537**

west gas pump facing south with the vehicle off camera but the trailer still in the camera's view. At approximately 13:18:28 hours, a black Nissan sedan pulled into the west side of the middle pump island at the gas station from the east. At approximately 13:18:54 hours, a male wearing a dark and white hat, dark green shirt and grey pants walks into the view of the camera walking towards the black Nissan sedan with his right hand behind his back. at 13:18:57 hours, the Nissan abruptly pulls out of the gas pump area heading south west, past the male, who simultaneously raised his right hand, took a fighting stance and pointed what appeared to be a pistol at the Nissan. The male then walked off camera, back towards the Durango.

In addition to the video, two bystanders at the gas station filled out sworn statements attesting that they saw the male (LEWIS) holding a gun during the altercation. KIMBERLY RITCHIE [redacted] wrote in a statement, "*at 1:15pm at my store at 2500 W Eisenhower Circle K I seen a Black nisson altima Leave pump 2 and almost run over a gentlemen in his late 20's early 30's pull a hand gun on the nisson. Then the man with the gun got into his Dodge durango green with a trailer on the back leave the parking lot.*"

KAYLA GRUND [redacted] wrote in a statement, "*on april-22-2021 as i was leaving from work we notice a green duregon pull into By Carwash He got out of the car. walk up to a black nissan at this point the black nissan left gas pump almost hitting the gentleman. gentleman with green truck who was holding a gun and was walking up to the black car with t he black car took off.*"

I placed LEWIS under Miranda Advisement and he told us that the person in the black Nissan, followed him from the area near his friend's house and that he did not know who he was. He said that the person drove into the parking lot at the gas station and he yelled at them and the driver revved his engine and tried to run him over.

Officer Dunlap and Officer P. Ashe searched the Durango and recovered four firearms to include a .22 LR revolver, a Glock 17 9mm pistol with an aftermarket pistol grip and aftermarket threaded barrel as well as a disassembled Glock style .22LR pistol and disassembled aftermarket pistol grip and trigger group. Also, they located a short-barreled shotgun and a lower receiver to an AR15 style rifle. The lower receiver had a type of glue similar to Bondo or JB Weld, painted over the left side of the magazine well covering any serial number. Also, the receiver had what looked like machine marks in several places that could possibly indicate the lower was altered or was what is commonly called an "80%" lower which can be purchased by individuals who would finish machining it, in order to bring up to working order. Along with the lower receiver, the officers recovered a complete AR15 bolt carrier group, buffer spring and buffer.

Officers Ashe and Dunlap also recovered three Glock magazines, a shotgun scabbard and other firearms related accessories. They also recovered ammunition to include shotgun shells, assorted rimfire ammunition, assorted pistol ammunition and rifle ammunition and several rounds of military surplus .30-06 armor piercing ammunition. Also, they recovered four homemade firearms suppressors and a book on manufacturing firearms suppressors. Also, they recovered a Bradley cutlery Company butterfly style knife with a four-inch blade. They also located what appeared to be a homemade explosive device manufactured out of a plastic tube with a large fuse coming out of the top. The device was confiscated by the Northern Colorado Bomb Squad and determined to be a type of incendiary device. In addition, the Officers recovered 4.64g of white crystalline substance they recognized as being consistent with methamphetamine. They also located a syringe with approximately 60 units of suspected heroin was located in a toothbrush holder.

I informed LEWIS he was under arrest for weapons violations and his warrants. I then placed him under Miranda Advisement. Loveland Sergeant M. Roberts asked LEWIS who the driver of the black sedan was and he said he did not know. When Sergeant Roberts asked LEWIS about the home-made explosive, LEWIS claimed it was a firework that he purchased in Wyoming. He also told us that there were other people's belongings in the vehicle and that he did not know about any firearms or suppressors. When Detective Roberts asked if LEWIS had been to prison and he said yes.

When I told LEWIS to take a seat in my patrol vehicle so I could transport him to the police department, he began to feign having stomach pains and acting like he was nauseous. He also stated he was claustrophobic and that he did not want to be seat belted. While enroot to the Loveland Police Station, LEWIS said he was very sick. I asked Dispatch to have an ambulance crew meet us at the police department to examine LEWIS. Fire and EMS personnel examined LEWIS at approximately 14:10 hours while in the Loveland Police Department (LPD) booking area. The EMS captain on scene suggested that LEWIS be given a jail medical clearance at a hospital out of an abundance of precaution. I transported LEWIS to the McKee Medical Center at approximately 14:30 hours. He was examined by Doctor I. Rule MD and was given a "G1 cocktail, Motrin and Zofran" for his stomach pain.

While LEWIS was being examined by medical staff, I observed that he had several tattoos on his abdomen. I observed two swastika tattoos, one each on each side of his abdomen. I also observed the word "Soldier" tattooed along his belt line on his belly, below the swastikas. LEWIS also had several tattoos on his hands, arms, head and above his ears. He also stated he had tattoos on his legs, that I did not observe.

Loveland Officers J. Hines and R. McAuley questioned LEWIS at the hospital. They asked him if he claimed affiliation with any gangs. He did not give specifics but said he affiliated with white supremist prison gangs while in prison. He said that the shotgun in his vehicle belonged to his brother "Jack Lewis". He restated his claim that the explosive device recovered from his vehicle was a firework bought from Wyoming but he would not elaborate where he bought it. He also stated that he was a welder by trade. I pointed out that it seemed more than coincidental that he was a welder and, in his vehicle, we located four homemade suppressors and a book on manufacturing suppressors. At that point, he stated he would not talk with us further without his attorney present.

After LEWIS was medically cleared at the hospital I transported him back to the police department to be booked. While in booking, Officer Dunlap informed me that the year validation tab sticker on LEWIS's Durango's license plate showed as belonging to another vehicle. He also told me the license plate on the trailer belonged to another vehicle, not owned by LEWIS.

42
INV_00000085


**Summary Report**
**Report Date: 04/22/2021 01:19**
**Activity Num: LP21-0002877**

**Loveland Police Department**
**810 E 10th St**
**Loveland, CO 80537**

After LEWIS was booked at the police department, he was transported to the Larimer County Detention center by Community Service Officer B. Jones.

Please refer to Officers Ashe, Dunlap, Marner, Berry and Sergeant Roberts' reports for further information regarding the initial contact with LEWIS and with the eye witnesses at the gas station. Please revere to Loveland Sergeant R. Ertman's report regarding information about the explosive device recovered from the Durango.

I uploaded the surveillance footage of the incident from the Circle K gas station into ADAMS under this case number. I also submitted photographs of LEWIS's hat, a neck knife, lighter and the butterfly knife into Adams under this case number.

Of note, in November of 2020, LEWIS was arrested and charged with several drug and weapons charges, to include being a previous offender in possession of a weapon and being in possession of a dangerous weapon. the court case number for that incident is 2020CR2281.

ADULT ARREST

## NARRATIVE - Marner, Joshua

Body Worn Camera Video Title: **042221 1323 LPD197**

On April 22, 2021 at approximately 1320 hours, I was dispatched to a weapons complaint at Circle K at 2500 West Eisenhower Boulevard in Loveland, Colorado. Dispatch stated the caller was a worker at Circle K and saw a guy driving a Green Dodge Durango pulling a trailer point a gun at another person in a black Nissan Altima. The caller stated both parties left the scene southbound on Wilson Avenue.

I began looking for the vehicles involved and heard Officer Evan Dunlap say over the radio he located the green Dodge Durango. I immediately began looking for the black Nissan Altima but was unable to locate it. The driver of the Altima never called in to make a report. When I arrived a saw a male standing at the back of the trailer. The male was later identified as CLIFFORD ELLIS DOB ▓▓▓▓.Officer Dunlap, Officer Nick Corrigan and I did a high risk traffic stop, however I did not aim my weapon at ELLIS due to his level of cooperation. ELLIS complied with orders to keep his hands up and come back towards our marked Police vehicles. ELLIS was detained and Officer Dunlap and I began to search the vehicle. I found a disassembled pistol that had a tan handle. I also found a black slide, Officer Paul Ashe checked the gun parts for serial numbers but was unable to locate any identifying numbers.

Officer Dunlap then located a suspicious item and showed it to me. Based on my training and experience, I immediately recognized the item as a possible explosive device. I told the other officers on scene and Officer Ashe called for a Bomb Squad consult. At this time I left the scene to continue to handle calls.

No further information.

## NARRATIVE - McAuley, Ryan

Body Worn Camera Video Title: **2021-04-22 1702 LPD194**

Officer Ryan McAuley reporting:

On 042221, Officer Jennifer Hines told me she was on her way to McKee Medical Center, located at 2000 N. Boise Ave, to interview a suspect in a weapons case. I learned from Officer Hines the suspect was in custody for felony menacing and multiple firearms were located in his vehicle by other officers. I learned the suspect was in possession of several pistols, a sawed off shotgun and some type of homemade explosive device. Officer Hines also told me the male was previously documented gang member. Officer Hines and I met with the male in a hospital room and Officer Nicholas Corrigan told he he had already been advised of his Miranda rights.

Officer Hines spoke with the male and asked about his prison tattoos that he stated were mostly from prison. I took two photographs of his stomach and arm tattoos and forwarded then to Officer Hines to document. Officer Hines then asked about the items and firearms that were located in the vehicle. I asked the male about the sawed off shotgun that was located in the vehicle and he told me it belonged to his brother, "Jack Lewis." The male also said the shotgun was stock from the store when it was purchased.

As we were talking to the male, he told us he did not wish to answer any further questions without his attorney. No further question were asked after this point.

This concludes my involvement in this case.

NFI

43
INV_00000088

## NARRATIVE - Ertman, Ryan

Body Worn Camera Video Title: **N/A**

On 042221 at approximately 1530 hours, I was off duty, monitoring a Bomb Squad callout where Detective Adam Braun was primary. He responded out and took custody of a suspected explosive device from a vehicle involved in a menacing call. Because of the hazardous nature of the item, it was not able to be booked into evidence. Det. Braun and I responded to the Northern Colorado Bomb Squad Range at the Larimer County Landfill to render the device safe and to secure it for further processing and examination by the ATF.

Upon my arrival, Det. Braun had already rendered the device safe and separated the fuse, the container, and the suspected explosive material. We conducted a flash test on a small amount of the material and found that it was incredibly energetic. So much so that it surprised both of us and caused me to move my phone while I was videotaping the result. I contacted Becca Sauerhaft with the ATF and explained my findings. ATF SA Stephen Shelley and ATF SA Luke Hitt agreed to meet me up at the range on 042321 to examine the item. I secured the items in our Conex box at the range with a lock that only I had the key. While on my way home, I was sent a photo of a material that was recovered from the suspect's belongings. It looked similar to the material found in the device so I responded to the PD to examine it. I collected the material to show the ATF and to secure for disposal if necessary.

On 042321 I met SAs Hitt and Shelley at the bomb range. I showed them the solid material located after the fact as well as the components of the device. After evaluating the contents and the basics of the case, it was determined the ATF did not want to take the case Federally regarding the explosive device. The solid material was determined to be a cylindrical block of epoxy. We discussed testing and they agreed to assist me with having the ATF test the energetic material once I collected samples. I contacted SA Elizabeth Simmons with the FBI and explained what we had as well. It was decided that State charges were best in this case.

On 042521 I returned to duty and responded to the Bomb Range to sample the material as well as the fuse. I weighed the plastic bag with the material (minus the weight of the bag) and noted that the material weighed 11.5 grams. I cut two small pieces of the fuse and placed them in bottles for storage and testing. I collected a small amount of the material and put it in two vials for testing. I left the fuse, the container, and the energetic material in the Conex until I could discuss the case with Office Nick Corrigan and Criminalist Stephanie Jackson. The container and the fuse are covered with the very fine material and thus deemed a hazard for storage.

I booked all the vials into evidence as well as the suspected epoxy. When the rest of the items are clear for destruction, we will dispose of them. I have uploaded all of the photos into the ADAMS system.

No further information

## NARRATIVE - Dunlap, Evan

Body Worn Camera Video Title: **2021-04-22 1324 LPD213**

Officer Evan Dunlap reporting:

On 04/22/21, at approximately 1319 hours, I responded to the area of Circle K gas station at 2500 W Eisenhower Blvd for a Weapons Complaint call involving a driver of a green Dodge Durango with a trailer involved in an altercation with the driver of a black Nissan Altima. The reporting party told Dispatch the driver of the Durango had a gun and the driver of the Nissan Altima had almost run over the driver of the Durango. The Durango was last seen driving southbound on N Wilson Ave. The reporting party also stated the driver of the Durango was the only occupant of the vehicle. The driver of the Durango with gun was described as "younger" with a beard, and wearing a hat and glasses.

I responded to the general area and located a green Dodge Durango (CO#FOB100) with an attached trailer (CO#FOM087) in the 2000 block of W 8th St. The Durango was parked on the shoulder of the roadway next to the river. I observed a male, later identified as CLIFFORD LEWIS (DOB: [        ] standing next to the Durango, and digging in the driver's seat area. I radioed I located the vehicle and pulled behind the trailer. I put on my rear emergency lights. I opened up my door, and stood outside my vehicle. LEWIS turned around and I directed him to step away from the vehicle and walk towards the rear of the trailer. LEWIS matched the description of the male that had a gun. I asked LEWIS if he had a gun and he said no. LEWIS quickly lifted up his shirt and I did not see a gun; however, it was took quick and too far away to assess if he had a gun in his possession. I asked LEWIS if he had been in an altercation at the Diamond Shamrock (Circle K) and he said no. Officer Joshua Marner and Officer Nicholas Corrigan arrived shortly after. I started to give commands to LEWIS, asking him to put his hands on top his head, turn around, and spread his feet. LEWIS had reached for his waist band. I had my handgun at the low ready and told LEWIS to not reach for his waist band. LEWIS complied with all of my commands. Officer Corrigan detained LEWIS and put him in handcuffs. LEWIS said he was alone and there was no one else in the vehicle. Myself and the other officers cleared the vehicle, and did not observe any one inside. LEWIS was placed in the back of Officer Corrigan's vehicle. LEWIS asked if he was under arrest and he was advised that he was not.

I looked underneath the driver's seat, and in the driver's immediate reach and did not see a gun in plain view. Officer Erin Berry went to the gas station and sent a video clip to Sergeant Matthew Roberts. I observed the video and saw LEWIS' vehicle with the

**Loveland Police Department**
**810 E 10th St**
**Loveland, CO 80537**

trailer park to the side of the gas pumps. A black Nissan Altima (unknown license plate) pulls up next to a gas pump. LEWIS can been seen walking across from the area of his vehicle towards the Nissan Altima with his hands behind his back. The Nissan started to quickly drive away, and LEWIS raised what appeared to be a gun in his right hand. LEWIS took a gun fighting stance and kept the gun pointed at the vehicle.

While I viewed the video, Officer Corrigan was speaking with LEWIS. I requested a criminal history from Dispatch, and later advised me LEWIS was a convicted felon. I was also later advised LEWIS had four CIJIS warrants for his arrest. Officer Marner and I started a search of the Durango. I located a black box next to the driver's seat, in between the seat and the door area. Inside the box, there was a lower receiver to a tan handgun, similar to a Glock. There was no serial number. In the box, there were also parts to insert a trigger. Officer Marner located a slide to a 9mm Glock pistol. As I continued to search, I located various drug paraphernalia related to methamphetamine and heroin use, which included a glass pipe, plastic baggies with residue, needle caps, spoons, etc. I also located numerous ammunition for various calibers, including .22, and 9mm. In the center console next to some ammunition, I found a plastic bag containing small red fireworks that looks like Black Cats. I also found a suspicious explosive device which was a tube with tape and a wick coming from the top. I provided the suspicious device to Officer Marner, who gave it to Officer Paul Ashe. Officer Ashe recognized the suspicious item as a possible incendiary device and requested the Northern Colorado Bomb Squad for assistance. Officers stopped the search of the vehicle due to locating the possible incendiary device.

While waiting for a bomb squad technician to respond, I heard LEWIS banging and yelling in the back seat of Officer Corrigan's patrol vehicle. He stated he was overheating and could not breathe. Sgt. Roberts rolled down the window for LEWIS and I turned off the heat. Officer Corrigan and I later attended to LEWIS again, and he said the handcuffs were too tight. Officer Corrigan and I checked the handcuffs for tightness, and I saw the left handcuff was a little tight. Officer Corrigan readjusted the handcuff. LEWIS requested medical treatment. LEWIS was transported to the Loveland Police Department and Officer Corrigan requested an ambulance to evaluated LEWIS.

I looked at the CCIC returns for the license plates on the Durango and trailer. The Durango showed in CCIC that the plates expired in 2020; however, there was a year validation sticker of 2021 with a different license plate number. I seized the license plate on the Durango. Officer Ashe checked the VIN on the trailer and compared it to the license plate and they were also different. The VIN on the trailer was clear. I attempted to contact the owner of plate attached to the trailer, JEFF DOEHRING (DOB); however he did not answer his phone. I requested a Larimer County Sheriff's Office Deputy to respond to his address in Estes Park, but never heard back. I later seized the plate on the trailer.

Northern Colorado Regional Bomb Squad Technician, Detective Adam Braun, arrived on scene and took custody of the possible incendiary device. Officer Ashe and I continued to search the vehicle, with assistance from Detective Braun. During the search of the vehicle, we located more ammunition, including shotgun shells, Glock 9mm handgun magazines, a loaded Glock 9mm pistol, a Glock 9mm barrel, a lower receiver for an AR-15 rifle, a buffer spring and a bolt carrier group for an AR-15, several suspected silencers and a book about how to make silencers for various caliber guns, pill bottles with various pills not prescribed to LEWIS, small amount of methamphetamine, an unloaded .22 revolver, an unloaded short barreled shotgun with a pistol grip, two cellular phones, and a wallet with a Maryland identification card belonging to LEWIS. There many different knives in the vehicle, including a butterfly knife. A handgun holster was attached to a belt loop on a pair of jeans in the back of the vehicle. Gun cleaning supplies were also found in the back cargo area. The ammunition, guns, gun parts, drug paraphernalia, pills, methamphetamines', cell phones, and wallet were seized.

Officer Ashe and I took all of the items from the trailer and secured it in the Durango before leaving. We booked the seized items into evidence at the Loveland Police Department. I weighed the methamphetamine, which was totaled to 3.94 and 0.90 grams. I tested the suspected methamphetamine using a NIK test, and it was presumptive positive. While in evidence, I found a loaded syringe stored in a toothbrush container with suspected liquid heroin inside. I did not test the substance. I did take a photo of the syringe, and it appeared to be 60 units. When I packaged the syringe, some of the liquid seeped through the cap and spilled inside the sharps container. All of the pills were identified, but only one was considered a controlled substance. I searched a camouflaged bag and found and a clear plastic tube with a unknown gray clay like substance inside. Loveland Police Sergeant Ryan Ertman with the bomb squad responded to evidence area and took possession of the substance.

I uploaded the pictures I took into Adams Foray. This concluded my involvement in this case.

## NARRATIVE - McAuley, Ryan

Body Worn Camera Video Title: **NONE**

Officer Ryan McAuley reporting:

On 042721, I submitted an online ATF eTrace request reference this case. The eTrace request was for LPD Item #001 #002, and #003. Once I receive the results of the eTrace, I will place a copy into the case file. I have no further involvement in this case.

## NARRATIVE - Hines, Jennifer L

**Summary Report**
**Report Date: 04/22/2021 01:19**
**Activity Num: LP21-0002877**

**Loveland Police Department**
**810 E 10th St**
**Loveland, CO 80537**

Body Worn Camera Video Title: **2021-04-22 1703 LPD134**

Officer J. Hines reporting:

On 042221 at approximately 1540 hours, I received a phone call from Officer N. Corrigan about a weapons call he was on. Officer Corrigan told me he arrested CLIFFORD LEWIS, DOB 091884 on various weapon violations. Officer Corrigan told me LEWIS, a prior convicted felon, was in possession of a sawed off shotgun, two hand guns, four homemade suppressors and a possible incendiary device.

Officer Corrigan told me he was with LEWIS at McKee Medical Center and I responded to his location to talk to him and look at LEWIS' criminal history.

Officer Corrigan told me Officer E. Dunlap was at the Loveland Police Department (LPD) logging evidence from LEWIS' vehicle and he found some unknown pills. After reviewing LEWIS' criminal history I responded to LPD to look at the evidence Officer Dunlap had. It was determined the majority of the pills in LEWIS' property were not controlled substances.

I went back to MMC with Officer McAuley to see if LEWIS would speak to me about any of the weapons he had, and about his status of being a gang member. Officer Corrigan told me he had already advised LEWIS of his Miranda Rights.

I asked LEWIS if I could talk to him for a minute and he said I could. I introduced myself and Officer McAuley to LEWIS. I asked LEWIS about his tattoos and what they stood for but he told me he didn't know. LEWIS told me I could see his tattoos if I asked nicely, and when I did he showed me the swastikas on his abdomen. I asked LEWIS if he had been read his Miranda Rights and he said he had. I asked LEWIS about the weapons that were found in his vehicle, a couple of suppressors, a sawed off shot gun, and a couple of handguns and he said, "What about them?" I asked LEWIS if they were all his and he said, "I don't know." LEWIS told me he did not make the suppressors, but knew they were in his car. LEWIS told me at this time he was living in his car, and he was supposed to start a job doing welding soon. LEWIS said he did not know how the weapons got in his vehicle. LEWIS told me not all of the belongings in his vehicle are his, some belong to his girlfriend and some belong to a friend of his.

LEWIS did not admit to having any gang affiliation when he was in prison, when I asked what the swastikas were for he told me it was stuff he used to be into. LEWIS said it was "stupid beliefs" and it had been a while since he had been into them. I asked LEWIS if he came out of the Maryland Department of Corrections documented as a gang member and he told me he did, but he did not know what gang, then said "White Supremacist but I don't think they had me in a gang".

LEWIS said a friend of his "Ryan something" had some belongings in his car also. I asked LEWIS if any of his DNA will be on the guns and he said, "I don't know". I said, "you had one in your hand today right?" and LEWIS replied, "I don't know, possibly." I asked LEWIS if he made the incendiary device and he said "no." LEWIS said as far as he knew it was factory made.

Officer McAuley asked LEWIS about the shotgun and he said it was his brothers, Jack Lewis. LEWIS said his brother left it in his car when they went to the mountains. LEWIS said the shotgun was not altered and it came that way from the store. Officer McAuley asked about other guns in LEWIS' vehicle and specifically mentioned a .22 pistol and LEWIS said, "a slide to one, it trades out on the fucking same one." Officer Corrigan talked about the gun that was taken apart, a tan pistol grip and the slide was off of it. LEWIS said, "No, that's just, something else." Officer Corrigan asked if the book on how to make suppressors was his and he said he did not know. Officer Corrigan pointed out that a guy with a background in welding could probably use a book like that and LEWIS said he doesn't do that stuff because it is illegal. I asked LEWIS about the welding on the pipe bomb, and he said "There isn't any welding on that thing it's fucking plastic." LEWIS said he was shown a picture of the pipe bomb and it was a firework. LEWIS said he bought in Wyoming, it was in a box with some old fireworks.

LEWIS did not want to answer any more questions until he talked to a lawyer so we ended the interview.

I talked to Colorado Department of Corrections and was told in 2018 when LEWIS was transferred to Colorado on parole he was documented as a Aryan Brotherhood and Supreme White Power gang member.

This concludes my involvement in this case.

NFI/

**NARRATIVE** - Roberts, Matthew D

46
INV_00000089

**Summary Report**
**Report Date: 04/22/2021 01:19**
**Activity Num: LP21-0002877**

**Loveland Police Department**
**810 E 10th St**
**Loveland, CO 80537**

Body Worn Camera Video Title: **2021-04-22 1329 LPD161; 2021-04-22 1345 LPD161**

Sergeant Matt Roberts reporting:

On April 22, 2021, at approximately 1321hrs, I responded to 2000 W. 8th St. to back-up other officers. We had received a report of a male in a Green Durango pulling a trailer who pointed a gun at another person in a black Nissan Altima. This occurred at the Circle K, 2500 W. Eisenhower Blvd. and Officer Evan Dunlap located the suspect vehicle on 8th St.

When I arrived, I observed three patrol cars behind the suspect car in what appeared to be a high-risk traffic stop. I learned the suspect, CLIFFORD LEWIS, had been detained without incident. LEWIS had arrest warrants as well.

Officer Erin Berry responded to the Circle K and watched the surveillance video which appeared to show LEWIS pointing a gun at the Nissan Altima. Officer Berry was able to forward a copy of the video and I could clearly tell that LEWIS was the suspect and pointed a gun at an unknown person. The victim was never located.

Speaking with officers on scene, we decided to frisk LEWIS and the vehicle for the weapons. LEWIS was handcuffed in the back of Officer Nick Corrgian's police car. I asked LEWIS if he had been to prison and stated he had and asked what that had to do with anything. I then explained that we were pulling him out of the patrol vehicle to frisk him and we were going to frisk his vehicle. LEWIS was upset that we were doing that and explained he had lots of people's property in his car and did not know what was in there. LEWIS explained that we did not have the right to do that. As I tried to explain to him what we were doing he interrupted me. As I was explaining the information about the gun, LEWIS interrupted me and said he did not have a gun but a cell phone in his hand. He explained he was talking to a friend trying to figure out who was following him.

Based on LEWIS'S constant questions, I asked Officer Nick Corrigan to read him Miranda warnings. LEWIS asked what being a felon had to do with anything and I explained if he was a convicted felon than he could not be in possession of a firearm. Officer Corrigan read Miranda from the back of Colorado Peace Officer's handbook (blue book). I stepped away to listen to the radio while Officer Corrigan finished miranda and later learned LEWIS'S waived.

As officers frisked the vehicle they quickly located pieces of a firearm and a device they suspected was an explosive device. Officer Paul Ashe called the bomb squad and we stopped searching until they arrived.

We received an emergency in progress call at another location so I attempted to clear and respond to that. That call cleared out as false prior to my leaving. I had turned my camera off while attempting to leave and reactivated it once I got out of my vehicle.

I showed LEWIS the surveillance video from the incident in question on my cellular telephone. LEWIS acknowledged he was the man in the green Dodge Durango pulling a trailer. He indicated the other subject we discussed following him was the black Nissan Altima that pulled up to a pump in the video. LEWIS confirmed that he had no idea who was in the car and explained he approached the car because it had been following him from his friend's house. I played the section where he walked towards the car with something in his hand behind his back and then pointed the gun shaped object at the Altima. LEWIS originally said it was a cell phone and then corrected he didn't know what it was. I asked LEWIS if he was into some bad stuff and he denied it. LEWIS then explained how the male turned around towards him and yelled at LEWIS to stay away from his house. I made a statement that LEWIS wouldn't have approached the car with a gun without feeling threatened and LEWIS explained the other party was following him.

I asked LEWIS to describe the male and he said mid 30's, wearing a beanie and camouflage clothing. LEWIS was evasive on which friend's house he was driving from and eventually described the trailer park at 1212 Butte Rd. His friend's name was MIKE ALLEN.

LEWIS asked about calling his girlfriend as he had dropped her off as Jax across the street from Circle K. LEWIS seemed to be misleading on this as well. His entire story appeared to not match and it was my opinion that he was covering up something about what lead up to the altercation at Circle K.

I left the scene while officers on scene waited for the bomb squad.

I was wearing my body worn camera, it was activated, and I later uploaded the video to www.Evidence.com.

EOR

**NARRATIVE - Ertman, Ryan**

47
INV_00000090

**Summary Report**
**Report Date:** 04/22/2021 01:19
**Activity Num:** LP21-0002877

**Loveland Police Department**
**810 E 10th St**
**Loveland, CO 80537**

Body Worn Camera Video Title: **N/A**

On 042821 I responded to the Northern Colorado Bomb Squad Range to retrieve the evidentiary items mentioned in my previous report. I had spoken to Criminalist Yoder regarding storing the container and fuse. She provided her approval and direction for packaging. I left the energetic material in the secured Conex to be disposed of when appropriate. I booked the container with residue and the fuse into evidence.

No further information.

## NARRATIVE - Corrigan, Nicholas

Body Worn Camera Video Title: **NONE**

Supplemental Report - Officer Corrigan Reporting

On 052121, I reviewed my initial report for this case with my supervisor and I observed several points in my report that require clarification.

In the seventh paragraph of my report narrative, I state in the first sentence, "I placed LEWIS under Miranda Advisement" and then elaborate on statements that he made to me. I then in the 10th paragraph of my narrative in the second sentence state, "I then placed him under Miranda Advisement." To clarify, I did not place LEWIS under Miranda Advisement twice. As a course of normal action, I cut and pasted the narrative from my arrest affidavit into my report when I first began writing my report. I do this to as a course of normal activity to avoid missing something in my report in an attempt to avoid having discrepancies between my affidavit and my report. In this instance, while expounding on the information from my affidavit in my report, I failed to recognize that I put the information concerning Miranda Advisement in the report twice. This was done in error.

In my arrest affidavit I stated in the seventh paragraph that I placed LEWIS under Miranda Advisement in an effort to provide the required minimal facts required to demonstrate my probable cause for my arrest of LEWIS to include with his booking paperwork. As stated above, I normally include much of my affidavits in my initial case reports to ensure I do not miss anything or exclude pertinent facts in my reports. In this instance, I expounded on the facts in my affidavit in my report, to include my interactions with, Mirandizing and questioning of LEWIS but failed to ensure that I removed redundant information from the narrative that could confuse a reader. My body worn camera recorded my interactions with LEWIS and shows that I only Mirandized him once.

Also, during my initial involvement with this case, I arrived on scene to assist Officers E. Dunlap and J. Marner who were conducting a high risk traffic stop of the LEWIS and his vehicle. I failed to illustrate in my initial report that I employed my issued service pistol briefly upon exiting my patrol vehicle when I arrived on scene. Officer Dunlap requested that I handcuff LEWIS when they had him walk to our location at our vehicles. I then holstered my weapon and placed LEWIS in handcuffs and placed him in my patrol vehicle. Once LEWIS was detained in my vehicle, I then re-employed my service pistol and assisted Officers Dunlap and Marner in clearing the vehicle. At no time did I aim my weapon at LEWIS, and only briefly employed my pistol prior to LEWIS being detained in my vehicle.

Also, my body worn camera footage will show that at one point I muted my camera to discuss tactics with the other and the facts of our initial contact with the other Officers on scene. During this time, we discussed which officer was taking the lead on the investigation. I forgot to narrate why I was muting my camera prior to muting it. Also, I had an interaction with LEWIS for the last few minutes of this time frame and forgot to unmute my camera until approximately 36:11.

In addition, at There are several portions of my body worn camera footage while at the McKee Medical Center with where I muted my camera while I was not in direct contact with LEWIS. I did so to avoid capturing any conversations by hospital staff or patients who were not involved with LEWIS. During these muted episodes, I forgot to narrate that I was muting for reasons of by stander privacy.

Supplemental Report

# Conventionally Submitted Materials

Criminal Case No. 21-cr-000268-RBJ

UNITED STATES OF AMERICA,

Plaintiff,

v.

CLIFFORD LEWIS,

Defendant.

## Flash Drive With:

## Exhibit 2 – Body-Cam Footage of Officer Dunlap

## Exhibit 3 – Body-Cam Footage of Officer Corrigan

## Exhibit 4 – Body-Cam Footage of Officer Berry

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 21-cr-00268-RBJ

UNITED STATES OF AMERICA,

      Plaintiff,

v.

**CLIFFORD LEWIS**,

      **Defendant.**

---

### DEFENDANT'S REPLY TO GOVERNMENT REPONSE TO MOTION TO SUPPRESS EVIDENCE

---

Clifford Lewis, through counsel, Assistant Federal Public Defender Laura H. Suelau, submits this reply to the government's response to his Motion to Suppress Evidence. Docs. 35, 26.

### FACTUAL BACKGROUND

As outlined in his Motion to Suppress, and Motion to Reply/Supplement, the government did not provide Mr. Lewis with Exhibits 2, 3, and 4, and approximately 15 other body-worn camera videos until *after* the filing of his Motion to Suppress Evidence. Upon review of those videos, Mr. Lewis submits the following modified factual background of his illegal seizure.

At approximately 1:19PM on April 22, 2021, an employee of Circle K gas station at 2500 W. Eisenhower Boulevard called 911 to report that drivers of two cars –a Nissan and a green Dodge Durango with a trailer – had an altercation at the gas station. According to the 911 caller, the driver of the Dodge Durango had a gun, and the driver of the Nissan nearly ran him over. The caller described the driver of the Dodge as "younger" with a beard, hat, and glasses. The Loveland Police Department was dispatched.

1

In the course of responding to the call, Loveland police officer Evan Dunlap saw a green Dodge Durango with a trailer pulled over on the shoulder of the 2000 block of W. 8th Street, Loveland, Colorado, next to a river, and approximately one mile from the Circle K. A man, later identified as Clifford Lewis, was standing outside the car, allegedly "digging" in the driver's seat area.

Officer Dunlap's body-worn camera was activated at 1:24PM, after officer Joshua Marner also arrived on scene and one or both officers asked Mr. Lewis to step to the back of his car. Before that, Officer Dunlap apparently asked Mr. Lewis if he had a gun. Mr. Lewis responded "no," and lifted his shirt to demonstrate that he did not. Officer Dunlap asked Mr. Lewis if he'd been in an altercation at the Circle K, he responded "no."

As a third officer, Nicholas Corrigan, arrived on-scene, officer Dunlap began to give Mr. Lewis directives to put his hands on top of his head and spread his feet, all while his gun was trained on Mr. Lewis. Mr. Lewis complied with each of those commands. The government states that Mr. Lewis "reached toward his waistband," implying that Officer Dunlap did not pull out his gun until that occurred. However, it is not clear when Dunlap drew his weapon, nor is it clear that Mr. Lewis was reaching for his waist. Instead, it appears Mr. Lewis simply did not hear Dunlap's initial command. Exhibit 2. In any event, officer Corrigan drew his firearm immediately upon arrival and trained it on Mr. Lewis despite the fact that he was already standing with his hands on his head, in compliance with Dunlap's commands. Exhibit 3.

Officer Corrigan frisked and handcuffed Mr. Lewis. Corrigan was non-responsive to Mr. Lewis's questions about why he was being placed in handcuffs. Instead, officer Corrigan again asked Mr. Lewis if anyone else was in his car and if there were weapons in his car – Mr. Lewis responded "no." Mr. Lewis persisted asking why he was being detained and officer Corrigan responded by

verbally and physically forcing him into the patrol car (stating "get in the car" no less than six times), taking Mr. Lewis's keys from his waistband, and shutting the door.[1]

After shutting and locking a hand-cuffed Mr. Lewis in a patrol car, the three officers approached the Durango. The officers looked through an open rear-window, and in the open driver's-side door. They looked in and under the driver's seat, leaning well into the confines of the car, and saw "nothing." One of the officers stated, "I don't see a gun under the seat, but [that] doesn't mean there's not one." The officers then speculated, not for the first time, that any firearm might have been thrown in the river directly next to the Durango.

At 1:29PM, approximately five minutes after first detaining Mr. Lewis, officer Corrigan opened the door to his patrol car and re-engaged Mr. Lewis. A minute later, he shut Mr. Lewis in patrol car a second time, stating "you are not under arrest right now, just give me a second to move my car." He moved his car from behind the Durango and trailer to in front of the Durango with Mr. Lewis handcuffed in the back. Corrigan then opened the door and reinitiated questioning Mr. Lewis, asking "so did he point a gun at you?" To which Mr. Lewis responded, "I don't know what they're talking about with a gun."

At 1:30PM officer Berry and a gas station attendant reviewed the surveillance video. Both remarked about the poor quality of the surveillance video – "it's hard to see," and "yeah, these cameras are not the greatest." Officer Berry joked, in reference to her vision that she had "old eyeballs." And both concluded they could not read the license plate of the car that tried to run over Mr. Lewis. Nonetheless, at 1:31PM Berry relayed (after viewing the video a single time) "it looks like the male in the Durango[…] he pulls out a gun."

---

[1] It appears the "knife" that was found in initial frisk was actually a non-concealed "neck knife" Mr. Lewis was wearing as a necklace.

Back on-scene, officer Corrigan determined that Mr. Lewis's out-of-state misdemeanor warrant was non-extraditable. At 1:34 PM officer Corrigan concluded, "alright cool, let me get you out of the handcuffs." But Mr. Lewis was never uncuffed. Instead, a fourth officer, Sgt. Matthew Roberts stopped Corrigan, telling him "we need to search that car…I think we need to frisk it at least." Officer Corrigan returned to Mr. Lewis, again told him he was not under arrest and "not going to jail on the warrant," but instructed him to put his legs inside and shut him inside the car for a third time. Mr. Lewis obeyed the command but pleaded with the officers saying, "guys, come on, please man." The officers responded by telling him to watch his toes and slamming the door shut. Sgt. Roberts commented, "I don't want him interrupting."

After shutting the door on Mr. Lewis, the officers discussed whether they had enough to "frisk [the car] at least." Sgt. Roberts relayed that officer Berry said the gun could be seen "clear as day," on surveillance and "there's an altercation." That was not what officer Berry said, nor was that true. Two of the officers discussed that there was "no victim" and they did not know whether or not Mr. Lewis was a prohibited person. Nonetheless, at 1:35 Roberts concluded: "let's search the car for a gun…I think we got at least enough to detain him." The officers then split up, with Corrigan and Roberts returning to Mr. Lewis and Marner and Dunlap searching the Durango.

Sgt. Roberts told Mr. Lewis they were going to search the Durango. Mr. Lewis responded "no, I have other people's property in there and I don't know what's in my car so I am not giving you permission to search my car." Roberts replied, "we are not asking for permission." Mr. Lewis continued to deny consent to search, following up with "well you can't just search my car like that…I know my rights." At some point, before being advised of his *Miranda* rights, Mr. Lewis told the officers: "I did not have a gun, I had my phone in my hand when I got out of my car…I was trying to talk to my friend to see who was following me… I had my phone in my hand." Sgt. Roberts was

4

undeterred, telling Mr. Lewis they were going to *Terry* Frisk his car, "we have evidence…or at least suspect that a firearm is involved." To which Mr. Lewis responded, "I didn't have one." Officer Roberts continued, "so what we are doing is investigating that allegation, there are alot of different laws, this one specifically is a *Terry* frisk, if we have evidence that people have guns we get to frisk you and the vehicle to ascertain." He continued, "you can frisk people's car based on *Terry v. Ohio.*"

At 1:40PM, while officers were searching the Durango, the Mr. Lewis was forced back into officer Corrigan's car, and the door was shut a fourth time. Again, he was told "you are not under arrest right now, you are just being detained." At 1:43PM the officers established that Mr. Lewis was a convicted felon and, after finding a firearm in his car, told him he was under arrest for "being in possession of a firearm."

## ARGUMENT

### I.     Mr. Lewis's encounter with police was an arrest without probable cause from the outset.

Mr. Lewis does not concede that police had reasonable suspicion to conduct a *Terry* stop. But that question is virtually moot because the stop quickly became an illegal arrest. Mr. Lewis's encounter with the police crossed the line between *Terry* stop and arrest at 1:24PM when officer Dunlap's initial conversation with Mr. Lewis was accompanied by two additional officers, drawn weapons, handcuffs, and the forceful placement of Mr. Lewis into a police car.

The government frames the police officers drawing their weapons and handcuffing Mr. Lewis as a question of whether or not such actions can be "permissible" during a *Terry* stop. That is not the proper analysis. The question is whether their actions exceed what was reasonably necessary under the totality of the circumstances – did the circumstances of Mr. Lewis's stop "warrant such measures"? If not, they converted the stop to an arrest. *U.S. v. Melendez-Garcia,* 28 F.3d 1046, 1052. (10th Cir. 1994). Therefore, it is useful to examine what police knew about Mr. Lewis and the circumstances of the

5

crimes alleged at the time three officers, weapons drawn, placed him in handcuffs and shut him in the back of a police car.

### A. Mr. Lewis was being investigated for a misdemeanor.

At the point at which officer Dunlap first approached Mr. Lewis (before 1:24PM), he knew Mr. Lewis was driving a car that matched the description of a car from the Circle K and that the driver of that car was both accused of aiming a gun and identified as the victim of an attempted vehicular assault. The government cites Colorado Revised Statutes § 18-3-206 (menacing), and § 18-12-106 (1)(a) (misdemeanor aiming of a firearm), as the conduct the police were investigating when they approached Mr. Lewis. Of note, menacing requires placing "another person in fear of imminent or serious bodily injury," yet the driver of the other car did not call 911 and had not been identified. The police officers on-scene, who are charged with knowing the law they enforce, clearly understood that there is no menacing without a victim. First an officer expressed concern about the continuing an investigation with "no victim," and later one reiterated "we don't have a victim." It was not until nearly twenty minutes after Mr. Lewis's detention began that the police began to consider whether there might be some other crime to investigate – including whether Mr. Lewis was a prohibited person. However, at 1:25PM, when Mr. Lewis was first instructed to put his hands on his head, police were investigating a victim-less menacing, and a misdemeanor aiming of a firearm. If there was reasonable suspicion, it existed only as to the misdemeanor aiming. Therefore, the scope of the *Terry* stop should have been limited to the "goal" of investigating that crime. *Melendez-Garcia,* 28 F.3d at 1051.

### B. Mr. Lewis was immediately cooperative and compliant.

When officer Dunlap approached Mr. Lewis, he was on the driver's side of his car, but willingly and calmly engaged with Dunlap, complying with the request to step to the back of his car. When two other officers arrived, at least one of them immediately drew his firearm. Officer Dunlap then drew

6

and kept drawn his firearm as Mr. Lewis complied with all officer commands: "put your hands on top of your head…turn around…spread your feet…don't move… walk backwards to the sound of my voice…keep walking back…stop…take some steps to your left…keep stepping left…get on your knees."[2] Throughout those directives, and as he was being hand cuffed, Mr. Lewis was calm and compliant. A frisk of Mr. Lewis did not reveal a firearm. Mr. Lewis both denied (again) having a firearm and denied that there was another person in the car. Nonetheless, the police placed him, handcuffed, in the back of a police car and shut the door – refusing to answer his questions and using physical force to shove him in the car.

Under a totality of the circumstances, including – the nature of the crime alleged, the dearth of evidence, and Mr. Lewis's behavior – the level of force and measures used on Mr. Lewis were not reasonable. But the police did not end their so-called *Terry* stop there, they continued the intrusion on Mr. Lewis's liberty while they conducted an illegal search, one that undercut any reason to believe Mr. Lewis had committed a crime.

## C. The first illegal search of Mr. Lewis's car weakened any claim of reasonable suspicion.

The government conflates what happened after Mr. Lewis was shut in the police car for the first time, the protective sweep of his car for weapons, with the later search of the car. Doc. 36, at 12. They are distinct searches and require different levels of legal scrutiny. They are related only because the first search underscores the illegality of the second search.[3]

---

[2] Although the government and the officers on-scene rely heavily on a brief apparent reach towards his waist, it is clear from the video that Mr. Lewis simply did not hear the officer's initial command to put his hands on his head and he immediately complied when the officer raised his voice. *See* Exhibit 2, at 0:20 (corresponding with 19:25:00 AXON BODY 2).

[3] Mr. Lewis did not challenge the first search, although illegal, because nothing of evidentiary value was found. It is the second search that is the subject of Mr. Lewis's suppression motion.

At 1:27PM police searched Mr. Lewis's car for the first time for approximately a minute and found nothing. That first search "a protective search for weapons…" was of the type that would permissible be under *Michigan v. Long* and *United States v. Palmer* if it were "limited in the sense that the officer conducting the protective search must first have reasonable suspicion that the suspect is dangerous, and the protective sweep must be directed only to locations which may contain a weapon to which the suspect my have access." 360 F.3d 1243, 1248 (10th Cir.).[4] But the facts of *Palmer* clearly distinguish that circumstance from Mr. Lewis's, rendering the first search impermissible. In *Palmer,* the police and a witness observed Mr. Palmer trying to hide something in the glove box after the police initiated a traffic stop and the police had information that Mr. Palmer was an "ex-convict" who was armed and dangerous. Here, the police had no knowledge of Mr. Lewis's criminal history or if he was known to be armed and dangerous. Although Mr. Lewis was apparently reaching under the driver's seat, it was clearly not for the purpose of concealing anything as he did not know officer Dunlap was approaching.

The first illegal search is significant because it demonstrates the gross illegality of the second search that occurred ten minutes later. First, it is evidence that the officers here were not acting reasonably from the inception. Instead, they conducted a protective sweep of Mr. Lewis's car without the requisite reasonable suspicion. Second, the illegal search contradicted their suspicion that Mr. Lewis did, in fact, possess and aim a gun. No gun was found in, under, or around the driver's seat and none could be seen through the other windows. Third, the scope of the first search clearly demonstrates that the second search, the one the officer's called a "*Terry* frisk" cannot fairly be

---

[4] The officers in *Palmer* were permitted to sweep the glove compartment because there was ample evidence that Mr. Palmer tried to hide something in the glove box before the police officer approached. d

8

characterized as a "protective sweep" of the type contemplated *Palmer* because that type of search had already occurred.

## II.     Mr. Lewis's detention became more than a *Terry* stop after the first illegal search.

Assuming, but not conceding, that police had reasonable suspicion when they first put Mr. Lewis in handcuffs, and further assuming, but not conceding, that handcuffing him at gunpoint and shutting him in a police car while they searched his car was reasonably within the scope of a *Terry* stop – that *Terry* stop should have ended after the first search concluded at 1:28:33. Not only did they not have probable cause, but any reasonable suspicion had clearly dissipated. Their investigation demonstrated there was *not* a reasonable probability that a crime was committed. Mr. Lewis's statements that he did not have a firearm and he was alone in the car had proven truthful, he was compliant with police commands, and he should have been released. He was not. With even less reason to believe that he'd committed either § 18-3-206 (menacing) or § 18-12-106 (1)(a) (aiming a firearm) than when they'd initially approached Mr. Lewis, police continued to keep him in custody and investigate.[5]

Over the next ten minutes, Mr. Lewis was told repeatedly he was not under arrest, likely because the police *knew* they did not have probable cause to arrest him. Nonetheless, he was shut in the police car on three more occasions, he was never permitted to leave the confines of police car (only have the door open), and the handcuffs were never removed. The police had possession of his car keys and at all times between three and four police officers stood between him and his car. He was not free to leave and yet justification for the narrowly draw scope of an investigative detention had

---

[5] Importantly, Officer Berry did view the contents of the "not very good" surveillance footage until minutes after the first search of the car and she did not send the officers on-scene the video until after they searched Mr. Lewis's car the second time.

9

long evaporated. *See U.S. v. King,* 990 F.2d 1552, 1557 (10th Cir. 1993). Mr. Lewis was unlawfully seized.

### III.     The search of Mr. Lewis's car was not lawful.

The government advances three arguments to justify the second search of Mr. Lewis's car. None provide the requisite justification.

#### 1.     The second search of the car was not a "protective sweep."

First, the government alleges the search of the car was a protective sweep for weapons. As outlined *supra,* a protective sweep for weapons did occur and no weapons were found. The second search (the one Mr. Lewis challenges) cannot accurately be characterized as a protective sweep pursuant to *Terry* and *Michigan v. Long.* Not only because that search had already occurred, but also because "in the name of investigating a person who is no more than suspected of criminal activity, the police may not carry out a full search of the person or of his automobile or other effects." *Royer,* 460 U.S. 491 499. The second search of Mr. Lewis's car was a full search. Police must have probable cause to conduct a full search and they did not. *See United States v. Jurado-Vallejo,* 380 F.3d 1235 (10th Cir. 2004).

#### 2.     The search of the car was not supported by probable cause.

Next the government argues that the search was supported by probable cause. That argument fails for multiple reasons. First, it fails because there was not probable cause to believe the car contained evidence of a crime – either menacing or aiming a firearm.[6] After the first fruitless search, the officers heard from officer Berry about "not very clear" surveillance video. But her report did not

---

[6] The government's argument concerning probable cause of "ownership and occupancy" almost does not warrant response, not in the least because Mr. Lewis never denied ownership or occupancy of the car. Nor does occupying a car that was at the scene of an alleged crime itself constitute a crime.

10

make it any more likely that a gun would be found in the car. Cutting against that probability was the officers' own repeated speculation that if Mr. Lewis *did* have a gun, it was likely in the river next to the car. They also had Mr. Lewis's statement that it was a cell phone, not a gun, in his hand. The officers conduct and statements before and during the search demonstrate that even they did not think they had probable cause. If Sgt. Roberts thought there was probable cause to search Mr. Lewis's car, he would not have gone to tortured lengths to characterize the second search as a "frisk" and part of a *Terry* stop rather than a search supported by probable cause. *See* Exhibit 3, at 11:55 (19:36).

Second, even if this Court finds the police did eventually develop probable cause to search the car, there was no break in the causal connection between the illegality of Mr. Lewis's arrest and the evidence obtained in the search of the car. Mr. Lewis's illegal seizure began, at the latest, at 1:28PM. *See supra,* I. Developing probable cause after-the-fact cannot cure an initial illegality. *See United States v. Shrum,* 908 F.3d 1219, 1231 (10th Cir. 2018). Indeed, *Wong Sun* and the suppression doctrine exist to disincentivize police committing illegalities in the name of eventually obtaining evidence. *See* Doc. 35.

### 3. The search of Mr. Lewis's car was not a lawful search incident to arrest.

The government's final argument is that the search of the car was a "lawfully incident to arrest." This argument also fails. First, it requires Mr. Lewis's arrest to be lawful and supported by probable cause. It was not. However, even if this Court finds that Mr. Lewis was under arrest (despite being told several times he was not) and that arrest was legal, such an arrest does not justify the search of Mr. Lewis's car. Contrary to the government's erroneous interpretation, *Arizona v. Gant* held: "police [may] search a vehicle incident to a recent occupant's arrest *only* when an arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." 556 U.S. 332,

343 (2009)(emphasis added).[7] Mr. Lewis's entire motion is the result of the fact that he was secured long before the time of the search and far from reaching distance of the passenger compartment of the car. Like in *Gant,* "neither the possibility of access nor the likelihood of discovering offense-related evidence authorized the search in this case." *Id.* at 344.

### IV. The evidence found during the search of Mr. Lewis's vehicle was fruit of Mr. Lewis's illegal detention.

The fact that Mr. Lewis was not actively driving at the time of his illegal seizure does not break the causal connection between that detention and the search of his car. When officer Corrigan initially forcefully removed Mr. Lewis's keys from his waist, Mr. Lewis asked "what are you doing? Why are you taking my keys?" and repeatedly asked "why are you all stopping me?" Mr. Lewis explained he merely stopped to look for his cigarettes. Absent his illegal seizure, Mr. Lewis would have found his cigarettes, gotten back in his car, and driven away. Evidence obtained after that seizure is fruit of the poisonous tree and should be suppressed. *See Wong Sun v. United States,* 371 U.S. 471 (1963).

---

[7] *United States v. Vinton,* 594 F.3d 14 (D.C.Cir. 2010) cited by the government is both non-binding and factually inapposite. In *Vinton,* the defendant was properly stopped on a traffic violation, the officer was working alone, and the officer saw another knife within reaching distance of the driver, thus justifying the search for additional weapons.

12

## CONCLUSION

For the forgoing reasons, this Court should suppress all evidence derived from the unlawful

seizure of Mr. Lewis and the subsequent search his car.


Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender


s/Laura H. Suelau
LAURA H. SUELAU
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
laura.suelau@fd.org
Attorney for Defendant

13

## CERTIFICATE OF SERVICE

I hereby certify that on **January 13, 2022**, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Rajiv Mohan, rajiv.mohan@usdoj.gov
Assistant United States Attorney

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

Clifford Lewis (U.S. Mail)

s/Laura Suelau
LAURA SUELAU
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO 80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
laura.suelau@fd.org
Attorney for Defendant

14

1                    IN THE UNITED STATES DISTRICT COURT

2                       FOR THE DISTRICT OF COLORADO

3
    Criminal Action No. 21-CR-00268-RBJ
4

5     UNITED STATES OF AMERICA,

6             Plaintiff,

7             vs.

8     CLIFFORD LEWIS,

9             Defendant.

10   ----------------------------------------------------------------

11                        REPORTER'S TRANSCRIPT
                             Motions Hearing
12   ----------------------------------------------------------------

13
             Proceedings before the HONORABLE R. BROOKE JACKSON,
14   Senior Judge, United States District Court for the District of
     Colorado, commencing on the 28th day of January, 2022, in
15   Courtroom A902, United States Courthouse, Denver, Colorado.

16                             APPEARANCES

17   For the Plaintiff:
     RAJIV MOHAN, U.S. Attorney's Office, 1801 California St., Ste.
18   1600, Denver, CO 80202

19   For the Defendant:
     LAURA H. SUELAU, Office of the Federal Public Defender, 633
20   Seventeeth St., Ste. 1000, Denver, CO 80202

21

22

23

24
        Sarah K. Mitchell, RPR, CRR, 901 19th Street, Room A252,
25                 Denver, CO 80294, 303-335-2108

            Proceedings reported by mechanical stenography;
                transcription produced via computer.

21-CR-00268-RBJ          Motions Hearing          01/28/2022    2

1                 *        *        *        *        *

2        (The proceedings commenced at 9:01 a.m.)

3              THE COURT:  This is United States versus Lewis,

4    21CR268.  This is a hearing on the defendant's motion to

5    suppress, ECF No. 35.  The Court is conducting the hearing

6    remotely for several reasons.  Number one, obviously the

7    pandemic and the difficulties that places on everyone.  Now

8    we've lost somebody.

9              MS. SUELAU:  Your Honor, I believe we lost Mr. Lewis.

10   I'll see if he's having any issues reconnecting.

11             THE COURT:  There he is.  As I was saying, the reason

12   we're doing it remotely is because of the pandemic and the

13   desirability to avoid in-person hearings when we can.  Second,

14   we have the consent of all parties to proceed remotely in this

15   hearing.  Third, I happen to be in Arizona this morning which

16   explains why I'm not wearing a robe.  I don't have one here.

17   What you see is the best I've got as of today.

18             Let me have your appearances.

19             MR. MOHAN:  Good morning, Your Honor.  Rajiv Mohan

20   and Albert Buchman for the United States.

21             MS. SUELAU:  Good morning, Your Honor.  Laura Suelau

22   on behalf of Clifford Lewis, and Mr. Lewis is present.  He is

23   out of custody, so he's appearing from his halfway house.

24             THE COURT:  Okay.  Thank you all.  I've read your

25   papers, and I think I understand the issues.  Does the

                     Sarah K. Mitchell, RPR, CRR

1   Government intend to present some evidence today?

2              MR. MOHAN:  Your Honor, the parties have agreed that

3   the Court can admit and consider the exhibits we submitted

4   with our response as the basis of the record for this motion

5   and proceed to argument on that record, and in addition to

6   that, we do not intend to produce any further evidence.

7              THE COURT:  Okay.  Given that, what I'd like to do

8   then is using my notes that I've taken from your respective

9   documents, I'd like to try to summarize what I think the facts

10  are so that you folks in turn can set me straight on anything

11  that I've misunderstood.  Is that acceptable?  I think

12  Mr. Mohan said yes, but he was muted.

13             MR. MOHAN:  Yes, Your Honor.  That is correct.

14  Sorry.

15             THE COURT:  And, Ms. Suelau?

16             MS. SUELAU:  Yes, Your Honor.

17             THE COURT:  All right.  So here's -- here's what I

18  took from your papers.  On April 22nd, 2021, employees at a

19  Circle K in Loveland called 911 and described an incident that

20  had just occurred.  This was in the early afternoon of that

21  day.  The employee indicated that the driver of a forest green

22  Dodge Durango with a trailer had just pointed a gun at the

23  driver of the Nissan Altima there at the Circle K gas station

24  area.  And she described the driver as younger, having a

25  beard, wearing a hat and wearing sunglasses.  And she claimed

                    Sarah K. Mitchell, RPR, CRR

1  that the driver of the Durango after pointing the gun at the

2  Nissan which appeared to be driving at him drove away

3  southwest on Wilson Avenue.

4          At approximately 1:19 p.m. -- and incidentally, I

5  will note here that in the defendant's motion the defendant

6  said that the employee called at approximately 1:19 p.m.  In

7  the Government's document it states that Officer Dunlap

8  responded and at 1:19 p.m. he located a forest green Dodge

9  Durango with the trailer on the shoulder of the 2000 block of

10  West 8th Avenue.  Now, I mention those two times to indicate

11  that according to your papers the employee's call and Dunlap

12  spotting the Durango occurred at the same time.  That wouldn't

13  be the case.  I'll simply infer that they were relatively

14  approximate but not at the same time.

15          Officer Dunlap observed in addition to the green

16  Dodge Durango with the trailer on the shoulder was a man with

17  a beard and a hat, although no sunglasses there.  The location

18  of the Dodge Durango on the shoulder on West -- was on

19  West 8th a little bit southeast of the Circle K, approximately

20  one mile away from the Circle K and alongside a ditch.  Dunlap

21  apparently stopped and inquired whether the driver had a gun

22  and at some point had been in an altercation at the Circle K.

23  The driver indicated no.  Dunlap states that the driver

24  reached for something in his waistband, and at that point

25  Dunlap ordered him to place his hands on his head, which he

Sarah K. Mitchell, RPR, CRR

1   did, and to walk backwards toward him, which he did.  I

2   observed that, by the way, on the videos which were sent to me

3   and which I have reviewed.

4           The second officer, Officer Corrigan, arrived and

5   directed the driver of the vehicle to get on his knees, placed

6   him in cuffs, and placed him in back of the police car.

7   Another officer, Officer Berry, arrived at about 1:28 p.m. --

8   I'm sorry -- Officer Berry at 1:28 p.m. went to the Circle K

9   where the employee confirmed what she had said, as did other

10  employees, and there he obtained surveillance footage from the

11  Circle K, which he brought back to the scene and either

12  brought back to the scene or sent it to Officers Corrigan and

13  Dunlap and Sergeant Roberts, who by then had also reported to

14  the scene.

15          Officer Corrigan had dispatched and run the plates.

16  They discovered that there was at least one warrant

17  outstanding for the driver, who is the defendant.  And later

18  on -- well, at some point the officers decided that the

19  warrants were not extraditable, and later at some point they

20  also learned that the driver Mr. Lewis was a convicted felon

21  and had other warrants.  Corrigan at this point after learning

22  about the warrant told the driver that he was not under

23  arrest, and I note that Sergeant Roberts also at about

24  1:29 p.m. had said that he was not under arrest.

25          The defendant, by the way, has taken the position

Sarah K. Mitchell, RPR, CRR

1  that he was, at least at that point, under arrest because of

2  he was handcuffed, placed in a police car at gunpoint, was not

3  free to leave, and was questioned about the gun.  So there's a

4  dispute as to whether at this point he had been arrested or,

5  as the officers were stating, he was not yet under arrest.

6  The defendant in response to questions from the officers said

7  he had no knowledge of the gun.  He did not at least initially

8  acknowledge that he was, in fact, Mr. Clifford (sic).  He said

9  that he had a phone in his hand and he was trying to talk to a

10 friend to see who was following him, being that black Nissan

11 that was involved in the incident at the Circle K.

12          Officer Roberts -- I should say Sergeant Roberts told

13 the defendant what was on the surveillance video.  The

14 officers decided they were going to either, quote, frisk,

15 closed quote, or search the car.  The defendant did not

16 consent to the search.  At this point in the chronology,

17 Officer Corrigan gave Mr. Lewis his Miranda rights.  After the

18 Miranda rights had been administered the defendant again

19 stated that he had no knowledge of the gun.  Officers Dunlap

20 and Ash proceeded to search the car.

21          In the course of their search they found a shoulder

22 holster, a loaded magazine, ammunition, something that they

23 described as an explosive device which the defendant said was

24 fireworks he had purchased in Wyoming, firearm parts and

25 accessories, a suspected silencer, a .22 caliber revolver, a

1  short barrel shotgun, drug paraphernalia, and some

2  methamphetamine.  After finding those objects, the officers

3  placed the defendant under arrest charged with unlawful

4  possession of a firearm.

5          I'm looking back at my notes.  I think that covers

6  the chronology as I understand it.  Obviously there is a

7  dispute here whether there was a legitimate Terry stop,

8  whether there was an arrest, when, if so, that arrest

9  occurred, and whether these statements that were made by Mr.

10  Lewis before he was Mirandized should be suppressed, whether

11  the entire search should be suppressed, and so forth.  Those

12  are the facts as I understand them to be.

13          Mr. Mohan, are those facts, in your view, accurate?

14          MR. MOHAN:  They are, Your Honor.  I would just note

15  a couple of points.  On the timing issue, I believe I will

16  concede error on the 1:19 timestamp for Dunlap's arrival on my

17  part.  I believe Ms. Suelau is correct.  I believe that is

18  confirmed by the timestamp on the body cam which is closer to

19  1 minute 24 seconds, so I think that clears that up.  And with

20  respect to --

21          THE COURT:  Wait a minute, what time do you believe

22  the incident occurred at the Circle K?  Ms. Suelau said 1:19.

23          MR. MOHAN:  We believe that the 911 call was around

24  1:19, and that Officer Dunlap encountered the Dodge around

25  1:24, which I think is consistent with what Ms. Suelau said.

Sarah K. Mitchell, RPR, CRR

21-CR-00268-RBJ          Motions Hearing          01/28/2022    8

1   I think what I had mistakenly said in my briefing which the

2   Court pointed out was that those both were around 1:19.

3           THE COURT:  Okay.  I got it.

4           MR. MOHAN:  And the second point that I would just

5   offer a little bit of color on is that in terms of when

6   Officer Berry conveyed to the officers on the scene, she

7   radioed what she saw on the video around 1:30, and you can

8   hear that on Exhibit 2 at about the 5-minute-32 mark, she did

9   not actually send the video until after the search of the car

10  had begun.  But with those minor points, I think I generally

11  agree with the Court's characterization.

12          THE COURT:  In other words, you say Officer Berry --

13  I'm sorry I described her as a he.  I didn't know, or didn't

14  remember -- looked at the surveillance video and then by radio

15  communicated what she had seen, but they didn't actually --

16  the officers on the scene at the shoulder on 8th Avenue hadn't

17  seen the actual video themselves until after the search.

18          MR. MOHAN:  Correct.

19          THE COURT:  All right.  Ms. Suelau, what would you

20  like to add or correct?

21          MS. SUELAU:  Your Honor, as to the timing, I agree

22  with Mr. Mohan, the only slight difference being that Officer

23  Dunlap's body camera video was activated at 1:24.  However,

24  his report, which I believe the Government submitted as

25  Exhibit 1, indicates that he had a brief conversation with Mr.

Sarah K. Mitchell, RPR, CRR

1  Lewis before the body-worn camera was activated.  That when he

2  drove up, Mr. Lewis was standing at the driver side door, and

3  then at his command walked to the back of the car, which is --

4  and they already had a brief conversation about whether or not

5  Mr. Lewis was at the Circle K, and that's when the body-worn

6  camera is activated.  So I do think it was going to be a

7  little bit before 1:24.

8          The other point I want to clarify is that Mr. Lewis

9  was not ordered to put his hands up in response to reaching

10 for his waist.  He was ordered to put his hands up and from my

11 viewing doesn't exactly hear what he's being told and motioned

12 for his waist or sort of is turning, and then they order again

13 put your hands up, and that's when he puts his hands up.  So

14 it wasn't that he was told to put his hands up in response to

15 any motioning that the officers construed as a motioning to

16 his waist.  He was being already told before any motioning to

17 put his hands up.

18          THE COURT:  Okay.

19          MS. SUELAU:  And with that, I also agree with what

20 Mr. Mohan stated about the officers on scene not having been

21 sent the -- it's not clear when they were sent the footage,

22 but it wasn't until after -- if they were sent it, it wasn't

23 until after the second search of the car.

24          THE COURT:  Okay.  All right.  So we have a set of

25 facts that I think with your comments added to them both sides

Sarah K. Mitchell, RPR, CRR

21-CR-00268-RBJ          Motions Hearing          01/28/2022    10

1    agree to, and I'll assume that those are the facts.  One thing

2    I haven't asked yet is whether Mr. Lewis himself wishes to

3    testify and to add or subtract anything from the facts.

4         MS. SUELAU:  No, Your Honor.  I don't intend to call

5    Mr. Lewis as a witness.

6         THE COURT:  All right.  Then the question is what is

7    the significance of all of that.  Again, if it would be

8    helpful, I will tell you what I'm thinking so that you'll know

9    what to shoot at.  I don't know what the significance is of

10   the officers telling the defendant twice he was not under

11   arrest.  Apparently the officers at least felt that he was not

12   under arrest.  The defendant believes that he was already

13   under arrest.  If, in fact, he was under arrest, then the

14   question is was there probable cause to arrest him.

15        When I look at the facts that were known to the

16   officers, they were, first, that the incident at the Circle K

17   involved the driver of a forest green Dodge Durango pulling a

18   trailer, with the driver being a younger individual with a

19   beard, a hat and sunglasses.  That description fits almost

20   exactly the description of the vehicle found by Officer Dunlap

21   on the side of the road.  It was, indeed, a forest green Dodge

22   Durango pulling a trailer.  The driver had a beard.  To me at

23   least he is a relatively younger man.  He's wearing a hat, and

24   he did not have glasses on.  But there is substantial identity

25   in terms of the description.

                    Sarah K. Mitchell, RPR, CRR

1          Secondly, the location of the vehicle that was found

2    on the shoulder was only a mile from the Circle K.  Third, the

3    timeframe between the 911 call and the arrival by Officer

4    Dunlap was at most five minutes, and according to Ms. Suelau,

5    less than five minutes.  And, fourth, by pointing the gun at

6    the Dodge Durango the defendant has ostensibly committed one

7    of two crimes as described by the Government in its response.

8    One is Colorado Revised Statute 18-3-206, felony menacing with

9    a real or simulated weapon, and the other is C.R.S. 18-12 -- I

10   believe it's 106(1)(a) knowingly and unlawfully aiming a

11   firearm at another person.

12          So when I combine all of those facts and that law

13   together, my impression is, as Ms. Suelau said, he was likely

14   either under arrest or at least the officers in my view had

15   probable cause to arrest him.  If I give the benefit to the

16   defendant, ironically, that he was not under arrest yet

17   despite the defendant's argument, then I would say that the

18   statements by the defendant before he received his Miranda

19   warnings that he had no knowledge of the gun, that he did not

20   acknowledge being Mr. Clifford initially, and even that he did

21   not consent to the search, that he had a phone in his hand,

22   that he was trying to talk to a friend to see who was

23   following him, all the statements that were made before he was

24   Mirandized -- well, if he was under arrest, then I guess I

25   would suppress those, wouldn't I, because he hadn't been

21-CR-00268-RBJ        Motions Hearing        01/28/2022    12

1   Mirandized.  If he wasn't under arrest -- so I guess I said it

2   backwards before.

3        If he wasn't under arrest, then those statements

4   would be potentially admissible.  But I think he probably was

5   under arrest, so I would be somewhat inclined to suppress

6   those statements, but when they gave the Miranda warnings, and

7   he repeated again that he had no knowledge of the gun, I

8   wouldn't be inclined to suppress that statement.  But my own

9   belief is that he was under arrest way back at the beginning

10  for all the reasons that Ms. Suelau said and that that would

11  cause me to exclude certain statements that he made, yes.  But

12  it seems to me that if he was under arrest, then the search

13  was probably proper incident to the arrest or as an inventory

14  search, either one.  So those are my impressions.

15        Ms. Suelau, it's your motion, so I think I should

16  give you the first opportunity to convince me that I've gone

17  astray somewhere.

18        MS. SUELAU:  Thank you, Your Honor.  I obviously

19  agree.  I think Mr. Lewis was arrested from nearly the

20  inception.  However, there was not probable cause to support

21  that arrest.  You know, I won't belabor this point because it

22  seems that Your Honor agrees on this, but if we're comparing

23  to the case on point, which is United States vs. Royer, in

24  Royer they ask Mr. Royer to come to a small room.  They

25  retained his ticket for the airplane and his driver's license,

21-CR-00268-RBJ          Motions Hearing          01/28/2022    13

1   and they don't tell him you're free to leave.

2          Here we have Mr. Lewis is in the back of a car.  They

3   draw their guns immediately.  You know, one of the officers in

4   his report said something -- made some sort of claim like he

5   -- he deployed his service weapon but didn't point it at Mr.

6   Lewis, and that really makes very little sense.  So to the

7   extent that the Government -- nor is it supported by the body

8   camera.  So to the extent the Government is going to claim

9   that the weapon -- their weapons weren't drawn, Your Honor

10  only needs to review the body camera.

11         They place him in handcuffs.  They take his keys, and

12  they lock him in the back of the car, and all that happens

13  within a minute or two of the body-worn camera starting and a

14  minute or two after the stop begins.  And then the question is

15  is they're framing it as a Terry stop, and I think they're

16  doing that because they don't have probable cause.  In many

17  ways it's -- they're saying we don't have probable cause, so

18  we need to frame it as a Terry stop, but they're executing all

19  of the things that would say it is an arrest.  So if we're

20  under a Terry stop, they need to use the least intrusive means

21  reasonably available, and I would say that reasonableness is

22  modified by least intrusive, not the reverse as suggested by

23  the Government.

24         And they need to do that to either dispel or verify

25  what their suspicions are, which is that Mr. Lewis not only

Sarah K. Mitchell, RPR, CRR

21-CR-00268-RBJ     Motions Hearing     01/28/2022     14

1   was the person at the gas station station, but, in fact, had a

2   gun.  And so if we're talking about does Mr. Lewis have a gun,

3   I think that we don't have probable cause to support that, and

4   if we're in the context of a Terry stop, they have a limited

5   amount of time and a limited scope to verify or dispel that.

6   So what we know is that when Officer Dunlap approaches, yes,

7   Mr. Lewis is close to the gas station, but I would say his

8   proximity to the gas station actually cuts against probable

9   cause of if he had a firearm at the gas station.  Someone who

10  had just pointed a gun at a gas station is going to go further

11  than a few blocks away to stop and get out of his car and look

12  for his cigarette.

13          So, you know, we have these other cases cited by the

14  Government such as *Perdue* and *Windom* where people are

15  basically fleeing from the police officers, and the police

16  say, well, there's probable cause because they're fleeing.  We

17  have the opposite of that here.  Mr. Lewis stopped close by.

18  When he's approached by Officer Dunlap, he immediately

19  complies with his directives.  He tells him I don't have a

20  gun, and he obeys all commands.  So that would cut against

21  probable cause to believe that he had, in fact, committed a

22  crime at the gas station.

23          But then we don't just have that.  We have illegal

24  search number one, which is the sweep of this car.  So instead

25  of letting Mr. Lewis leave, they take his keys, put him in

Sarah K. Mitchell, RPR, CRR

21-CR-00268-RBJ     Motions Hearing     01/28/2022    15

 1   handcuffs in the back of the police car, and I would say that

 2   was, you know -- in that the Government cites I believe it's

 3   -- I'm not remembering the name -- basically that you can do a

 4   sweep if you have reason to believe a person is dangerous, and

 5   the case they cite to the police had information that the

 6   driver was armed and dangerous.  They saw a knife immediately

 7   in the car, and so under those circumstances they're allowed

 8   to do a sweep of the car.  They don't have that here, but they

 9   do a sweep of the car anyway.

10         And even if we, you know, set aside that that sweep

11   was not supported by the requisite things necessary to make it

12   legal, that sweep tells them, again, that their suspicion

13   should be dispelled.  The sweep is pretty extensive.  They're

14   looking in the car with their bodies in the car.  They're

15   looking under the driver's seat and through the back windows,

16   and all three of the officers who were involved in this say, I

17   don't see anything.  I don't see a gun under the seat.  And if

18   we had like any doubt that -- if we're in a Terry world, and

19   we say you have this time to verify or dispel your suspicion,

20   this is it.

21         This is 1:28 p.m. they conclude I don't see a gun

22   under the seat.  They walk back to the car to talk to Mr.

23   Lewis, and at that point he should have been let go.  That's

24   when this should have ended completely.  They did not have

25   probable cause.  They had dispelled their suspicions under

Sarah K. Mitchell, RPR, CRR

1    Terry.  But instead they just keep investigating, and you

2    cannot arrest someone for the purpose of investigating.  And I

3    want to note that it wasn't until after four minutes after

4    they do this sweep and say I don't see a gun under the seat

5    that Officer Berry replays information about the contents of

6    the security camera over the radio.

7         And I first want to point out that Officer Berry's

8    description was not accurate.  She -- you can see what she's

9    seeing on her body-worn camera.  You can hear her talking to

10   the clerk, and it's not clear that they're looking at the

11   person with a gun.  But, in any event, her relaying of that

12   information doesn't change the quantum of evidence against Mr.

13   Lewis.  They're still investigating the same thing they were

14   at the beginning, which is whether or not he has a firearm and

15   is aiming it.

16        I know that the Government alleges felony menacing.

17   Felony menacing requires another person to have actually been

18   in fear, and the officers here knew that the person in the

19   Nissan who had tried to run Mr. Lewis down in the gas station

20   did not call 911 and did not assert a gun was drawn on them.

21   So what we have strongest evidence of presumably would be the

22   misdemeanor aiming.  And I don't think that Officer Berry's

23   relaying of this information over the radio changes anything.

24   So they're still investigating the same thing they were when

25   they stopped -- started this alleged Terry stop.

                    Sarah K. Mitchell, RPR, CRR

1          They've also done what's required to dispel their

2    suspicion.  Mr. Lewis said he doesn't have a gun.  They don't

3    see a gun, and then other statements of his turn to be true,

4    and they say is there someone else in the car, and he says no,

5    there's not someone else in the car.  He's cooperative.  He's

6    not showing himself to be dangerous, and he should have been

7    released.

8          THE COURT:  Can I ask --

9          MS. SUELAU:  Yes.

10          THE COURT:  I didn't want to interrupt until you were

11    finished, but I have some questions.

12          MS. SUELAU:  Uh-huh.

13          THE COURT:  Do you want to finish first or do you

14    want me to interrupt you, which I already have by accident.

15          MS. SUELAU:  Either way, Your Honor.

16          THE COURT:  Just to clarify the citation you

17    mentioned, you said United States vs. Royer.  I think it's

18    *Florida vs. Royer*.

19          MS. SUELAU:  That's right, Your Honor.  It's *Florida

20    vs. Royer*.  That's my mistake.

21          THE COURT:  250 U.S. 491 (1983).  And I think the

22    point of that case, and you cite page 500, is that you can't

23    conduct a full search of the car based only on suspicion.  I

24    don't know if that's still good law or not, but you can't sort

25    of have it both ways.  You're saying this wasn't a Terry stop.

                    Sarah K. Mitchell, RPR, CRR

1   It wasn't just suspicion, but was an actual arrest, although

2   you deny probable cause.  But if there was an arrest, that I

3   think would probably make *Florida vs. Royer* not relevant.  Do

4   you agree or disagree?

5        MS. SUELAU:  I think that hinges on the probable

6   cause question.  *Florida vs. Royer* is still good law, and I

7   would say if there's anything, it was reasonable suspicion.

8   It's clear that the officers believe there's only reasonable

9   suspicion.  They're telling Mr. Lewis there's only reasonable

10  suspicion.  So in saying to them, well, because you conducted

11  an illegal arrest, then you get to do all the things that come

12  with an arrest, but you don't have to Mirandize him, was

13  really undercut the delineation between a Terry stop and an

14  arrest, and it would sort of incentivize this kind of illegal

15  arrest where you don't have to give Mr. Lewis the rights he's

16  entitled to, but you do get to do a search incident to arrest.

17       And as to the search of the car, I don't believe that

18  the Government has -- if you're doing a search incident to

19  arrest, if we're in that scenario, you still don't get to

20  search the car because Mr. Lewis is confined in the back of

21  the police car.  He does not have ready access to the car, and

22  they don't have probable cause to believe there's evidence of

23  a crime in the car, in large part because of this first

24  illegal sweep of the car.

25       THE COURT:  Well, you obviously do not believe that

Sarah K. Mitchell, RPR, CRR

 1  what the officers said is significant.  The officers said you

 2  are not under arrest, but you don't believe that's significant

 3  because you believe the facts say that he was under arrest.

 4  Oh, I think we lost her.

 5          MS. SUELAU:  Can you see and hear me now?

 6          THE COURT:  I can see you and hear you.  I don't know

 7  if you could hear me when you were temporarily not on the

 8  screen, but what I was saying was the officer said you're not

 9  under arrest, but you believe he was under arrest.  So I infer

10  from that that you believe the fact that the officers say

11  you're not under arrest -- she's gone again.  She's back.

12          MS. SUELAU:  My apologies.  I think I've resolved the

13  issue.

14          THE COURT:  Okay.  I think you may have probably

15  missed part of what I was saying.  You believe -- and I think

16  I also believe -- that the fact that the officer says you're

17  not under arrest is not dispositive, right?

18          MS. SUELAU:  Yes.

19          THE COURT:  You believe, and I am inclined to agree

20  with you that he was under arrest, and the reason I think so,

21  for pretty much the same reasons you think so, they had

22  pointed their gun at him, and they had placed him on the

23  ground.  They had handcuffed him.  They had put him in the

24  police car.  When I look at the -- and at that point what they

25  believed was there was a gun in the car.  When you put that

Sarah K. Mitchell, RPR, CRR

1   together, to me it looks a lot like an arrest.  What they

2   didn't have yet was the telephone call from Berry.

3           But they did know that the employees at the Circle K

4   had called in that this man driving this vehicle had pointed a

5   gun at the Nissan Altima, which, if they didn't have probable

6   cause by now to arrest, then when Berry calls and says I've

7   seen the surveillance video and, yes, the guy did point a gun

8   at the Nissan Altima -- now, whether or not the surveillance

9   is clear, Berry communicates that to the officer at the scene,

10  so now they have confirmation from video in addition to what

11  the employee said that he had a gun.

12          And now if there was any question in my mind about

13  whether he'd been arrested now, I'm even more convinced that

14  he was arrested.  I understand that you disagree that there

15  was probable cause, and that we can debate.  But if there was

16  probable cause to arrest, and he was arrested, then that has

17  two consequences, I think.  One, he was Mirandized, and

18  therefore statements that he volunteered after that would be

19  admissible so long as they were voluntary; and, two, there are

20  two different reasons maybe more for searching the car.

21          One is they had to believe that there was a gun in

22  the car; and, two, it's a search incident to an arrest anyway;

23  and, three, because he was arrested, they could conduct an

24  inventory search of the contents of the vehicle, right?  So it

25  all comes back to whether they have probable cause to arrest.

                        Sarah K. Mitchell, RPR, CRR

1    Yes or no?

2              MS. SUELAU:  Your Honor, in some ways it does.  I

3    would point out in addition to the things that cut against

4    probable cause, we also have all of the speculation by

5    everyone on scene that if there was a gun, it had been

6    disposed of in the river, so I think that cuts against

7    probable cause.  But --

8              THE COURT:  Why?  Why?

9              MS. SUELAU:  Because --

10             THE COURT:  That's pure speculation.

11             MS. SUELAU:  Well, because at this point they've

12   looked in the car, and they didn't see a gun.  And so --

13             THE COURT:  They looked through a window, and they

14   didn't see a gun.

15             MS. SUELAU:  No.  They're looking through an open

16   driver's door leaning well across the interior of the car

17   under the seat and then looking through the back window.  This

18   is more just a peek through a window.  The door is open, and

19   they have their body in the car.  And then as to -- so even if

20   we're at, okay, Your Honor believes there was probable cause,

21   Mr. Lewis is under arrest, neither of the two things that Your

22   Honor cited would be a reason to search this car.  The first

23   is the incident to arrest, because even assuming this was an

24   arrest, first, an incident to arrest can only happen in

25   circumstance of a lawful arrest.  But you can get a search

Sarah K. Mitchell, RPR, CRR

1    incident to arrest of a car if the arrestee is unsecured and

2    was in reaching distance of the passenger compartment.

3           THE COURT:  I'm not sure I agree with that.  I think

4    that was once upon a time the law, but I think that law was

5    changed.  I think there's a decision by Rehnquist, if I

6    recall.

7           MS. SUELAU:  Your Honor, I believe --

8           THE COURT:  There are situations where a guy -- the

9    defendant is in a car and cuffed and the car is on its way out

10   of the parking lot, and I think the law still is that they can

11   search incident to the arrest.  Maybe that's -- maybe there's

12   something very recent that I'm not familiar with.

13          MS. SUELAU:  Your Honor, I'm referring to Arizona vs.

14   Gant.  That's 556 U.S. 332, and that's 2009, which I have in

15   my reply brief.  Police may search a vehicle incident to a

16   recent occupant's arrest only when the arrestee is unsecured

17   and is in reaching distance of the passenger compartment at

18   the time of the search.

19          THE COURT:  Yeah, well, I am not sure that's current

20   law.  Even if it were, they would conduct an inventory search

21   anyway, and they would find whatever is in there once they've

22   arrested him.  There was no other driver around to take the

23   vehicle away.  They're going to take that vehicle in the

24   impound.  They're going to do an inventory search.

25          MS. SUELAU:  Your Honor, for that I would visit

Sarah K. Mitchell, RPR, CRR

Case 1:21-cr-00268-RBJ Document 95 Filed 02/15/22 USDC Colorado Page 86 of 161

21-CR-00268-RBJ        Motions Hearing        01/28/2022    23

1   United States vs. Sanders, which sets essentially the

2   standard, and for that I'm looking at -- I will get Your Honor

3   a citation on that in one moment.  But they're saying

4   essentially you don't get an automatic inventory search.  You

5   have show that the inventory is justified by certain things,

6   either a community caretaking exception, in addition to the

7   regulations of a certain department.  And so it's not an

8   automatic you get to impound and inventory every car.

9        The Government also hasn't raised this argument, and

10  they've been silent on what the regulations of the Loveland

11  Police Department are.  If Your Honor is inclined to deny the

12  motion on that basis, I'd ask for the opportunity to brief

13  that issue as the Government did not raise impoundment and

14  inventory as an alternative legal basis for the search.

15       THE COURT:  Okay.  We'll hear what Mr. Mohan has to

16  say.  Go ahead with your argument if you have more.

17       MS. SUELAU:  Your Honor, I'd only just conclude that

18  at -- it is troubling to me that we would be in a situation

19  where Your Honor would conclude that the police, in fact,

20  arrested Mr. Lewis.  Again, I'd assert that arrest is without

21  probable cause, that that arrest somehow triggers for the

22  police the ability to search his car but doesn't trigger the

23  necessity to Mirandize, and so instead --

24       THE COURT:  Well, they didn't Mirandize.

25       MS. SUELAU:  Eventually after or contemporaneous with

Sarah K. Mitchell, RPR, CRR

21-CR-00268-RBJ        Motions Hearing        01/28/2022    24

1    the search of the car.  My position would be that they did not

2    have probable cause.  This arrest was illegal.  Mr. Lewis

3    should have been released because they had -- if we're in a

4    Terry stop, which this should have been, their suspicions are

5    dispelled.  He should have been released.  He would have been

6    on his way, and this car would not have been searched.

7             THE COURT:  Okay.  So --

8             MS. SUELAU:  The fact that he was, in fact, arrested

9    illegally without probable cause does not trigger for the

10   Government certain rights to his car.  As I stated, it can't

11   be a search incident to an invalid arrest even.  If it's a

12   valid arrest, they don't have the necessary components to

13   conduct a lawful search incident to arrest, and they have not

14   raised the issue of whether or not this was a valid inventory

15   search.  It is their burden to show that the search was valid,

16   and they have met that.

17            THE COURT:  Okay.  So one more question, Ms. Suelau.

18   This is more a matter of common sense than anything else

19   possibly.  We have a situation where the officers were very

20   sure that the vehicle stopped there on the shoulder was the

21   vehicle in the incident at the Circle K.  They're very sure of

22   that because it's a unique description of a green -- forest

23   green Dodge Durango, check; pulling a trailer, check; driven

24   by a man with a beard, check; wearing a hat, check; within

25   three or four minutes of the incident, check; and in the

Sarah K. Mitchell, RPR, CRR

21-CR-00268-RBJ          Motions Hearing          01/28/2022    25

1    location approximate to the incident, check.  The officers are

2    very sure that this is the vehicle and the man involved in the

3    Circle K incident, whatever the incident was.

4             Secondly, they have an eyewitness who called in a 911

5    who said she saw the driver of that vehicle point a gun at the

6    black Nissan Altima.  Third, once another officer has a chance

7    to view the surveillance video, and that's also within minutes

8    of the incident, she is convinced that it does show a man

9    pointing a gun at the black Nissan, and she calls that in to

10   the officers at the scene.  At that point, you're suggesting

11   that these officers, despite that information, should just let

12   him go on his way and say have a nice day because they don't

13   have enough at that point to arrest him for pointing a gun at

14   a person or on suspicion of felony menacing?  That's -- as a

15   common sense, that just doesn't -- it just doesn't seem to

16   make sense to me.

17            MS. SUELAU:  Your Honor, what I'm saying is that when

18   they approached Mr. Lewis, they were investigating whether or

19   not he had a firearm.  I agree that the evidence that he was

20   probably the person at the gas station was strong.  They have

21   a 911 call that says this person has a firearm.  And so under

22   those circumstances, they would have enough for Terry, and

23   they had a limited scope.  So the illegal arrest kind of, you

24   know, doesn't just wash away what they're allowed to do under

25   Terry.  The fact that they illegally arrested him doesn't

                    Sarah K. Mitchell, RPR, CRR

21-CR-00268-RBJ       Motions Hearing       01/28/2022    26

1    undercut the small scope of Terry, which is a brief

2    investigative detention.  So then in that brief time, in the

3    brief investigative detention, they did a few things which

4    should have dispelled the idea that he, in fact, had a gun.

5            THE COURT:  What was that?

6            MS. SUELAU:  And that was, one, that he didn't have a

7    gun on his person when he was frisked.  Two, he denied having

8    a gun.  Three, they look in the car under the driver's seat,

9    in the passenger compartment and say -- I think one of the

10   officers said something like I don't see a gun in the car.

11   And then his statement -- pair that with his behavior.  He's

12   being cooperative.  He's obeying all commands, and none of

13   that is indicative of criminality when we're talking about

14   those amorphous factors like flight and not being cooperative.

15   We don't have any of that here.

16           THE COURT:  Well, I think we do.  I think we do,

17   because they asked him -- they ran the plates and found out

18   that he was Mr. Clifford and there were warrants for his

19   arrest outstanding, and they asked him are you Clifford, and

20   he said -- I can't remember the words, but he said no, or I'm

21   not going to answer, or something to that effect.  That's not

22   cooperative.

23           MS. SUELAU:  Your Honor, that interaction is long

24   after when the demarcation would have been that he should have

25   been released.  It's my position that he should have been

                    Sarah K. Mitchell, RPR, CRR

21-CR-00268-RBJ      Motions Hearing      01/28/2022   27

 1   released after they search in the car and they don't find a

 2   gun the first time, and that's about 1:27, 1:28 p.m.

 3            THE COURT:  Okay.

 4            MS. SUELAU:  The interaction later on in my opinion

 5   is clearly Mr. Lewis not being funny but attempting to be

 6   funny.  Both he and the officers clearly know that he's

 7   Clifford Lewis, and at this point he's understandably

 8   frustrated because he has been illegally arrested.  He has

 9   been handcuffed and shut in the back of a police car at that

10   point I think three different times, and they're driving down

11   the street with him in the back.  So I don't think that

12   evidence is him uncooperative.  First, it's after he should

13   have been released; and, second, I don't think it goes to him

14   not being cooperative.

15            If we're looking at the beginning of Exhibit 2 when

16   Officer Dunlap arrives, at that point Mr. Lewis had already

17   stepped away from the driver side as directed.  He walked to

18   the back of the car as directed.  He puts his hands on his

19   head.  He walks back, walks back, walks back with his hands

20   up, gets on his knees, and he's interacting with them

21   willingly.

22            THE COURT:  Okay.  Well, they asked him if they could

23   search the car and he said no.  That was within his rights.

24   He absolutely didn't have to consent to a search of the car,

25   but you're making such a point about how cooperative he was,

                    Sarah K. Mitchell, RPR, CRR

21-CR-00268-RBJ     Motions Hearing     01/28/2022     28

1    he wasn't cooperative on that.  He asserted his rights as he

2    had a right to.

3         MS. SUELAU:  Your Honor, that -- that conversation

4    about him saying you cannot search the car, again, happened

5    long after 1:28 p.m.  That happened well after the initial

6    search of his car.

7         THE COURT:  I guess I don't know the difference

8    between what you call the initial search and the search.

9         MS. SUELAU:  Well, Your Honor, the initial search --

10   if Your Honor looks at Exhibit 2 -- and would it be helpful if

11   I played now and we can walk through it?  Mr. Mohan has agreed

12   to help me and play that, and I think the beginning of it is

13   just a few minutes, but it would help illustrate this point.

14        THE COURT:  If you want to do that, that's fine.  I

15   have looked at it.  I tried to look at all the videos, and I

16   can't remember exactly what happened when.

17        MS. SUELAU:  Okay.  So Mr. Mohan has kindly agreed to

18   help me with technology and is going to share a screen and

19   play Exhibit 2 from the beginning.

20        And then, Mr. Mohan, will you just stop when it's at

21   1:29 p.m. on the video.  Thank you.

22        MR. MOHAN:  Just give me one minute to pull it up.

23        THE COURT:  I see it but cannot hear anything.

24        MR. MOHAN:  I will unmute myself and see if that

25   cures the problem.

                    Sarah K. Mitchell, RPR, CRR

1          THE COURT:  Yes.

2       (Video played.)

3          MR. MOHAN:  Would you like any more, Laura?

4          MS. SUELAU:  Just another like 30 seconds.  Thank you

5  Rajiv.

6       (Video played.)

7          THE COURT:  Okay.  Yes, that clarifies what you call

8  the initial search.  Thank you.

9          MS. SUELAU:  So, Your Honor, in reference to that, I

10  would just say that I think the police were right in that they

11  were in a Terry stop situation.  They were wrong in that they

12  effectuated an arrest instead of a Terry stop.  But they were

13  -- they only had the ability to do what is allowed under

14  Terry, which is verify or dispel.  Here they clearly dispelled

15  -- I mean, I would consider that search fairly extensive.

16  They conclude there is not a gun.  They speculate it might be

17  in the river.  Mr. Lewis at this point is being fully

18  cooperative, and that's when he should have been released.

19  They do not --

20          THE COURT:  I think you're leaving out part of that

21  video, frankly.  They went over -- they couldn't see in the

22  back of the vehicle because it had tinted windows.  They had

23  the doors open.  They looked in.  They didn't see anything in

24  plain view that was a gun.  They said I don't see a gun under

25  the seat, but doesn't mean it isn't there.  They didn't, as

                    Sarah K. Mitchell, RPR, CRR

21-CR-00268-RBJ        Motions Hearing        01/28/2022    30

1    far as the video showed, go in there with a flashlight and

2    kneel down and look under the seat or reach in with their arms

3    and feel around.  Basically they were just looking to see what

4    they could see, I think.  Do you disagree with me?

5            MS. SUELAU:  Your Honor, if you look, a portion of

6    the back window is open, so they do look through that.  I

7    don't -- I don't disagree that they don't have flashlights.  I

8    do agree that it wasn't an extensive search.  But my position

9    is they didn't even have probable cause or enough reasonable

10   suspicion under the case law cited by the Government, because

11   in order to search a car in a Terry situation, you need

12   evidence of dangerousness and evidence that this person is

13   going to access something dangerous.  So I would say the

14   search was illegal all around, but to the extent that they

15   conducted it, it was thorough enough to dispel suspicion.

16           THE COURT:  Okay.

17           MS. SUELAU:  And I do have a citation, Your Honor, on

18   *Sanders*, and that is the impoundment inventory case, which is

19   *United States vs. Sanders*, 796 F.3d 1241, and that's a 2015

20   case from the Tenth Circuit that talks about the factors that

21   a Court has to consider in whether or not an impoundment and

22   subsequent inventory are justified under the law.  It has to

23   be pursuant to standardized policy.  The Government has not

24   proven any evidence of a Loveland Police policy.  There's a

25   consideration of whether it's on public or private property.

                    Sarah K. Mitchell, RPR, CRR

21-CR-00268-RBJ        Motions Hearing        01/28/2022    31

1    Here we do have a public property.

2            They have to explore whether or not there's an

3    alternative to impoundment, and no one else was with Mr.

4    Lewis, but they did not ask Mr. Lewis can someone come get the

5    car and drive it away, and surely he has family and friends in

6    the area who could have come and gotten the car and driven it

7    away.  He's implicated in the crime and whether or not the

8    person consented to impoundment.  So those are all factors for

9    this Court to consider whether or not the impoundment, and

10   therefore inventory, was valid.

11           THE COURT:  I agree with you.

12           MS. SUELAU:  Then unless Your Honor has further

13   questions, I would just ask to have a brief reply to the

14   Government's argument.

15           THE COURT:  Okay.  Mr. Mohan, your turn.

16           MR. MOHAN:  Thank you, Your Honor.  I would like to

17   start with the question of whether or not there was an arrest,

18   and I certainly understand Your Honor's perception that the

19   measures that the officers use are typically ones that we

20   would associate with an arrest, guns drawn, handcuffs, and the

21   like.  But I want to do my best to dispel that notion under

22   the case law, and the Tenth Circuit has in a number of cases

23   addressed these sorts of measures; namely, officers drawing

24   their guns, using handcuffs, placing a suspect in the

25   backseat.

                    Sarah K. Mitchell, RPR, CRR

 1              And it's held that while they are normally associated

 2      with an arrest, there are sometimes when officers may use

 3      those measures in connection with a mere Terry stop, and the

 4      test for that is whether a man of reasonable caution would

 5      believe they are appropriate for officer safety, and that was

 6      stated by the Tenth Circuit in the *Mosley* case, which is 743

 7      F.3d at 1329.  And I just wanted to cite some of the examples

 8      where the Tenth Circuit has held that such measures are

 9      appropriate, because I think the facts here compare favorably

10      to them.

11              First off, in *United States vs. Copening*, which is

12      506 F.3d. 1241 at 1244, the officers essentially had an

13      anonymous tip that the detainee had dropped the gun, picked it

14      up and stuck it underneath the seat in a vehicle, and when the

15      officers encountered him, they did so with guns drawn and so

16      forth.  In *United States vs. Perdue*, the detainee was simply

17      driving towards the house where the officers knew that there

18      had been a gun.  And in *United States vs. Windom*, 863 F.3d at

19      1333, the officers had a tip that a gang member had flashed a

20      gun in a public area, and they had stopped the car in a high

21      crime area.

22              Now, none of these cases involve the exact same facts

23      here, but I think the fact that you have a 911 call, not an

24      anonymous call, by the way, where the report was that the man

25      who matched the description had brandished a gun a short time

                         Sarah K. Mitchell, RPR, CRR

21-CR-00268-RBJ       Motions Hearing       01/28/2022    33

 1   before gave rise to a reasonable officer that there were

 2   genuine officer safety concerns that justified their use of

 3   handcuffs, that justified their guns being drawn without

 4   converting this into a Terry stop.

 5           THE COURT:  Okay.  Let me stop you right there.

 6           MR. MOHAN:  Sure.

 7           THE COURT:  Let's say that I agree with you, and

 8   certainly I do.  There was unquestionably sufficient

 9   information to conduct a detention, a Terry stop.  I don't

10   have any question about that.  My question to you then is if

11   that is what they were doing, then what is the significance of

12   that?  You're now saying they hadn't arrested him yet.  When

13   they said you're not under arrest, that was true.  They were

14   conducting a Terry stop.  But, number one, doesn't that lead

15   you right into Ms. Suelau's argument on *Florida vs. Royer*?

16   And, number two, in your brief don't you say in the

17   alternative they had probable cause to arrest.

18           MR. MOHAN:  We do, Your Honor.  I think there is

19   probable cause to arrest.  I think -- you know, the

20   consequences, here's how I would describe them.  I think with

21   respect to the search of the car, there may be three separate

22   roads that justify the search.  One, it's sort of if the

23   initial stop was a Terry stop.  One is if the initial stop was

24   an arrest.  And the second I think is applicable to both of

25   those regardless of whether it was a Terry stop or an arrest.

                    Sarah K. Mitchell, RPR, CRR

 1          So the consequence if the initial stop was a Terry

 2   stop and not an arrest is that under *Michigan vs. Long*, in

 3   connection with a Terry stop, officers may search locations

 4   where a gun may be fit in or placed based on a reasonable --

 5   one second -- based on a belief that the suspect is dangerous

 6   and may gain immediate control of weapons.  And I just want to

 7   highlight that the immediate control of weapons, this is based

 8   on the theory that if it is merely a Terry stop, there's a

 9   possibility that the detainee will be returned to the car and

10   at that point have access to weapons.  So the fact that he is

11   in handcuffs, in the back of the car while the search is

12   ongoing does not eliminate the officer safety concerns in that

13   respect, and the Tenth Circuit made that abundantly clear in

14   *United States vs. Palmer*.

15          And, again, under *Long* it's sort of this search is

16   limited to areas where a weapon may be placed or hidden, and

17   in that respect I sort of just want to address this issue of

18   the two searches that we have seen.  As the Court just saw on

19   the video, the first search was Officer Dunlap simply looking

20   underneath the driver's seat.  What Ms. Suelau calls the

21   second search, I would submit, was still limited to areas

22   where a weapon may be placed or hidden, which is what is the

23   touchstone of the scope of the search under *Michigan vs. Long*.

24   They were looking in the front seat and the driver seat, and I

25   think if there's any doubt about the scope of the search under

                    Sarah K. Mitchell, RPR, CRR

1   *Michigan vs. Long*, there's no doubt that extends to the

2   passenger compartment, and if they did not have probable cause

3   before, their almost immediate discovery of the holster, the

4   lower receiver and the ammunition certainly gave them probable

5   cause at that point.

6           THE COURT:  So let me stop you there.  Make sure

7   we're -- I understand exactly what you're saying.  You're

8   saying that when they first arrived at the scene, they had

9   reasonable suspicion based on the description of the vehicle

10  and the 911 call's indication that he had pointed a gun.  That

11  gave them reasonable suspicion to believe that a crime had

12  been committed or might have been committed.  So far so good

13  with your theory?

14          MR. MOHAN:  Yes.

15          THE COURT:  And based on the reasonable suspicion

16  under your, I guess, *Palmer* case, one of your cases that you

17  cited, they have the right given the nature of the suspicion

18  to do a search limited to the places where the driver likely

19  might have placed the gun, i.e., driver seat and the passenger

20  seat next to him, center console, that kind of thing, correct?

21          MR. MOHAN:  Yes.

22          THE COURT:  But there still had not been an arrest.

23  You say, in other words, that Corrigan said you're not under

24  arrest, and what Roberts said you're not under arrest, if it

25  was Roberts -- two of them said you're not under arrest, they

                    Sarah K. Mitchell, RPR, CRR

21-CR-00268-RBJ     Motions Hearing     01/28/2022   36

1   were right, according to your theory.  He wasn't under arrest
2   yet.
3        MR. MOHAN:  Yes.  According to one of our theories,
4   Your Honor.
5        THE COURT:  Well, both sides seem to be claiming more
6   than one theory here.  I'm just trying to understand as best I
7   can what you honestly believe happened here, and I think what
8   you're saying is what I honestly believe happened was they had
9   reasonable suspicion that a crime had been committed based on
10  the description of a vehicle and the description that he had
11  pointed a gun at another car.  Based on the reasonable
12  suspicion, for officer safety reasons they were entitled to
13  put him in handcuffs, put him in the police car, get him out
14  of the way so they're safe, to do what comes next, and that is
15  a brief, not full, but brief search of the places in the
16  vehicle where a gun likely would have been stashed by the
17  driver.  They're entitled to do that even though he's in the
18  vehicle in cuffs for officer safety reasons, because when he
19  is taken out of cuffs and returned to the vehicle, he still is
20  a safety risk.  So far so good?
21       MR. MOHAN:  Yes, Your Honor.
22       THE COURT:  Okay.  And then you say during this
23  initial reasonable suspicion search, they discover the
24  shoulder holster, and was it something else that they
25  discovered during this limited search?

                    Sarah K. Mitchell, RPR, CRR

1          MR. MOHAN:  Almost immediately, Your Honor, they

2    discover the shoulder holster and the lower receiver of the

3    firearm, a firearm, and some ammunition.

4          THE COURT:  And that cements in your theory -- or one

5    of your theories -- that they now have probable cause to

6    arrest.  And so you're saying that they arrested him, gave him

7    his Miranda rights, and then did a full search incident to the

8    arrest.

9          MR. MOHAN:  Either incident to the arrest or simply

10   under the automobile exception as justified by probable cause

11   that the car contained evidence of a crime.

12         THE COURT:  Okay.  So I'm the one that got everybody

13   off track when I went down the rabbit hole of the inventory

14   search.  Ms. Suelau is absolutely correct, number one, you

15   didn't raise it; and, number two, there are a whole bunch of

16   things the Court has to find for an inventory search to be

17   justifiable, so we're not --

18         MR. MOHAN:  We're not relying on that, Your Honor.

19         THE COURT:  You're not relying on that, and I should

20   have kept that to myself.  You're relying on the search

21   incident to arrest, or what you call the automobile exception,

22   reasonable cause to believe that there was a gun inside.

23   Okay.  I get it.

24         MR. MOHAN:  Sure, Your Honor.  And I just want to

25   clarify sort of the law on the search incident to arrest.

                        Sarah K. Mitchell, RPR, CRR

21-CR-00268-RBJ          Motions Hearing          01/28/2022          38

1    Ms. Suelau appropriately cited United States -- or excuse me

2    -- *Arizona v. Gant* which dealt with this issue.

3              THE COURT:  Was that a recent decision?

4              MR. MOHAN:  It was 2009, Your Honor.  I believe Chief

5    Justice Rehnquist may have retired, but I'm not sure who wrote

6    the opinion.  I believe it was Justice Scalia, if memory

7    serves, but that may be incorrect.  In any event, one of the

8    things that *Gant* talks about is what Ms. Suelau referred to;

9    namely, the justification based on the arrestee's immediate

10   access to the firearm.  But *Gant* also offered a new basis for

11   a search incident to arrest, which is, quote, when it is

12   reasonable to believe that evidence of the offense of arrest

13   may be found in a vehicle, and that's at 556 U.S. 332,

14   page 335.  So it's not just limited to immediate access to the

15   firearm.  There's also an evidence-based justification under

16   *Arizona v. Gant* which the Court added.

17             Now, as I said, that's one of our theories.  I do

18   think there was probable cause for an arrest even if the Court

19   deems it that way.  I want to address some of the more

20   specific factual and legal points on that score.  Ms. Suelau

21   talked about whether this was -- whether what happened at the

22   gas station was felony menacing, and sort of her assertion is

23   that, well, you need a victim for it to be felony menacing,

24   and the Colorado Court of Appeals has held that, We conclude

25   that it is unnecessary for the victim to actually hear or be

                    Sarah K. Mitchell, RPR, CRR

1    cognizant of any threat from the defendant.  Instead, if there

2    is evidence from which the jury could reasonably find that the

3    defendant knew his actions, if discovered, would place the

4    victim in fear of imminent serious bodily injury, then the

5    intent element of the offense may be satisfied.  That's *People*

6    *vs. Saltray*, 969 P.2d 729, at page 732.  So I think whether

7    you view it as felony menacing or misdemeanor pointing of a

8    gun and your aiming of a gun, there is probable cause as to

9    both.

10            And just a few points from the body cam.  As the

11   Court saw, at the very beginning of Exhibit 2, which we played

12   for you, from the officer's perspective, Officer Dunlap tells

13   him, Put your hands on your head.  Mr. Lewis reaches towards

14   his handgun, and at which point Officer Dunlap says, Don't

15   reach for anything, dude.

16            THE COURT:  He reached toward his waist, not toward

17   his handgun.

18            MR. MOHAN:  Reached towards his waistband, excuse me,

19   Your Honor.  And this prompted Dunlap to say, Don't reach for

20   anything, dude.  But I think the point is that from the

21   officer's perspective, that raised some concern.  And it was

22   true that he did comply thereafter with the officers'

23   commands, but I think some of his statements raised more

24   questions than answers.  If the Court looks at Exhibit 3 at

25   the 3:44 mark, Mr. Lewis is talking with Officer Corrigan, and

                    Sarah K. Mitchell, RPR, CRR

1  Mr. Lewis confirms that he was at the gas station.  He offers

2  a different view of what happened, but he nonetheless

3  confirmed that he was there.  And then at Exhibit 3 at about

4  5 minutes and 40 seconds, this is when Officer Corrigan asks,

5  Are you Clifford?  And Mr. Lewis says, It's hard to know,

6  which it may have been a joke on Mr. Lewis's part, but from

7  the officer's perspective it was certainly a suspicious

8  answer.

9         So we think when the Court considers all of those

10 facts, there was probable cause, there was certainly

11 reasonable suspicion, and I think there are multiple tracks --

12 I know it's confusing for us to advance so many theories, but

13 I think the reality is the officers have multiple theories in

14 mind too.  I think you can hear on the body cam when Sergeant

15 Roberts is talking about the basis for the search and talks

16 about a frisk of the car, but he also says I think we have

17 probable cause.  So I think these officers were operating in

18 realtime.  They were thinking about a lot of things, and I

19 think there are multiple tracks by which this Court can

20 conclude that both Mr. Lewis's detention and the subsequent

21 search of the car was lawful.  Thank you.

22        THE COURT:  Thank you.  Ms. Suelau, you wanted to

23 reserve a little time for rebuttal.

24        MS. SUELAU:  Yes.  Thank you, Your Honor.  I think

25 the Government's argument sort of highlights the issue here,

1   which is that police need to essentially pick a track.  Either

2   it's a Terry stop and it should be limited as Courts direct us

3   a Terry stop should be limited, or they have probable cause.

4   This idea that they can both act as if they have probable

5   cause and then not Mirandize Mr. Lewis in the other aspect

6   really cuts down on a defendant's rights when they're

7   confronted by police.

8          And if we're in the Government's first track, I'll

9   call, a Terry stop world, I don't believe that the cases cited

10  by the Government for the police's actions here are justified.

11  If we look at *United States vs. Perdue*, for example, that they

12  cite for the proposition that police could have ordered Mr.

13  Lewis handcuffed, and they could have held him at gunpoint,

14  the facts on that case are completely different than what we

15  have here.

16         They have a building in the middle of nowhere where

17  they found 500 marijuana plants, and that's down a long dirt

18  road.  A car starts driving down that long dirt road, and then

19  when they see the police, they turn around and start to flee.

20  Finally they're stopped, and police use guns and handcuffs to

21  get the driver and passenger out of the car, and then

22  immediately the driver says, I know you found my marijuana.

23  That's just not this case.  We have -- all of those things cut

24  against what we have here.

25         And so also the analysis doesn't work because

Sarah K. Mitchell, RPR, CRR

21-CR-00268-RBJ          Motions Hearing          01/28/2022    42

1    Mr. Perdue immediately admits that he has committed a crime.

2    There's a passenger in the car.  Same with *Windom*.  The Court

3    talks about it's a different analysis when you have a

4    passenger in a car whether or not it's appropriate and

5    reasonable to put someone in handcuffs and draw your firearm.

6    Also in *Windom* we have someone flashing a gun claiming to be a

7    Crip gang member and not immediately stopping, and then

8    immediately after patting Mr. Windom down, they find a gun on

9    him.

10          So those cases don't work because immediately upon

11   putting this person in handcuffs at gunpoint the case elevates

12   from a Terry stop to a case of probable cause.  That's the

13   opposite of what we have here.  We have someone who remains in

14   handcuffs locked in the back of a police car after the police

15   now have evidence that cuts against the notion that the crime

16   they're investigating actually happened.

17          I would disagree that the first search of the car was

18   just Officer Dunlap looking in.  We can see on the camera

19   there's two officers fully looking in the car .  And in the

20   second search of the car, if the Government is saying we're

21   still in Terry, and the second search of the car is justified

22   under *Arizona v. Gant* and Terry or *Michigan v. Long* and

23   *Palmer*, which I highlighted in my reply, again, those cases

24   are not factually similar to this case, they are distinct in

25   very material ways, then I would say we don't have -- it cuts

Sarah K. Mitchell, RPR, CRR

 1   out the automobile exception altogether.  If we say there

 2   wasn't probable cause, it wasn't Terry, and the police get two

 3   sweeps of a car for someone they don't have indication is

 4   dangerous, who doesn't have access to his car, we might as

 5   well cut out the probable cause altogether for searches of a

 6   vehicle is essentially what the Government is saying.

 7          So for those reasons, it's our position that the

 8   police had reasonable suspicion for a Terry stop.  Their

 9   suspicions were well dispelled after the first search of the

10   car.  Mr. Lewis should have been released, and everything that

11   followed that was on the basis of an illegal seizure of Mr.

12   Lewis.  They did not have probable cause to arrest him, and he

13   should have been released.  If he was released, the car would

14   have never been there, and all the things they found in the

15   car on the second search should be suppressed.

16          THE COURT:  Thank you.  Very interesting arguments

17   and situation.  I'm not sure that I agree with Ms. Suelau when

18   she says the Government should take one track or the other,

19   not alternative tracks, because I think these facts lead to

20   consideration of both Terry stops and arrests.  In my view,

21   the police had probable cause to arrest Mr. Clifford when

22   Mr. Dunlap, Officer Dunlap, first arrived at the scene.  That

23   is based on these facts which are essentially undisputed and

24   agreed by the Court and the parties at the beginning of this

25   hearing.

                    Sarah K. Mitchell, RPR, CRR

1        The 911 call reported a forest green Dodge pulling a

2   trailer as the vehicle, the driver as a gentleman who was

3   younger wearing a hat and a beard, and the caller said that

4   she had observed that individual point a gun at a black Nissan

5   Altima.  During the course of the hearing today it has been

6   agreed even by the defense counsel that the evidence that it

7   was, indeed, Mr. Clifford and his vehicle at the Circle K was

8   strong.  The Court finds that it was very strong and virtually

9   indisputable given the description of the vehicle, the

10  description of the defendant, the fact that the encounter

11  between Dunlap occurred three to five minutes after the

12  incident at the Circle K, the fact that it occurred within a

13  mile of the Circle K.  All those things to my mind give it's

14  probable cause to believe that Mr. Clifford is guilty of

15  felony menacing with a real or simulated weapon, and/or

16  knowingly and unlawfully aiming a firearm at another person,

17  those being respectively violations of the Colorado Revised

18  Statutes Sections 18-3-206 and 18-12-106(1)(a).

19        So I believe that had the Government taken the track

20  that there was a lawful arrest, they would have been on solid

21  ground, but the Government has chosen at least as its

22  preferred alternative to look at the situation differently.

23  They argue that there was at least a reasonable suspicion to

24  detain Mr. Clifford based on the same facts that I said in my

25  view support probable cause.  And there is no doubt that they

1  had that at least.  Even the defendant didn't dispute that.

2  Once they have reasonable grounds to detain, then given that

3  it had been said that he had a gun and had pointed it at

4  somebody, it was reasonable for officer safety to require that

5  he be handcuffed and placed away from the officers in a patrol

6  car.

7      And it would have also been reasonable incident to

8  the detention to do a minimal search of the places in the

9  vehicle.  So I don't have reason to condemn their search,

10  which I viewed on the video and which consisted of having the

11  doors -- front doors of the vehicle open, looking in to see

12  what they could see, even looking under the seat in the

13  passenger seat to see if there was a gun readily observable.

14  I think that is within the scope of a reasonable detention and

15  certainly would have been justified if there were, as I think

16  there was, probable cause to arrest.

17      As Mr. Mohan says, in the course of that initial less

18  than full search when they came upon a shoulder holster and a

19  firearm part, if they didn't have probable cause before to

20  arrest, they would have had it by then .  In my view at that

21  point they were entitled to conduct a full search of the

22  vehicle incident to the arrest, or alternatively, under the

23  automobile exception that permits a search of the vehicle

24  where there is a reasonable cause to believe that a weapon,

25  evidence of the crime, was present somewhere in the vehicle,

Sarah K. Mitchell, RPR, CRR

21-CR-00268-RBJ        Motions Hearing        01/28/2022        46

1    and during that full search they discovered the suspected

2    silencer, the .22 caliber revolver, short barrel shotgun, and

3    some additional ammunition, in addition, incidentally, too

4    some drug paraphernalia and some methamphetamine.  He wasn't

5    charged with any narcotics offense.

6            So the Court denies the motion to suppress the search

7    and the results of the search under either theory, the

8    reasonable suspicion evolving into an arrest or probable cause

9    to arrest initially.  If ironically you go down the track that

10   the Government has gone down that it was initially a Terry

11   stop and didn't progress to an arrest until they found the

12   initial indicia of firearm paraphernalia, one could question

13   whether the statements were made before he was Mirandized,

14   i.e., that he had no knowledge of the gun, that he was trying

15   to talk to a friend because he was concerned that he had been

16   followed by that black Nissan Altima, and possibly depending

17   on the timing even his so-called joke about his name might be

18   inadmissible, but the defendant hasn't argued that.

19           The defendant has argued that all those things

20   occurred after an arrest, that simply there was no probable

21   cause for the arrest.  That's an ironic position, but at this

22   point I don't have -- well, let me ask you.  Given what I've

23   said so far, what are your positions on whether or not the

24   statements he had no knowledge of the gun and so forth that

25   were made before he was Mirandized are or are not admissible?

Sarah K. Mitchell, RPR, CRR

1  Mr. Mohan?  Maybe you don't care.

2          MR. MOHAN:  That may ultimately be the answer, Your

3  Honor.  I would note that I don't read the defendant's motion

4  itself to seek suppression of those statements.  His request

5  simply asks that the Court suppress all evidence found in the

6  search of his car, so I would sort of leave it at that for

7  present purposes.

8          THE COURT:  Ms. Suelau?

9          MS. SUELAU:  Your Honor, as to the statements, if

10  Your Honor is finding that Mr. Lewis was, in fact, under

11  arrest, we would ask that all statements prior to his Miranda

12  warning be suppressed.  I do want to offer an important

13  clarification.  The shoulder holster and the firearm lower

14  that the Government referenced were not found in the first

15  search of the car.  They were found in the second full search

16  of the car, and I don't believe Mr. Mohan disputes that, and I

17  think the body cam is clear on that point that they did not

18  find any indicia of a firearm or a firearm itself on the first

19  search of a car.

20          THE COURT:  See, I think there's a dispute between

21  the parties as to how many searches occurred and what took

22  place in each of these so-called searches.  I heard Mr. Mohan

23  to say that it was during the initial limited search pursuant

24  to reasonable suspicion of the areas where a firearm would

25  likely be stashed that they came upon the shoulder holster and

21-CR-00268-RBJ          Motions Hearing          01/28/2022      48

1   at that point they had probable cause to arrest.  That's what

2   I thought he said.

3            MS. SUELAU:  Your Honor, if that is Mr. Mohan's

4   position, that is an inaccurate statement of fact based on the

5   evidence before this Court.

6            MR. MOHAN:  Your Honor, if I may clarify briefly.  I

7   think Ms. Suelau and I are in agreement that the holster was

8   not found when Officer Dunlap was looking underneath the seat,

9   which is what Ms. Suelau calls the first search.  I agree that

10  it was found in what Ms. Suelau calls the second search.  I

11  think we just disagree about the legal nature of those

12  respective searches.

13           THE COURT:  So you're saying -- when is it your

14  position that there was an arrest?

15           MR. MOHAN:  I think the officers had -- well, again,

16  it depends on the theory.  I think that under the Terry

17  theory, when the officers -- certainly by the time they found

18  the holster and the lower receiver, which is in what

19  Ms. Suelau calls the second search which we still think is a

20  limited protective search under *Long*, I think they certainly

21  had it at that point.  Again, our position is that they had it

22  at the outset, and we do not disagree with the Court on that

23  point.

24           THE COURT:  Well, you've got *Florida vs. Royer* which

25  says you can't conduct a full search of the car based only on

Sarah K. Mitchell, RPR, CRR

21-CR-00268-RBJ     Motions Hearing     01/28/2022     49

1   suspicion.

2         MR. MOHAN:  That's correct, Your Honor.  And my

3   point, which is under *Michigan vs. Long* and *Palmer,* is that

4   the area where the officers were searching in what Ms. Suelau

5   calls the second search, that was the passenger compartment.

6   Those were places where a firearm could be hidden or placed.

7   It's not as though they were searching the trunk or anything

8   like that at that point, and we think it was still within the

9   scope of a protective search.  It was not a full search of the

10  car.

11        THE COURT:  Okay.  Well, again, I believe that there

12  was probable cause to arrest way back at the beginning, but

13  they apparently did not arrest him.  They say they didn't

14  arrest him, and if I give the defendant the benefit of the

15  doubt, then although it wasn't raised in the motion, and

16  therefore I probably should not at this time comment on it, my

17  impression at trial would be that the statements that were

18  made before Miranda probably would not be admissible.

19        But if I stay locked in to the Government's main

20  theory that there was just a Terry stop going on until they

21  found the shoulder holster, I would be inclined, given the

22  circumstances, the knowledge of the gun, the likelihood that

23  the gun was there within reach of the driver, that the search

24  -- not a full search of the vehicle, but a search of the

25  passenger compartment would have been appropriate.  I think

Sarah K. Mitchell, RPR, CRR

21-CR-00268-RBJ       Motions Hearing       01/28/2022       50

 1   for sure it's appropriate pursuant to an arrest on probable

 2   cause, which is what I think actually happened.  Either way,

 3   the Court is not going to grant the motion to suppress.

 4           Now, when is the case set for trial?  Maybe I have a

 5   note of it.  I don't remember.

 6           MR. MOHAN:  I believe March 7th, Your Honor.

 7           THE COURT:  March what?

 8           MR. MOHAN:  7th.

 9           THE COURT:  March 7th.  Okay.  And I know that I've

10   got a civil case starting on March 7th for three weeks, a

11   Black Lives Matter type lawsuit for damages arising from the

12   George Floyd protests, but your case would take priority as a

13   criminal case.  Given that there is a three-week civil trial

14   behind you, I guess it would be quite helpful if you're going

15   to have a disposition that you notify the Court sooner rather

16   than later.  That's just a request.  You don't have to honor

17   that request.

18           MS. SUELAU:  Your Honor, I have another trial set for

19   March 7th in front of Judge Blackburn that will proceed, and

20   we are having witnesses writ from the Bureau of Prisons, all

21   of which have been executed, so that trial needs to proceed at

22   that time.  So I anticipate if this case proceeds to trial

23   that I will be seeking additional time to prepare for that

24   trial.  Mr. Lewis is on bond and would not oppose a

25   continuance.

                    Sarah K. Mitchell, RPR, CRR

1           THE COURT:  Well, typically the Government doesn't

2   oppose exclusions of time for --

3           MR. MOHAN:  I am also handling that trial that

4   Ms. Suelau is referring to, so I think it works out for

5   everyone.

6           THE COURT:  Well, do you want to take care of that

7   now then?

8           MS. SUELAU:  Yeah.  In that regard, Your Honor, I'll

9   move orally for a motion excluding an additional 60 days from

10  the speedy trial clock.  I believe not only do I have a trial

11  set for March 7th, but also that Mr. Lewis's case warrants

12  additional investigation.  There may be issues as to the

13  nature of the firearms involved and what does and doesn't

14  qualify as a firearm or what does and doesn't qualify as a

15  destructive device.  For that I would need to visit the ATF or

16  whatever agency has custody of those items and visit them and

17  perhaps get an expert to opine on the nature of them.  So for

18  all of those reasons I ask the Court for an additional 60 days

19  to be excluded from the speedy trial clock.  As I stated Mr.

20  Lewis is on bond.  He's been doing well receiving treatment

21  and living at Emmy's House, which is a halfway house.

22          THE COURT:  I see.  How much time is remaining on

23  speedy at this point?

24          MS. SUELAU:  One moment.  I don't have access to all

25  of my drive.

                    Sarah K. Mitchell, RPR, CRR

21-CR-00268-RBJ     Motions Hearing     01/28/2022     52

1            THE COURT:  That's okay.  Would it be of any interest

2   to see if we can set a trial date and then exclude the amount

3   of time necessary to cover that trial date?

4            MS. SUELAU:  Your Honor, that would be of interest,

5   and so I think that it would be appropriate to set this in

6   early or mid-May.  Mr. Mohan can speak to his availability.  I

7   am available both the first, second, and third week of May.

8            MR. MOHAN:  As am I.

9            THE COURT:  Mr. Clifford, would that be -- or Mr.

10  Lewis, would that be acceptable to you, sir?  I think he might

11  be muted.

12           THE DEFENDANT:  Yes, sir.  That's fine, Your Honor.

13           THE COURT:  All right.  Julie, would there be any one

14  of those weeks in May where we could put this trial?

15           THE COURTROOM DEPUTY:  Your Honor, it's Julie.  Mary

16  is going to look for us, and she'll chime in.

17           THE COURT:  Okay.

18           THE COURTROOM DEPUTY:  Never mind.  Her audio is not

19  working.  We have May 9th available.

20           THE COURT:  Is that acceptable to everyone?

21           MR. MOHAN:  Yes, Your Honor.

22           MS. SUELAU:  Yes, Your Honor .

23           THE COURT:  Would it be acceptable then to exclude

24  time from speedy through the end of that week, which would be

25  May 13th, 2022, upon the Court's finding that the parties have

                    Sarah K. Mitchell, RPR, CRR

21-CR-00268-RBJ     Motions Hearing     01/28/2022   53

1  been diligent in pursuing this case, that counsel have

2  conflicts with another trial that interfere with the current

3  trial date, that both parties have agreed to vacate the

4  March 7th setting and to reset it for May 9th, that there is

5  no indication of prejudice to any person or to the public, and

6  that such an exclusion should be granted in the ends of

7  justice?

8        MS. SUELAU:  Yes, Your Honor.  I would agree with

9  that analysis.

10       MR. MOHAN:  As would I, Your Honor.  Thank you.

11       THE COURT:  All right.  I'll find and exclude time

12  through May 13th and set the trial in this case for May 9th,

13  wish you good luck on both sides with your trial in March, and

14  wish all of you continued health and safety in avoiding COVID.

15  If there's nothing else, that will conclude the hearing.  Does

16  anyone have anything else?

17       MR. MOHAN:  No, Your Honor.  Thank you.

18       MS. SUELAU:  No, Your Honor.  Thank you.  And same to

19  you on health and safety.

20       THE COURT:  All right.  I'll be back in the snow and

21  cold Monday morning bright and early wearing a robe.

22  Good-bye.

23       THE COURTROOM DEPUTY:  Court is in recess.

24     (The proceedings were concluded at 10:48 a.m.)

25

                    Sarah K. Mitchell, RPR, CRR

1               REPORTER'S CERTIFICATE

2

3          I, SARAH K. MITCHELL, Official Court Reporter for the

4    United States District Court for the District of Colorado, a

5    Registered Professional Reporter and Certified Realtime

6    Reporter, do hereby certify that I reported by machine

7    shorthand the proceedings contained herein at the time and

8    place aforementioned and that the foregoing pages constitute a

9    full, true and correct transcript.

10         Dated this 2nd day of March, 2022.

11

12

13

14              _____/s/ Sarah K. Mitchell_____

15                 SARAH K. MITCHELL
                 Official Court Reporter
16          Registered Professional Reporter
               Certified Realtime Reporter
17

18

19

20

21

22

23

24

25

                  Sarah K. Mitchell, RPR, CRR

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No. 21-cr-00268-RBJ

UNITED STATES OF AMERICA,

      Plaintiff,

v.

CLIFFORD LEWIS,

      Defendant.

---

## PLEA AGREEMENT

    The United States of America, by and through Rajiv Mohan, Assistant United States Attorney, and the defendant, Clifford Lewis, personally and by counsel, Laura Suelau, Assistant Public Defender, hereby submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1.   This agreement binds only the Criminal Division of the United States Attorney's Office for the District of Colorado and the defendant.

### I.  AGREEMENT

**A.  Defendant's Plea of Guilty:**

    The defendant agrees to (1) plead guilty to Count 1 of the indictment, charging a violation of 18 U.S.C. § 922(g)(1), possession of a firearm or ammunition by a previously convicted felon; (2) waive certain appellate and collateral-attack rights, as explained in detail below; and (3) agree not to contest forfeiture, as more fully described below.

**B.  Government's Obligations:**

    The  government  agrees  to,  provided  that  the  defendant  does  not  engage  in

COURT
EXHIBIT
1

1

prohibited conduct or otherwise implicate U.S.S.G. §§ 3C1.1 and 3E1.1, cmt. n.4, between the guilty plea and sentencing in this case, the government agrees that the defendant should receive a two-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a) and agrees to file a motion requesting that the defendant receive a one-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(b).

The government further agrees that, with consent of the Court pursuant to Fed. R. Crim. P. 11(a)(2), the defendant may enter his plea of guilty conditionally, reserving the right to have an appellate court review the Court's order (Doc. 47) denying his motion to suppress (Doc. 35). For purposes of this plea agreement, the appellate waiver as stated below does not affect the defendant's right to appeal from the Court's order denying his motion to suppress.

**C.  Defendant's Waiver of Appeal:**

The defendant is aware that 18 U.S.C. § 3742 affords the right to appeal the sentence, including the manner in which that sentence is determined. Understanding this, and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence (including any restitution order), unless it meets one of the following criteria: (1) the sentence exceeds the maximum sentence provided in the statute of conviction; (2) the sentence exceeds the top end of the advisory guideline range from the Sentencing Guidelines that applies for the defendant's criminal history (as determined by the district court) at a total offense level of 23; or (3) the government appeals the sentence imposed. If the first criterion applies, the defendant may appeal only the issue of how his sentence exceeds the statutory maximum sentence.

But if one of the latter two criterion apply, the defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

The defendant also knowingly and voluntarily waives the right to challenge this prosecution, conviction, or sentence (including any restitution order) in any collateral attack (including, but not limited to, a motion brought under 28 U.S.C. § 2255). This waiver provision does not prevent the defendant from seeking relief otherwise available in a collateral attack on any of the following grounds: (1) the defendant should receive the benefit of an explicitly retroactive change in the sentencing guidelines or sentencing statute; (2) the defendant was deprived of the effective assistance of counsel; or (3) the defendant was prejudiced by prosecutorial misconduct.

The defendant also waives the right to appeal any sentence imposed below or within the guideline range upon a revocation of supervised release in this case number, except where the defendant unsuccessfully objects to the grade of violation applied by the court during the district court revocation proceedings. In that event, this waiver does not apply and the defendant may appeal the sentence imposed upon a revocation of supervised release, even if that sentence falls below or within the guideline range as calculated by the court.

The defendant also waives the right to appeal the denial of any motion filed under 18 U.S.C. § 3582(c)(1)(A) where such denial rests in any part upon the court's determination that a sentence reduction is not warranted under the factors set forth in 18 U.S.C. § 3553(a). This waiver does not apply to an appeal of a denied § 3582(c)(1)(A)(i) motion where the district court, in denying the motion on § 3553(a) grounds, failed to

3

consider the facts allegedly establishing extraordinary and compelling circumstances as part of its § 3553(a) analysis.

**D.    Forfeiture of Assets**

The defendant admits to the forfeiture allegations.   The defendant further agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. § 924(d) and 28 U.S.C. § 2461(c), whether in the possession or control of the United States or in the possession or control of the defendant or the defendant's nominees or elsewhere.   The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil, and/or administrative forfeiture action.   The defendant understands that pursuant to 18 U.S.C. § 983, the seizing agency is required to send notice in non-judicial civil forfeiture matters.   Having been advised of said rights regarding notice, the defendant hereby knowingly and voluntarily waives his/her rights to notice being sent within the time frames in 18 U.S.C. § 983 and to having the property returned to him/her if notice is not sent within the prescribed time frames.   Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this Court may impose on the defendant in addition to forfeiture.

## II.   ELEMENTS OF THE OFFENSE

The parties agree that the elements for a violation of 18 U.S.C. § 922(g)(1) are as follows:

*First*:   The defendant knowingly possessed a firearm or ammunition.

*Second*:   The defendant was convicted of a felony, that is, a crime punishable by imprisonment for a term exceeding one year, before he possessed the firearm or

4

ammunition.

*Third*:   At the time he possessed the firearm or ammunition, the defendant knew that he had been convicted of such an offense.

*Fourth*:   Before the defendant possessed the firearm or ammunition, the firearm or ammunition had moved at some time from one state to another.

## III.   STATUTORY PENALTIES

The maximum penalties for a violation of 18 U.S.C. § 922(g)(1) are:   not more than 10 years of imprisonment; not more than a $250,000 fine, or both; not more than 3 years of supervised release; and a $100 special assessment fee.   If a term of probation or supervised release is imposed, any violation of the terms and/or conditions of supervision may result in an additional term of imprisonment.

## IV.   COLLATERAL CONSEQUENCES

This felony conviction may cause the loss of civil rights including, but not limited to, the rights to possess firearms, vote, hold elected office, and sit on a jury.

## V.   STIPULATION OF FACTS

The factual basis for this plea is set forth below.   Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those considerations and computations.   To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from presenting non-

contradictory additional facts which are relevant to the Court's guideline computation, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

The parties stipulate that the following facts are true and correct: On April 29, 2021, Loveland Police Department officers responded to a report of a dispute at a gas station in Loveland, Colorado. Witnesses reported that a man, later identified as the defendant, exited a green Dodge Durango with a trailer and pointed a gun at someone in another car driving away.

Shortly after responding to the scene, officers located a green Dodge Durango with a trailer. The defendant was standing by the car, which was his. There was no one else around. His physical characteristics matched the man with the gun on the surveillance footage and the witnesses' accounts of gunman.

Officers searched the car and found a 12-gauge shotgun, a .22 caliber revolver, a 9mm pistol, four homemade silencers, and a pipe bomb. The defendant possessed all of these items. The shotgun was a Charles Daly Model 601, manufactured by Alder Silah Sanayii in Turkey, with serial number 19CH-00620. It functioned as designed. Before April 29, 2021, the firearm had crossed state lines.

Before April 29, 2021, the defendant had been convicted of a felony offense, and knew he had been convicted of such an offense.

## VI. ADVISORY GUIDELINE COMPUTATION AND 18 U.S.C. § 3553 ADVISEMENT

The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing

6

Commission. To aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines (U.S.S.G.). To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

The guideline calculation below is the good-faith estimate of the parties, but it is only an estimate. The parties understand that the government also has an independent obligation to assist the Court in making an accurate determination of the correct guideline range. To that end, the government may argue that facts identified in the presentence report, or otherwise identified during the sentencing process, affect the estimate below.

A. Under U.S.S.G. § 2K2.1(a)(4)(B), the base offense level is 20.

B. Specific offense characteristics: There is a **2-level** increase because the offense involved 3-7 firearms. U.S.S.G. § 2K2.1(b)(1).

The government believes there is a **4-level** increase, because the defendant possessed any firearm in connection with another felony offense. U.S.S.G. § 2K2.1(b)(6)(B). The defendant disputes this enhancement.

C. Adjustments: There are no victim-related, role-in-offense, obstruction, and/or multiple count adjustments.

D. The government's estimated adjusted offense level therefore would be **26**. The defendant's estimated adjusted offense level therefore would be **22**.

E. The defendant should receive a 3-level adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1. The resulting total offense level under the government's calculation therefore would be **23**. The resulting total offense level under the defendant's calculation therefore would be **19**.

F.     The parties understand that the defendant's criminal history computation is tentative and based on the defendant's prior convictions.   The parties believe that the defendant is in criminal history category **III.**

G.     The career-offender, criminal-livelihood, and armed-career criminal adjustments do not apply.

H.     <u>Imprisonment</u>:   The advisory guideline range of imprisonment resulting from these calculations under the government's estimate is **57-71 months**.   The advisory guideline range of imprisonment resulting from these calculations under the defendant's estimate is **37-46 months**.   However, in order to be as accurate as possible, with the criminal history category undetermined at this time, the offense level estimated above by the government could conceivably result in a range of 46 months (bottom of Category I) to 115 months (top of Category VI).   The offense level estimated above by the defendant could conceivably result in a range of 30 months (bottom of Category I) to 78 months (top of category VI).

H.     <u>Fine</u>:   Pursuant to § 5E1.2, assuming an estimated offense level of 23, the fine range for this offense would be $20,000 to $200,000, plus applicable interest and penalties.     Assuming an offense level of 19, the fine range for this offense would be $10,000 to $100,000, plus applicable interest and penalties.

I.     <u>Supervised Release</u>:   The guideline range of supervised release under § 5D1.2(a)(2) is at least 1 year but not more than 3 years.

The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less

8

than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VII.  ENTIRE AGREEMENT

This agreement disclosed to the Court is the entire agreement.  There are no other promises, agreements or "side agreements," terms, conditions, understandings, or assurances, express or implied.  In entering this agreement, neither the government nor the defendant has relied, or is relying, on any other terms, promises, conditions, or assurances not expressly stated in this agreement.

Date: _5-16-22_

Clifford Lewis
Defendant

Date: _5/10/22_

Laura Suelau
Attorney for the Defendant

Date: _5/16/2022_

Rajiv Mohan
Assistant United States Attorney

9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 21-cr-00268-RBJ

UNITED STATES OF AMERICA,

      Plaintiff,

v.

**CLIFFORD LEWIS,**

      **Defendant.**

---

**DEFENDANT'S OBJECTIONS TO THE
PRESENTENCE INVESTIGATION REPORT**

---

Clifford Lewis, through Assistant Federal Public Defender Laura H. Suelau, submits the following objections and responses to the Presentence Investigation Report (PSR). Doc. 69.

**I. Objections and clarifications not impacting the guideline calculation.**

    **1.**   **Paragraph 5 –** This paragraph contains allegations concerning Mr. Lewis's conduct while on pretrial release at Emmy's House. First, Mr. Lewis denies ownership of the items located in his room, a space he shared with other occupants of Emmy's House and accessible to all staff and clients of the house.

    Second, although he does not deny performing welding projects in in the attached garage, he was performing those projects for his employer, and he denies ever inquiring about a detonator – that allegation is untrue and lacks any indicia of reliability. The PSR is silent as to the source of that information, i.e., with whom Mr. Lewis inquired about the detonator. Therefore, that allegation is just that, an allegation without additional indicia of reliability. It should not be considered by this court and should be stricken from the PSR.

    A court may only consider evidence bearing "some minimal indicium of reliability beyond

mere allegation." *United States v. Beaulieu*, 893 F.2d 1177, 1181 (10th Cir. 1990); *accord* U.S.S.G. § 6A1.3 (evidence used at sentencing must have "sufficient indicia of reliability to support its probable accuracy"). Thus, factual findings cannot be based solely on unreliable or unsupported allegations. *United States v. Castillo,* 8 F.4th 68 (2021). Factors for this Court to consider in determining whether hearsay evidence offered at sentencing is sufficiently reliable include: (1) whether the witness testifying at the sentencing hearing *personally* had the opportunity to observe an out-of-court declarant's "demeanor and [to] form an opinion regarding their veracity" and (2) whether the out-of-court statements are corroborated through independent evidence. *See Cook*, 550 F.3d at 1297. Here, the allegation that Mr. Lewis was "inquiring about a 'detonator'" lacks any evidence of reliability. The probation officer did not personally hear Mr. Lewis make that inquiry and it is not supported by independent evidence.

**2. Paragraph 16 –** Mr. Lewis denies ownership of some of the items found in his vehicle including heroin, methamphetamine, and prescription drugs. When he was contacted by the police in connection with the instant offense, he reported that other people's belongings, as well as his own, were in the vehicle. Consistent with that, prescriptions belonging to other individuals were found in the car as were items belonging to a woman (based on their character). Photographs of some of that evidence, taken by Federal Public Defender Investigator David Staub at the Loveland Police Department, are below.





3



3. **Paragraph 17 –** Mr. Lewis denies any gang membership or affiliation including membership in the Aryan Brotherhood. Consistent with that denial, staff at FDC Englewood, where Mr. Lewis was incarcerated from May 2022 to August 2022, reported that Mr. Lewis has "no known gang affiliation." Mr. Lewis requests that information be struck from the PSR lest the BOP rely on that information and erroneously place him in a facility and housing unit with members of the Aryan Brotherhood, a gang with which he has no affiliation.

4. **Paragraph 97 –** Mr. Lewis did not say (or did not intend) that he "gets bored with doing good." Instead, he offered the insight that he can get complacent when he begins to feel "good" being sober. In retrospect, he realizes that complacency undercuts his sobriety. Instead, he needs to, and intends to, continue utilizing those tools that helped him get sober to also help him stay sober.

**II. Objections impacting the guideline calculation.**

5. **Paragraphs 30-32 –** Mr. Lewis agrees with the probation officer that U.S.S.G. § 2K2.1 (b)(6)(B) does not apply and the proper total offense level is 19. The government filed an Objection, Doc. 70, alleging "there is sufficient evidence that Lewis's possession of firearms facilitated a felony menacing in violation of C.R.S. § 18-3-206(a)." That objection should be overruled.

4

As a threshold matter, the Loveland Police Department, those officers investigating the incident in question on April 22, 2021, disagree with the government's position. After his traffic stop, Mr. Lewis was arrested pursuant to an Affidavit in Support of a Warrantless Arrest. Exhibit A. That Affidavit alleges a number of violations, but not felony menacing. Mr. Lewis was not then, nor in the five months between April 22, 2021 and his arrest in the instant case, charged with felony menacing. Therefore, those officers who investigated the conduct at issue did not believe Mr. Lewis engaged in felony menacing. The government's post-hoc analysis 18 months later is unavailing. There are a few reasons why Mr. Lewis was likely not charged with felony menacing and should not now be found to have committed that offense.

First, there was and is insufficient evidence that Mr. Lewis was in fact aiming a gun. The government's own objection concedes that only context clues, not clear evidence, support the notion that he was pointing a gun (not a cell phone or other object). The screenshot they provide and conventionally submitted video are far from clear. Officer Berry, the officer who reviewed the gas station surveillance footage soon after the incident, told the gas station clerk "it's hard to see," and "these cameras are not the greatest." *See* Doc. 42. When asked by the police, Mr. Lewis stated that he had a phone in his hand, not a gun. Mtn Hearing Trans. p. 6. The only evidence that object was a gun comes from gas station employees who may not have been in a position to clearly observe the object.

Second, Mr. Lewis agrees with the PSR's assessment that *if* he aimed a weapon, it was in response to the actions of the black Nissan's driver. There is abundant evidence that Mr. Lewis aimed the object in self-defense. Mr. Lewis told police in his Mirandized interview that the incident began when the Nissan followed him closely from his friend's house. He became concerned and pulled into the gas station to get away, but the Nissan followed. The government's conventionally submitted exhibit (INV_263) shows Mr. Lewis pulling into the gas station from the road at approximately 1:18:01 PM. The Nissan (black with tinted windows) can be seem tailing him closely. Another surveillance

5

camera from the gas station (not submitted by the government) captures the Nissan quickly rounding the corner and pulling into the station via another entrance at 1:18:17 PM.



The surveillance videos do not have audio and did not capture what happened next. But Mr. Lewis reported to the police that when he began to approach the Nissan, the driver audibly revved the engine before accelerating and trying to run him over. The driver's aggression after revving the engine is plainly visible in the government's exhibit and the 911 caller to first report the incident told the operator the same: "[the Nissan] almost ran [the driver of the Durango] over."

For those reasons, the court should overrule the government's objection and not apply the four-level increase contemplated by § 2K2.1(b)(6)(B).

**III. Objection to Special Conditions of Supervised Release.**

**6. Special Condition 3 – Medication**

The probation officer proposes: "In conjunction with mental health treatment, you must remain medication compliant and take all medications that are prescribed by your treatment provider." To justify that condition, they state: "special condition requiring medication compliance is warranted

6

based on the needs of his respective diagnoses and history of medication ingestion." Mr. Lewis has

been diagnosed with depression, anxiety, and PTSD. His medication ingestion history is as follows:

1. In 2009 he was prescribed medication which he ingested (as prescribed) for two years. He did not feel the medication was beneficial. ¶ 82.

2. In March 2022 he was prescribed three medications at Denver County Jail. He took those medications and felt they were beneficial. ¶ 83.

3. In May 2022, he was transferred to the FDC where he was told that the three medications he was prescribed were unavailable and was instead offered two different medications without a medical evaluation. He declined to take those medications. ¶ 84.

### A. Applicable Legal Standard.

Imposition of conditions of supervised release is governed by 18 U.S.C. § 3583(d). That Section provides that the Court may order a special condition of supervised release, provided such condition:

(1) is reasonably related to the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D);

(2) involves *no greater deprivation of liberty than is reasonably necessary* for the purposes set forth in section 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D); and

(3) is consistent with any pertinent policy statements issued by the Sentencing Commission pursuant to 28 U.S.C. § 994(a).

18 U.S.C. § 3583(d) (emphasis added). Interpreting this Section, the Tenth Circuit has required "conditions of supervised release to be linked to the offense and be no broader than necessary to rehabilitate the defendant and protect the public." See *United States v. Smith*, 606 F.3d 1270, 1282 (10th Cir. 2010). The Tenth Circuit has recognized several specific conditions that affect a significant liberty interest and require elevated scrutiny. These include requiring participation in residential treatment, requiring penile plethysmograph testing, and the forced administration of psychotropic medication. *Id.*; *see also United States v. Fivaz*, 521 Fed. Appx. 696, 701-02 (10th Cir. April 15, 2013) (unpublished).

7

The imposition of such conditions cannot be delegated to a third-party such as a treatment provider. Instead, "any condition that affects a significant liberty interest… must be imposed by the district court and supported by particularized findings that it does not constitute a greater deprivation of liberty than reasonably necessary to accomplish sentencing goals." *Mike,* 632 F.3d at 696.

In addition to statutory requirements, conditions of supervision must also "comport with the relevant constitutional provisions." *Id.* Chief among these is the Due Process Clause of the Fifth Amendment. The Supreme Court has made clear that individuals (including pre-trial detainees and convicted criminals) have a "constitutionally protected liberty interest in avoiding involuntary administration of antipsychotic drugs – an interested that only an essential or overriding state interest might overcome." *Sell v. United States,* 539 U.S. 166, 178-79 (2003) (internal quotation marks omitted); *see also Washington v. Harper,* 494 U.S. 210, 221-22 (1990) ("We have no doubt that … respondent possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment."). Among the governmental interests that may be sufficiently important to support an order for involuntary medication are the need to protect the individual and others from the individual's potentially dangerous behavior, *see Riggins v. Nevada,* 504 U.S. 127 (1992); *Harper,* 494 U.S. at 225-26; and the government's interest in rendering a criminal defendant competent to stand trial. S*ee Sell,* 539 U.S. at 179-80

### B. Forced medication compliance is not warranted in this case.

Mr. Lewis has no objection to mental health treatment and agrees that condition (Special Condition 2) is appropriate to address his mental health diagnoses. He also has no objection to medication *per se.* However, the involuntary administration of medication involves a greater deprivation of Mr. Lewis's liberty than is reasonably necessary and there is no governmental interest, let alone important governmental interest, supporting an order of its involuntary administration. *Harper, Riggins* and *Sell* are unequivocal: the involuntary administration of anti-psychotic drugs involve

8

a substantial deprivation of liberty. As a general matter, an involuntary-medication order is constitutionally impermissible "absent a finding of overriding justification *and* a determination of medical appropriateness." In the 18 U.S.C. § 3583(d) context, that overriding justification might be found if medication were necessary to deter criminal activity, protect the public, and promote Mr. Lewis's rehabilitation. It is not.

The fact that Mr. Lewis has previously taken medications for his depression, anxiety, and PTSD on two occasions, and opted not to take medications on a third, does not support the need for involuntary medication. Quite the opposite. Mr. Lewis's history demonstrates that he is willing to take medication when appropriate. Nor did his refusal to take the alternate medication provided by the FDC result in behavior that harmed himself or others. There is *zero* evidence that involuntary medication is needed to protect Mr. Lewis or others.

On the other hand, the harm caused by the force administration of medication is not insubstantial. The Supreme Court agrees:

> The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty. The purpose of the drugs is to alter the chemical balance in a patient's brain, leading to changes, intended to be beneficial, in his or her cognitive processes.... While the therapeutic benefits of antipsychotic drugs are well documented, it is also true that the drugs can have serious, even fatal, side effects. One such side effect ... is acute dystonia, a severe involuntary spasm of the upper body, tongue, throat, or eyes.... Other side effects include akathesia (motor restlessness, often characterized by an inability to sit still); neuroleptic malignant syndrome (a relatively rare condition which can lead to death from cardiac dysfunction); and tardive dyskinesia, perhaps the most discussed side effect of antipsychotic drugs.... Tardive dyskinesia is a neurological disorder, irreversible in some cases, that is characterized by involuntary, uncontrollable movements of various muscles, especially around the face.

*Washington v. Harper,* 494 U.S. 210, 229-30 (1990).

Additionally, the proposed condition can only be monitored through blood testing, another significant bodily intrusion that implicates Mr. Lewis's constitutionally protected privacy interests. *Missouri v. McNeely,* 569 U.S. 141, 159 (2013) (finding that involuntary blood

9

tests are an unreasonable search and cannot be conducted in drunk-driving cases absent a warrant).

Governmental interests that may support an order for involuntary medication – the need to protect the individual and others from the individual's potentially dangerous behavior – are not present here. S*ee Riggins v. Nevada,* 504 U.S. 127 (1992); *Harper,* 494 U.S. at 225-26. The intrusion of forced medication and blood testing violates Mr. Lewis's constitutional rights and is not supported by any compelling government interest. Proposed condition 3 should not be imposed.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender

s/ Laura H. Suelau
LAURA H. SUELAU
Assistant Federal Public Defender
633 Seventeenth Street, Suite 1000
Denver, Colorado 80202
Telephone: (903) 294-7002
FAX: (903) 294-1192
laura.suelau@fd.org
Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on September 7, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

> Rajiv Mohan, Assistant United States Attorney
> rajiv.mohan@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

> Clifford Lewis (U.S. Mail)

> s/ Laura H. Suelau
> LAURA H. SUELAU
> Assistant Federal Public Defender
> 633 Seventeenth Street, Suite 1000
> Denver, Colorado 80202
> Telephone: (903) 294-7002
> FAX: (903) 294-1192
> laura.suelau@fd.org
> Attorney for Defendant

STATE OF COLORADO )
                    )ss.
COUNTY OF LARIMER )

Check one:
☒ Felony Affidavit (No Summons)
☐ Misd. Affidavit attached to Summons

## LOVELAND POLICE DEPARTMENT
### AFFIDAVIT IN SUPPORT OF WARRANTLESS ARREST

Affiant, Corrigan, Nicholas, being duly sworn upon oath, says that there is probable cause for the warrantless arrest of Lewis, Cliff Lin , 09/18/1984, for the crime(s) stated, and that the following facts are true and correct upon best knowledge, information, and belief.

Agency: LOVELAND POLICE DEPARTMENT

Agency Case Number: LP21-0002877

Arrest Date/Time: April 22, 2021 / 14:03

Arresting Officer and Number: Corrigan, Nicholas / # LP208

*21 - 02877*

| CHARGE DESCRIPTION | CRS Citation | Class |
|---|---|---|
| POSSESS WEAPON BY PREVIOUS OFFENDER - (F6) | 18-12-108(1) | F6 |
| POSSESS WEAPON BY PREVIOUS OFFENDER - (F6) | 18-12-108(1) | F6 |
| POSSESS WEAPON BY PREVIOUS OFFENDER - (F6) | 18-12-108(1) | F6 |
| POSSESS WEAPON BY PREVIOUS OFFENDER - (F6) | 18-12-108(1) | F6 |
| POSSESSION OF ANY EXPLOSIVE OR INCENDIARY DEVICE PARTS - EXPLOSIVES - (F4) | 18-12-109(6) | F4 |
| POSSESSING A DANGEROUS WEAPON - SUBSEQUENT VIOLATIONS - (F4) | 18-12-102(3) | F4 |
| POSSESSING A DANGEROUS WEAPON - SUBSEQUENT VIOLATIONS - (F4) | 18-12-102(3) | F4 |
| POSSESSING A DANGEROUS WEAPON - SUBSEQUENT VIOLATIONS - (F4) | 18-12-102(3) | F4 |
| POSSESSING A DANGEROUS WEAPON - SUBSEQUENT VIOLATIONS - (F4) | 18-12-102(3) | F4 |
| POSSESSING A DANGEROUS WEAPON - SUBSEQUENT VIOLATIONS - (F4) | 18-12-102(3) | F4 |
| POSSESS WEAPON BY PREVIOUS OFFENDER - (F6) | 18-12-108(1) | F6 |
| UNLAWFUL POSSESS SCHEDULE I OR II/METHAMPHETAMINE NO MORE THAN 4 GRAMS (DM1) | 18-18-403.5(2)(c) | DM1 |
| POSSESSION OF DRUG PARAPHERNALIA - (DPO) | 18-18-428 | DPO |
| DROVE (MOTOR/OFF-HIGHWAY) VEHICLE UPON HIGHWAY WHEN (LICENSE/ PRIVILEGE TO DRIVE) WAS RESTRAINED FOR EXPRESS CONSENT OR ALCOHOL/ DRUG RELATED OFFENSE | 42-2-138(1)(d)(I) | M |
| (DISPLAYED/POSSESSED/OFFERED FOR SALE) (FICTITIOUS/CANCELLED/REVOKED/ SUSPENDED/ALTERED/STOLEN) (TITLE/NUMBER PLATE/VALIDATION TAB OR STICKER) | 42-3-121(1)(b) | MT2 |
| PROHIBITED USE OF WEAPONS - (M2) | 18-12-106 | M2 |
| (DISPLAYED/POSSESSED/OFFERED FOR SALE) (FICTITIOUS/CANCELLED/REVOKED/ SUSPENDED/ALTERED/STOLEN) (TITLE/NUMBER PLATE/VALIDATION TAB OR STICKER) | 42-3-121(1)(b) | MT2 |

The facts establishing probable cause for arrest are that on April 22, 2021 at 13:19, in the county of Larimer, State of Colorado, at 2500 E EISENHOWER BLVD,LOVELAND, CO, 80537 the following activity occured:

**SCANNED**

Officer Corrigan Reporting:

On 042221 at approximately 13:20 hours, I responded along with several other officers to the Circle K gas station located at 2500 W Eisenhower Blvd, Loveland CO 80538, after Dispatch received a 911 call from a gas station employee who stated a male driving a late model green Dodge Durango pulling a trailer, was involved in an altercation with the driver of a black Nissan Altima. The reporting party stated the male in the Durango had a gun during the altercation. The reporting party stated both vehicles left the parking lot heading south on Wilson Ave and the male driver of the Durango was wearing a hat and glasses and had a beard.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 21-cr-00268-RBJ

UNITED STATES OF AMERICA,

        Plaintiff,

v.

**CLIFFORD LEWIS,**

        **Defendant.**

---

## DEFENDANT'S MOTION FOR VARIANT SENTENCE

---

Clifford Lewis, through Assistant Federal Public Defender Laura H. Suelau, respectfully requests this Court impose a sentence of 46 months. An 11-month variance in this case is supported by those factors outlined at 18 U.S.C. § 3553(a).[1]

**I.    Mr. Lewis's history and characteristics, and their relevance to the circumstances of this offense, support a variant sentence.[2]**

The Presentence Report paints something of a rosy picture of Mr. Lewis's upbringing up until the time of his mother's untimely and unexpected death from a brain aneurism when was he was 15 years old. That's not entirely accurate. Mr. Lewis's parents divorced when he was 13 years old. Prior to that, his father, Steve Lewis, was physically abusive to his mother, Mary Lewis. Steve Lewis was arrested in 1996, when Mr. Lewis was 12 years old for domestic violence.[3]

---

[1] 46 months is at the top of the guideline range contemplated in the Plea Agreement (37 to 46 months) and 11 months below the guideline range calculated in the PSR. At the time of the Plea Agreement, the parties estimated Mr. Lewis's criminal history category was III, not V.
[2] The information contained herein is based on counsel and Federal Public Defender Investigator David Staub's interviews with Mr. Lewis, Steve Lewis, Danae Lewis, and Vanessa Valois.
[3] *Colorado v. Steven Lewis*, 1996M200879, Larimer Co. (a protective order was issued for Mary, Danae, Jack and Clifford Lewis).

Prior to his parent's divorce, Mr. Lewis went on a camping trip with his paternal uncle, Brian Lewis. On the trip, Brian encouraged Mr. Lewis to sit on his lap, under the guise of teaching him to drive. Instead, Brian molested his young nephew. Mr. Lewis, then 10 years old, remained silent in his shame and discomfort. At the end of the trip, Mr. Lewis exited the shower to find his uncle taking nude photographs of him. Mr. Lewis yelled, but Brian acted as if that was an overreaction, and claimed the photos were innocent. After the trip, Mr. Lewis reported the abuse to his mother and father. Mr. Lewis and his sister Danae Lewis have slightly differing recollections of what happened next, but both agree that no legal actions were pursued against Brian Lewis and their parents dealt the with matter by speaking to Brian and their paternal grandmother (with whom Brian was living). Both Brian and the grandmother all but denied that the abuse occurred. After that, Mr. Lewis rarely saw his father's family. Mr. Lewis was never taken to counseling and because of his own shame and complicated emotions about the abuse, he did not speak of it with his parents or siblings again. He believed the best way to cope with the situation was to not talk about it. When contacted about the abuse, Steve Lewis reported to FPD Investigator David Staub, "that was dealt with," and indicated an unwillingness to speak further. At one point, he referred to the abuse as "rumors."

Steve Lewis was hardly an ideal father. While Mrs. Lewis cared for her children's emotional and physical needs and was involved in every aspect of their lives, Steve Lewis was emotionally unavailable and aloof towards his children. In 1999, the year before Mrs. Lewis's death, Steve Lewis was arrested on charges of child abuse and neglect and ordered to complete anger management classes.[4] Unsurprisingly, Steve Lewis was not prepared to help his young son deal with the sudden loss of his mother. Instead, the message that Mr. Lewis received from his father was that displays of emotion were unacceptable and talking about feelings represented weakness. Mrs. Lewis had always

---

[4] *Colorado v. Steven Lewis*, 1999M2000524, Larimer Co. Mr. Lewis does not recall the facts and circumstances of his father's arrest in this case.

created a safe space for her son to talk about his feelings and express his emotions. Without her, Mr. Lewis was bereft and alone. He never received grief counseling. Mr. Lewis's childhood and emotional development effectively ended after his mother's death.

The impact of the Adverse Childhood Experience (ACEs) Mr. Lewis experienced, and the untimely death of his mother, can clearly be seen in his lack of education, substance abuse, and criminal history.[5] After his mother's death Mr. Lewis "stopped caring." He began skipping school, using drugs, and engaging in self-destructive behaviors. Within a year of her death, he was committed to the Colorado Department of Youth Corrections (CDYC) for a two-year sentence.

ACEs impact brain development and are linked to adverse physical and mental health issues in adulthood including mental illness and substance abuse. [6] Studies have definitely linked those childhood experiences to the type of negative adult experiences Mr. Lewis suffered: lack of education, unemployment, and incarceration.[7] Because ACEs impact brain development, they are not something that simply resolve with time and age. The impact of ACEs are somewhat mitigated by "protective" factors in the form of safe, stable, and nurturing relationships. Mr. Lewis lost his protective factor, his mother, suddenly and was left with an aloof and disengaged caregiver.

---

[5] ACEs are traumatic events that occur before a child reaches 18. *See* Department of Health and Human Services, Child Welfare Information Gateway, https://www.childwelfare.gov/topics/preventing/overview/framework/aces/#:~:text=What%20Are%20ACEs%3F,%2C%20incarceration%2C%20and%20domestic%20violence (last accessed Aug. 18, 2022); *see also* Centers for Disease Prevention and Control (CDC), https://www.cdc.gov/violenceprevention/aces/fastfact.html.
[6] *See* CDC, Adverse Childhood Experiences Resources, various articles, https://www.cdc.gov/violenceprevention/aces/resources.html.
[7] *Id.*

3

## II.  Mr. Lewis's criminal history is the result of his untreated grief and substance abuse.

Mr. Lewis is now 37 years old and has struggled significantly since his release from CDYC at 18 years old. His criminal history is clearly that of someone with substance use disorder. With few exceptions, his prior convictions are misdemeanor and traffic offenses related to drug and alcohol use. His only felony convictions are from Driving While Ability Impaired (with priors) in 2017 and a Violation of Bail Bonds for that same case in 2020. Those offenses, while serious, are non-violent and the direct result of his addiction, therefore somewhat non-volitional. Substance abuse experts describe the interplay between criminality and drug addiction in those terms, "if you see somebody who continues to use despite their lives being totally destroyed — losing their jobs, losing loved ones, ending up in jail — nobody would choose that. Nobody anywhere would ever choose that life. So clearly it is beyond this individual's control on some level."[8]

## III.  Mr. Lewis is at a turning point.

Mr. Lewis is now 37 years old and his 38th birthday is just days before sentencing. He's facing his first federal felony conviction and, by far, his most serious felony conviction. Although he's received somewhat lengthy sentences in other cases, he's never *served* a sentence close to 46 months. He is also facing serious personal collateral consequences for his actions in this case and his relapse while on bond. His sister Danae Lewis, with whom he is very close, told him that she can no longer support him. At the time of his detention hearing Danae reported that she is his "biggest cheerleader." Doc. 19-1. Now, she's told Mr. Lewis that she will *only* support him after a proven track record of sobriety and non-recidivism. She was unwilling to write another letter to this court, something about which Mr. Lewis has great pain. Additionally, Mr. Lewis married Vanessa Valois last year and they

---

[8]  Vox, *The opioid epidemic, explained,* German Lopez, https://www.vox.com/science-and-health/2017/8/3/16079772/opioid-epidemic-drug-overdoses (2017)

hope to start a life and family together upon his release. Like Danae Lewis, Ms. Valois has indicated an unwillingness to stand by Mr. Lewis if he does not make significant changes. He has no choice but to stop his path of destruction and every reason to commit to rehabilitation. He's realized that the grief over the loss of his mother may effectively lead to the loss of the rest of his family.

Mr. Lewis knows that he will need substantial support to not just get sober but stay sober and he intends to seek that out. He was diagnosed with PTSD in Denver County Jail in addition to anxiety and depression. While there, he was given access to medication and therapy that significantly alleviated his psychological distress. He hopes to continue counseling and medication (if appropriate) upon release.

Mr. Lewis would like to begin counseling and drug rehabilitation immediately, but he's unlikely to receive such services while in the Bureau of Prisons. Under the best of circumstances, the BOP manages to place just 17% of inmates who meet the criteria of "drug abuse or dependence" in RDAP.[9] Mr. Lewis is not entering the BOP in the best of circumstances, he's entering over two years into the COVID-19 pandemic, amid staff shortages and ever-changing operational modifications.[10] Likewise, the BOP has a dubious track-record of providing inmates with any, let alone adequate, mental health treatment.[11] A 2016 Department of Justice Study found that approximately 44.8% of all federal inmates have some mental health problem. And yet, prisons are ill-suited to treat mental illness. BOP psychologists are directed to give first priority to crisis intervention, suicide prevention, treatment of severely mentally ill inmates, treatment of BOP employees, and the initial screening of

---

[9] Redonna Chandler, Bennett Fletcher, and Nora Volkow, *Treating Drug Abuse and Addiction in the Criminal Justice System, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2681083/*.

[10] *See* NBC News, *Staffing shortages and deficient training leave First Step Act floundering, federal prison employees say* (July 28, 2022), https://www.nbcnews.com/news/us-news/staffing-shortages-deficient-training-leave-first-step-act-floundering-rcna40210; *See also* BOP Modified Operations, https://www.bop.gov/coronavirus/covid19_status.jsp (last accessed Aug. 18, 2022).

[11] *See* Christie Thompson et. al., *Treatment denied: The Mental Health Crisis in Federal Prisons*, The Marshall Project, November 21, 2018, https://bit.ly/MarshallProject-Mental-Illness.

inmates. Counseling, individual psychotherapy, and group therapy—the treatment options that an inmate can request by self-referral—are all prioritized after these more urgent mental health issues.[12] In fact, in 2017 the BOP classified just 3% of inmates as having a mental illness serious enough to require regular treatment. Again, these shortcomings have only gotten worse after COVID. Despite his documented mental health needs, Mr. Lewis is unlikely to get any treatment in the BOP. Therefore, a lengthy prison sentence is *not* the most effective to provide Mr. Lewis with the treatment and care. *See* 18 U.S.C. 3553(a)(2).

Nor is a sentence of incarceration beyond the 46 months requested necessary to further deter Mr. Lewis. A 2016 National Institute of Justice Study is unequivocal: sending a person convicted of a crime to prison isn't very effective and increasing the severity of punishment does little to deter crime.[13] A more severe punishment does not "chasten" individuals – "scientists have found *no* evidence for the chastening effect."[14]

A more powerful deterrent to crime is age – crime begins to decline steeply at age 35. Mr. Lewis will be almost 42 years old by the time of his release. While it is true that a prison sentence for someone naturally aging out of crime, like Mr. Lewis, achieves incapacitation, "that incapacitation is a costly way to deter future crimes by aging individuals who are already less likely to commit those crimes by virtue of age."[15] With proper substance abuse and mental health treatment, Mr. Lewis is unlikely to reoffend into his 40s.

---

[12] *See* U.S. Dept. of Justice, Fed. Bureau of Prisons, Program Statement P5310.17, Psychology Services Manual, at 4-5 (Aug. 25, 2016). https://www.bop.gov/policy/progstat/5310_017.pdf
[13] National Institute of Justice, *Five Things About Deterrence* (NIJ.gov, May 2016).
[14] *Id.* (emphasis added).
[15] *Id.*

## IV.  Conclusion.

For the forgoing reasons, Mr. Lewis asks this Court to impose a variant sentence 46 months followed by three years of supervised release.


Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender

s/ Laura H. Suelau
LAURA H. SUELAU
Assistant Federal Public Defender
633 Seventeenth Street, Suite 1000
Denver, Colorado  80202
Telephone:  (903) 294-7002
FAX:  (903) 294-1192
laura.suelau@fd.org
Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

> Rajiv Mohan, Assistant United States Attorney
> rajiv.mohan@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non-CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

> Clifford Lewis (U.S. Mail)

> s/ Laura H. Suelau
> LAURA H. SUELAU
> Assistant Federal Public Defender
> 633 Seventeenth Street, Suite 1000
> Denver, Colorado  80202
> Telephone:  (903) 294-7002
> FAX:  (903) 294-1192
> laura.suelau@fd.org
> Attorney for Defendant

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No. 21-cr-00268-RBJ

UNITED STATES OF AMERICA,

      Plaintiff,

v.

CLIFFORD LEWIS,

      Defendant.

---

### RESPONSE TO VARIANCE MOTION

---

The United States of America submits this response to defendant Clifford Lewis's variance motion, in which he requests a sentence of 46 months' imprisonment. This Court should instead impose a sentence of 60 months' imprisonment.

1.      Lewis has little—in fact, nothing—to say about the nature of the circumstances of the offense here. Even if the Court concludes that Lewis did not possess a firearm in connection with another felony offense, it remains undisputed that he pulled out what appeared to be a gun and pointed it at a car. PSR ¶ 49. Whether he acted in what could plausibly be called self-defense or not, Lewis was a convicted felon who could not possess a firearm, let alone brandish one in public. In doing so, he created an increased risk of danger to the public, and illustrated precisely why felons are not allowed to possess firearms. Even if no sentencing enhancement applies, Lewis's conduct itself warrants a higher sentence.

Not only that, when officers eventually searched Lewis's car, they found four

1

firearms and various firearm parts. PSR ¶ 13. They also found a number of suspected homemade silencers, one of which turned out to be a silencer under the technical definition, and a book entitled "How to Build Military Grade Suppressors." PSR ¶ 16 & n.2. And they found a "'cricket,' which is a small but dangerous improvised explosive (manufactured out of plastic tube with a large fuse coming out of the top)." PSR ¶ 16. The Northern Colorado Bomb squad was called in.

All to say, the nature and circumstances of the offense here—brandishing a firearm, possession of multiple firearms, possession of an improvised explosive, and so forth—reflect a heightened danger to the public than just a felon with a gun.

**2.** That leads to something else Lewis tries to minimize—his bond violations in this case. The petition for revocation of bond alleged that Lewis failed to maintain residence at a sober-living house, Emmy's House, after his stay there was terminated based on failure to pay rent, possession of unauthorized objects, and welding without authorization. Doc. 48 at 1-2. His bond was revoked. Doc. 58. These bond violations occurred just months ago, and belie the notion Lewis is at a genuine turning point.

What Lewis has to say about the bond violations, in his objections to the presentence report, is that he "denies ownership of the items located in his room, a space he shared with other occupants of Emmy's House and accessible to all staff and clients of the house." Doc. 75 at 1.

Lewis did not dispute that he violated bond as alleged in the petition. Doc. 57. The petition stated that, "[o]n February 16, 2021, a random room search was conducted in the defendant's living space … and the following items were confiscated: three

2

switch blades (different sizes and double sided), three knives of different sizes, length and width, a double-sided machete, ammunition (.40 caliber), gunpowder and an open Narcan package." Doc. 48 at 1. The petition went on to say, "[t]he machete was found under the defendant's mattress and one of the knives was found under the defendant's pillow." *Id*. "The ammunition was found in a box, on top of the federal probation officer's business card." *Id*. Shared living space or not, if Lewis is seriously disputing possession of at least those items, it speaks volumes about his willingness to take responsibility for his actions, and hence his prospects for rehabilitation.

3. Lewis makes a number of arguments in favor of a variance. He relies on his history and characteristics, namely, the adverse experiences he had in childhood. The government agrees that aspects of his upbringing are mitigating. That is why the government is requesting a variance by its estimate of the guidelines, or a sentence toward the lower end of the guideline by Lewis's and probation's estimate.

That said, Lewis's adverse childhood experiences cut both ways. If, as Lewis argues, his criminal history is the "result" of those experiences (and substance abuse), and those experiences are "not something that simply resolve in time and age" then this Court should place less weight on his assurances that he is at a "turning point" and has "no choice but to stop his path of destruction." Doc. 77 at 3, 4. Given Lewis's criminal history, whatever its cause, those assurances rest in more hope than expectation.

Lewis also says that imprisonment is not effective at deterrence. Doc. 77 at 6. This is a recurring argument in these cases, and it is not without some merit. Lewis's own criminal history attests to that: Repeated and significant terms of imprisonment

have not stopped him from committing more crimes. But the alternative to imprisonment frequently offered, and offered here, is also inadequate to deter. To wit, Lewis says, "proper substance abuse and mental health treatment" will stop him from committing more crimes. *Id.* at 6. But look at Lewis's history of supervision. He has had mental-health treatment as part of supervision, and has participated in substance-abuse treatment "on numerous occasions while incarcerated and for court-ordered supervision[.]" PSR ¶ 87, 98. Despite that, he has continued to commit more crimes. And as an adult he has had five probation revocations, one of which is pending, an unsatisfactory release from probation, and a pending case for bail-bond violations, to say nothing of the bond violations in this case. PSR ¶¶ 44, 46, 57, 58, 60, 62.

Lewis also says that he is "naturally aging out of crime" and that "crime begins to decline steeply at age 35." Doc. 77 at 6. But he is 38 years old, and committed likely his most serious offense in this case.

At bottom, Lewis's adverse childhood experiences are mitigating to some extent. But by his own theory of mitigation—that they are the cause of his criminal conduct—they also increase the risk he will commit crimes. Combined with the past inadequacy of imprisonment and supervision to deter him from committing further crimes, this Court is left with the need to protect the public from his further crimes. Given the heightened risk to the public that Lewis presented in this case, the government believes a somewhat higher sentence of 60 months is necessary to serve the sentencing factors.

Dated: August 31, 2022

Respectfully submitted,

COLE FINEGAN
United States Attorney

By: s/ *Rajiv Mohan*
Rajiv Mohan
Assistant U.S. Attorney
U.S. Attorney's Office
1801 California Street, Suite 1600
Denver, CO 80202
Telephone: 303-454-0100
Fax: 303-454-0406
E-mail: Rajiv.Mohan@usdoj.gov

## **CERTIFICATE OF SERVICE**

       I hereby certify that on August 31, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record in this case.

       Laura Suelau                        Laura_Suelau@fd.org

By:  s/ *Rajiv Mohan*
Rajiv Mohan
Assistant U.S. Attorney
U.S. Attorney's Office
1801 California Street, Suite 1600
Denver, CO 80202
Telephone: 303-454-0100
Fax:  303-454-0406
E-mail:  Rajiv.Mohan@usdoj.gov

# UNITED STATES DISTRICT COURT

District of Colorado

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | ) | |
| | ) | |
| CLIFFORD  LEWIS | ) | Case Number:  1:21-cr-00268-RBJ-1 |
| | ) | USM Number:  62574-509 |
| | ) | |
| | ) | Laura Hayes Suelau |
| | ) | Defendant's Attorney |

## THE DEFENDANT:

☒ pleaded guilty to count(s)  1 of the Indictment.

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

☐ was found guilty on count(s) _____
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 922(g)(1) | Possession of a Firearm and Ammunition by a Prohibited Person | 04/22/2021 | 1 |

    The defendant is sentenced as provided in pages 2 through _____7_____ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

September 23, 2022
Date of Imposition of Judgment

Signature of Judge

R. Brooke Jackson, Senior United States District Judge
Name and Title of Judge

September 28, 2022
Date

AO 245B (CO Rev. 11/20) Judgment in Criminal Case

Judgment — Page ___2___ of ___7___

DEFENDANT:      CLIFFORD  LEWIS
CASE NUMBER:      1:21-cr-00268-RBJ-1

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
**Sixty-four (64) months.**

☒      The court makes the following recommendations to the Bureau of Prisons:
The Court recommends the defendant be designated to a facility that offers the RDAP program.
The Court further recommends that the defendant be designated to a facility in Florence, Colorado.

☒      The defendant is remanded to the custody of the United States Marshal.

☐      The defendant shall surrender to the United States Marshal for this district:

     ☐      at _____ ☐ a.m. ☐ p.m. on _____ .

     ☐      as notified by the United States Marshal.

☐      The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

     ☐      before 2 p.m. on _____ .

     ☐      as notified by the United States Marshal.

     ☐      as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B (CO Rev. 11/20) Judgment in Criminal Case

DEFENDANT:           CLIFFORD  LEWIS
CASE NUMBER:         1:21-cr-00268-RBJ-1

# SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of: **Three (3) years**

# MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and a maximum of 20 tests per year of supervision thereafter.
    - ☐  The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.  ☐  You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.  ☒  You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.  ☐  You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.  ☐  You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (CO Rev. 11/20) Judgment in Criminal Case

Judgment — Page ___4___ of ___7___

DEFENDANT: CLIFFORD LEWIS
CASE NUMBER: 1:21-cr-00268-RBJ-1

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may, after obtaining Court approval, notify the person about the risk or require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____     Date _____

| | Judgment — Page 5 of 7 |
|---|---|

DEFENDANT: CLIFFORD LEWIS
CASE NUMBER: 1:21-cr-00268-RBJ-1

## SPECIAL CONDITIONS OF SUPERVISION

1. You must participate in a program of testing and/or treatment for substance abuse approved by the probation officer and follow the rules and regulations of such program. The probation officer, in consultation with the treatment provider, will supervise your participation in the program as to modality, duration, and intensity. You must abstain from the use of alcohol or other intoxicants during the course of treatment. You must not attempt to obstruct, tamper with or circumvent the testing methods. You must pay for the cost of testing and/or treatment based on your ability to pay.

2. You must participate in a program of mental health treatment approved by the probation officer and follow the rules and regulations of such program. The probation officer, in consultation with the treatment provider, will supervise your participation in the program as to modality, duration, and intensity. You must pay for the cost of treatment based on your ability to pay.

3. You must submit your person, property, house, residence, papers, or office, to a search conducted by a United States probation officer. Failure to submit to search may be grounds for revocation of release. You must warn any other occupants that the premises may be subject to searches pursuant to this condition. An officer may conduct a search pursuant to this condition only when reasonable suspicion exists that you have violated a condition of your supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

AO 245B (CO Rev. 11/20) Judgment in Criminal Case

| | |
|---|---|
| | Judgment — Page ___6___ of ___7___ |

DEFENDANT:        CLIFFORD  LEWIS
CASE NUMBER:     1:21-cr-00268-RBJ-1

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on the following page.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 100.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 |

☐  The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*\*\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |

| | | | |
|---|---|---|---|
| **TOTALS** | $ _____ | $ _____ | |

☐  Restitution amount ordered pursuant to plea agreement     $ _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on the following page may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐  the interest requirement is waived for the     ☐  fine   ☐  restitution.

☐  the interest requirement for the     ☐  fine     ☐  restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Publ. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (CO Rev. 11/20) Judgment in Criminal Case

| | |
|---|---|
| | Judgment — Page _____7_____ of _____7_____ |

DEFENDANT: CLIFFORD LEWIS
CASE NUMBER: 1:21-cr-00268-RBJ-1

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A ☐ Lump sum payment of $ _____ due immediately, balance due

      ☐ not later than _____ , or
      ☐ in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

B ☒ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

C ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

D ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

E ☐ Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several Amount | Corresponding Payee, if<br>appropriate |
|---|---|---|---|
| | | | |

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO.    21-cr-00268-RBJ

UNITED STATES OF AMERICA,

    Plaintiff,

v.

**CLIFFORD LEWIS**,

    Defendant.

---

## DEFENDANT'S NOTICE OF APPEAL

---

Defendant, Clifford Lewis, through appointed counsel, Laura Suelau and the Office of the Federal Public Defender, files this Notice of Appeal to the Tenth Circuit Court of Appeals and appeals the Judgment (Doc. No. 84) that was entered on September 28, 2022.


Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender


s/Laura H. Suelau
LAURA H. SUELAU
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
laura_suelau@fd.org
Attorney for Defendant

# CERTIFICATE OF SERVICE

I hereby certify that on October 5, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

Rajiv Mohan, Assistant United States Attorney
Email: Rajiv.mohan@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non-CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

Clifford Lewis (Via U.S. Mail)

s/ Laura Suelau
LAURA SUELAU
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO 80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
laura_suelau@fd.org
Attorney for Defendant